# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| **JAMAAL HOWARD** | ) | |
| **Petitioner** | ) | |
| | ) | **1:13-CV-256** |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **WILLIAM STEPHENS, Director** | ) | |
| Texas Department of Criminal Justice, | ) | **(Death Penalty Case)** |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

# PETITION
# FOR A WRIT OF HABEAS CORPUS

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR PETITIONER

TABLE OF CONTENTS

TABLE OF ABBREVIATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . VI

PETITION FOR WRIT OF HABEAS CORPUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      A.   OFFENSE & ARREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      B.   PRETRIAL MENTAL HEALTH EVALUATIONS. . . . . . . . . . . . . . . . . . . . . . . 4
           DR. FASON'S INITIAL EXAMAINATION. . . . . . . . . . . . . . . . . . . . 4
           DR. DUNCAN'S COMPETENCY EVALUATION. . . . . . . . . . . . . . . . 5
           DR. FASON'S SECOND EXAMINATION. . . . . . . . . . . . . . . . . . . . 6
      C.   COMPETENCY TRIALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      D.   NOTICE OF INSANITY DEFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      E.   GUILT PHASE OF THE TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
           STATE'S CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
           DEFENSE'S FIRST WITNESS. . . . . . . . . . . . . . . . . . . . . . . . . . . 9
           REMAINDER OF THE GUILT PHASE DEFENSE: DEFENSE WITNESSES'
               TESTIMONY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
           STATE'S REBUTTAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
           CLOSING ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      E.   PENALTY-PHASE OF THE TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           PROSECUTION'S PENALTY PHASE CASE. . . . . . . . . . . . . . . . . . . 14
           MR. HOWARD'S DEFIANT BEHAVIOR IN SCHOOL. . . . . . . . . . . . . 14
           THE DEFENSE PENALTY PHASE EVIDENCE. . . . . . . . . . . . . . . . . 17
           THE PROSECUTION'S REBUTTAL. . . . . . . . . . . . . . . . . . . . . . . . 24
           THE PROSECUTOR'S CLOSING ARGUMENT. . . . . . . . . . . . . . . . . 24

REASONS TO ISSUE THE WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . . . . . . . . . . . 25

GROUND ONE: MR. HOWARD WAS DENIED HIS SIXTH & FOURTEENTH AMENDMENT RIGHTS TO
    EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO CONDUCT A
    REASONABLE INVESTIGATION OF HIS LIFE HISTORY, INCLUDING HIS EDUCATIONAL HISTORY
    AND MENTAL HEALTH HISTORY, ALL OF WHICH WERE CRUCIAL AND RELEVANT TO A
    COMPLETE AND RELIABLE EVALUATION OF HIS MENTAL STATE AT THE TIME OF THE
    OFFENSE, AT THE TIME OF HIS ARREST AND CONFESSION, AT THE TIME OF TRIAL AND AS
    MITIGATING AT HIS PENALTY PHASE DEFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          1.   LACK OF SELF-CARE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
          2.   BIZARRE BEHAVIORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
          3.   BELOW GRADE ACADEMIC ABILITY. . . . . . . . . . . . . . . . . . . . . . . 28
          4.   DRUG USE : COMMON IN THE NEIGHBORHOOD & AMONG FAMILY. . . . . . . 29

5.    ROLE MODELS OF CRIMINALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
6.    ABUSE AND NEGLECT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

GROUND TWO: MR. HOWARD WAS DENIED HIS SIXTH & FOURTEENTH AMENDMENT RIGHTS TO
EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO SEEK TIMELY AND
RELEVANT EVALUATIONS OF HIS MENTAL CONDITION REGARDING:
A.    THE RELIABILITY AND VOLUNTARINESS OF HIS CONFESSION;
B.    HIS COMPETENCY TO STAND TRIAL;
C.    HIS CRIMINAL RESPONSIBILITY FOR THE DEATH OF VICKIE SWARTOUT; AND
D.    HIS MORAL CULPABILITY AND THE APPROPRIATE PUNISHMENT... . . . . . . . . 30

GROUND THREE: DEFENSE COUNSEL'S LACK OF, AND FAILURE TO CONDUCT THE NECESSARY
RESEARCH TO DEVELOP, A REASONABLE UNDERSTANDING OF THE DIFFERENCES BETWEEN
COMPETENCY TO STAND TRIAL AND MENTAL DEFENSES TO CRIMINAL RESPONSIBILITY
DEPRIVED MR. HOWARD OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL... . . . . . . 32

GROUND FOUR: MR. HOWARD WAS DENIED HIS SIXTH & FOURTEENTH AMENDMENT RIGHTS
TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO CONDUCT A
REASONABLE INVESTIGATION OF THE CIRCUMSTANCES OF HIS "WAIVER OF COUNSEL" AND
CONFESSION AND TO PRESENT AVAILABLE CHALLENGES TO THE "WAIVER OF COUNSEL"
AND THE ADMISSABILITY OF HIS CONFESSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
A.    TRIAL COUNSEL'S FAILURE TO CONDUCT SUCH AN INVESTIGATION WAS
UNREASONABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
B.    BUT FOR COUNSEL'S DEFICIENT PERFORMANCE, THERE IS A REASONABLE
POSSIBILITY THAT A MERITORIOUS CHALLENGE TO THE ADMISSABILITY OF THE
CONFESSION WOULD HAVE BEEN GRANTED AND IN TURN, THAT THE OUTCOME OF
EITHER THE GUILT OR PENALTY PHASE DECISION WOULD HAVE BEEN DIFFERENT.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

GROUND FIVE: MR. HOWARD WAS DENIED HIS SIXTH & FOURTEENTH AMENDMENT RIGHTS TO
EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO REASONABLY
INTERVIEW, PREPARE AND PRESENT THE TESTIMONY OF THE DEFENSE WITNESSES AT BOTH
PHASES OF THE TRIAL.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

GROUND SIX: TRIAL COUNSEL'S INEFFECTIVE FAILURE TO OBJECT TO INADMISSIBLE EVIDENCE
BY PROSECUTION WITNESSES ALLOWED HIGHLY PREJUDICIAL AND UNRELIABLE
INFORMATION TO BE CONSIDERED BY THE JURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

GROUND SEVEN: MR. HOWARD IS MENTALLY RETARDED.  THE IMPOSITION OF A DEATH
SENTENCE VIOLATES HIS 8TH AMENDMENT RIGHTS BECAUSE HE IS NOT ELIGIBLE FOR A
DEATH SENTENCE UNDER *ATKINS V. VIRGINIA*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
A.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
B.    ARGUMENT AND AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
1.    THREE PRONGS OF MENTAL RETARDATION. . . . . . . . . . . . . . . . . . . . . 41

iii

          A.      "SIGNIFICANTLY SUBAVERAGE" GENERAL INTELLECTUAL FUNCTIONING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

          B.      ACCOMPANIED BY LIMITATIONS IN ADAPTIVE FUNCTIONING. . . . . 42

          C.      THE ONSET OF WHICH OCCURS BEFORE AGE 18. . . . . . . . . . . . . . . 43

    2.    MR. HOWARD IS LIKELY MENTALLY RETARDED.. . . . . . . . . . . . . . . . . . . 43

          A.      FIRST PRONG: SUB-AVERAGE INTELLECT. . . . . . . . . . . . . . . . . . 43

          B.      SECOND PRONG: ADAPTIVE DEFICITS. . . . . . . . . . . . . . . . . . . . 44

               (1)    CONCEPTUAL SKILLS DEFICITS. . . . . . . . . . . . . . . . . . . . . 44

               (2)    SOCIAL SKILLS DEFICITS. . . . . . . . . . . . . . . . . . . . . . . . . 44

               (3)    DEFICITS IN PRACTICAL LIVING SKILLS. . . . . . . . . . . . . . 45

          C.      THIRD PRONG: MANIFESTING BEFORE AGE 18.. . . . . . . . . . . . 45

    3.    THE STATE COURT RULING IS CONTRARY TO AND AN UNREASONABLE APPLICATION OF *ATKINS*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

GROUND EIGHT: THE PROSECUTOR'S CLOSING ARGUMENT VIOLATED MR. FREEMAN'S EIGHTH AND FOURTEENTH AMENDMENT RIGHT TO HAVE THE JURY GIVE EFFECT TO MITIGATING EVIDENCE EVEN IF THE MITIGATING EVIDENCE HAD NO CAUSAL RELATIONSHIP TO THE CAPITAL CRIME. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    A.    STATEMENT OF FACTS: THE PROSECUTOR'S PUNISHMENT PHASE CLOSING ARGUMENT EMPHASIZED THAT THE DEFENSE EXPERT "DIDN'T SAY THAT THIS [THE CRIME] WAS ANY WAY RELATED TO SOMEONE HAVING SCHIZOPHRENIA.". . . . . . 47

    B.    ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        1.    AT THE TIME OF THE 2001 TRIAL, TEXAS AND FIFTH CIRCUIT PRECEDENT REQUIRED A NEXUS SHOWING; THE PROSECUTOR'S NEXUS ARGUMENT CREATED A REASONABLE LIKELIHOOD THAT THE JURY WOULD HAVE FOUND ITSELF FORECLOSED FROM CONSIDERING SCHIZOPHRENIA AS RELEVANT MITIGATING EVIDENCE IN ANSWERING SPECIAL ISSUE NO. 2. . . . . . . . . . 49

        2.    *TENNARD*: IN 2004, THE SUPREME COURT DECIDED *TENNARD*, WHICH REJECTED THE RULE THAT A DEFENDANT MUST ESTABLISH A NEXUS BETWEEN THE MITIGATING EVIDENCE AND THE CRIME . . . . . . . . . . . . . . 50

        3.    *TEAGUE*: MR. HOWARD'S CONVICTION WAS NOT FINAL AT THE TIME *TENNARD* WAS DECIDED; THUS, *TENNARD* IS APPLICABLE. . . . . . . . . . . . . 51

GROUND NINE: ASSUMING FOR THE SAKE OF ARGUMENT THAT *TENNARD* DID NOT CREATE A NEW RULE, MR. HOWARD WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BECAUSE HIS COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S NEXUS ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    A.    STATEMENT OF FACTS (INCORPORATED FROM GROUND EIGHT). . . . . . . . . . . . 53

    B.    TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE.. . . . . . . . . . . . . . . . . 53

        1.    <u>DEFICIENT PERFORMANCE</u>: TRIAL COUNSEL FAILED TO OBJECT ON THE BASIS OF A FEDERAL EIGHTH AMENDMENT VIOLATION TO THE PROSECUTOR'S ASSERTION THAT THE DEFENSE HAD TO ESTABLISH A NEXUS BETWEEN SCHIZOPHRENIA AND THE CRIME BEFORE SCHIZOPHRENIA COULD BE CONSIDERED AS MITIGATING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        2.    <u>PREJUDICE</u>: THE PROSECUTOR'S NEXUS ARGUMENT CREATED A

REASONABLE LIKELIHOOD THAT THE JURY WOULD HAVE FOUND ITSELF
FORECLOSED FROM CONSIDERING SCHIZOPHRENIA AS RELEVANT
MITIGATING EVIDENCE IN ANSWERING SPECIAL ISSUE NO. 2... . . . . . . . . . 54

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CERTIFICATE OF SERVICE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## <u>TABLE OF ABBREVIATIONS</u>

The following are a list of abbreviations used within the pleading:

CR __:__                    CR is the abbreviation for Clerk's Record of the trial, as required by TEX. R. APP. PROC. 34.1.  It is followed by the volume number before the colon, and the page numbers after the colon.

CWR__                       CWR is the abbreviation for Clerk's Writ Record, which is a single volume.  It is followed by the volume number (1) before the colon, and the page numbers after the colon where the cited material can be found

CSWR                        CSWR is the abbreviation for Clerk's Supplemental Writ Record

IATC                        Ineffective-assistance-of-trial-counsel (IATC) claim

RR __:__                    RR is the abbreviation for Reporter's Record of the trial, pursuant to TEX. R. APP. PROC. 34.1,which is the trial transcript testimony recorded by the court reporter. The abbreviation RR is followed by the volume number before the colon, and the page numbers after the colon.

TCCA                        Texas Court of Criminal Appeals

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| **JAMAAL HOWARD** | ) | |
| **Petitioner** | ) | |
| | ) | **1:13-CV-256** |
| **v.** | ) | |
| | ) | |
| **WILLIAM STEPHENS, Director** | ) | |
| Texas Department of Criminal Justice, | ) | **(Death Penalty Case)** |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS

Jamaal Howard (hereinafter also referred to as Petitioner, Applicant, or Howard) asks this

Court to issue a writ of habeas corpus and grant him relief from his unlawful confinement and death

sentence.  Mr. Howard is unlawfully confined by the Texas Department of Criminal Justice in

Livingston, Texas, State of Texas under the authority of Respondent.

### JURISDICTION

This petition for a writ of habeas corpus is filed pursuant to 28 U.S.C. § 2241 & 28

U.S.C.§ 2254, seeking relief from his unlawful conviction and death sentence which were

obtained in violation of the Constitution of the United States.  This is his first federal habeas

petitin.

### PROCEDURAL HISTORY

On June 13, 2000, the State of Texas indicted Mr. Jamaal Howard for capital murder in

the shooting death of Vicki Swartout on May 12, 2000. (CR 1:2,3)[1].  Tyrone C. Moncriffe  of

Houston, Texas,  represented Mr. Howard in the trial proceedings.  On the second day of the trial

---

[1]See Table of Abbreviations *supra* at vii.

1

testimony, the defense's first witness raised a question regarding Mr. Howard's competency to stand trial.  The court promptly recessed the trial in order to conduct a competency trial before a different jury.  RR 21:45-47; CR 2:238.

The first competency trial ended in a mistrial when jury could not agree on a verdict.  RR 29 through RR 30; CR 2:245. In a second competency trial, the jury found Mr. Howard competent to stand trial.  RR 32:134; CR 2.

The guilt phase of the trial resumed on April 18, immediately after the second competency trial.  At its conclusion, the jury returned a guilty verdict on capital murder. RR 24:53-53; CR 3:568.  Following the punishment phase of the trial, the jury answered yes to the future-dangerousness special issue and no to the mitigation special issue, and the court sentenced Mr. Howard to death.  RR 27:57, 63; CR 3:576-578.  On June 14, 2001, a motion for new trial was denied.

In 2004, the Texas Court of Criminal Appeals (TCCA) affirmed Mr. Howard's conviction and death sentence. On February 27, 2006, the U.S. Supreme Court denied the petition for writ of certiorari to the TCCA.  *Howard v. Texas*, 546 U.S. 1214 (2006).  On April 24, 2003, while the direct appeal was pending, Mr Howard, through appointed state habeas counsel, filed the Application for Post-Conviction Writ of Habeas Corpus ("State Writ").  CWR 1:23.  On June 15, 2012, the 2012, then presiding judge of the trial court, Steven Thomas, signed the district attorney's Proposed Findings of Fact and Conclusions of Law recommending that relief be denied.  CSWR at 38.  On December 12, 2012, the TCCA adopted the trial court's findings and denied relief,  *Ex parte Howard*, 2012 WL 6200688 (No. WR–77906–01, Dec. 12, 2012), triggering the commencement of the one year federal statute of limitations for filing a federal habeas corpus petition

On May 15, 2013, the Court appointed undersigned counsel to represent Mr. Howard in these proceedings.

STATEMENT OF RELEVANT FACTS

**A.      Offense & Arrest**

On May 12, 2000, a co-worker discovered the body of Vicki Swartout at a gas station where she was working in Silsbee, Hardin County, Texas.  RR. 20:25.  A video security tape showed that she had been shot by a young African American man that morning between 10:25 a.m. and 10:55 am.  The young man was quickly identified as Jamaal Howard.  RR. 2:20, 25, 42-45.

Shortly after the murder, a local resident saw Mr. Howard coming out of a shed where the murder weapon was later discovered. RR. 20:33, 53, 60. He described Mr. Howard as looking "nervous" and visibly shaking, with eyes that looked "wild," "glazed over," and "teary" RR. 20:37, 142.  Law enforcement officers went to the residence of Mr. Howard's 84 year old disabled grandfather, R. C. Kyles, with whom Mr. Howard had lived for several years. The officers found Mr. Howard in a vacant house next door to Mr. Kyles' house.  Mr. Howard was curled up, sitting in a crouched position inside a closet in the house. The officer testified that when he first saw Jamaal, he was "smiling, grinning ear to ear" and you could see his teeth.  RR. 20:119 - 120.

Mr. Howard was arrested and taken to the Silsbee Police Department offices where Texas Ranger L. C. Wilson interrogated him.  After briefly denying any involvement, Mr. Howard quickly confessed to shooting Ms. Swartout.  According to Ranger Wilson, Mr. Howard was "quite at ease during the questioning. . . really almost uncanny in a sense because he was very calm. . ."  RR 20:122.  He told Ranger Wilson that he had been "staying with his grandfather for

3

some years and had woken up pretty early that morning and was watching some of the daytime soaps and game shows and stuff like that and then went and took his grandfather's pistol out from under his pillow and walked to the store and shot her and came back." *Id* at 126.  The officer said that Mr. Howard didn't provide any reason why he did it.  *Id.*  Ranger Wilson testified that he typed up a narrative confession based upon his interrogation of Mr. Howard, and Mr. Howard signed it.   The confession was introduced at trial without any objection.

According to the written confession, Mr. Howard got a gun from under his grandfather's pillow at around 10:35 a.m. and went to the gas station and "the gun went off and shot the woman that worked there."  He looked in the cash register, got some money and cigarettes and then left the store.  He then ran toward his house and stopped at an "old junk house."  Mr. Howard said that he didn't plan it, he was just "playing with the gun and went up to the store." Although the statement says, "I am really not sorry this happened," Ranger Wilson testified he had asked Mr. Howard if he had any "remorse."   When defense counsel asked him whether asked Mr. Howard if he knew what "remorse" meant, Ranger Wilson said: "Well, I don't specifically remember asking him that, but I do also remember using the phrase of 'Do you feel sorry about what you did?'"  RR 20:122-129, 136.

According to Ranger Wilson, Mr. Howard did not appear to be under the influence of any alcohol or narcotics or impaired in any way, but Ranger Wilson did comment on the unusual nature of defendant's reaction to his arrest. RR. 20:113-122, 134.

**B.     Pretrial Mental Health Evaluations**

**Dr. Fason's Initial Examaination**

Shortly after the offense, Mr. Howard's family retained Tyrone Moncriffe of Houston, Texas to represent him.  On January 2, 2001, after the court had scheduled the trial, with jury

selection to begin on March 6, 2001, Mr. Moncriffe retained Dr. Fred Fason, a Houston

psychiatrist, to evaluate Mr. Howard.  Dr. Fason's first examination of Mr. Howard took place

on February 5, 2001.  At his initial examination, Dr. Fason didn't have enough information to

form any conclusions.  RR 29:106.  He had difficulty obtaining information from Mr. Howard,

and Mr. Moncriffe had not provided him with any background information, school records, or

mental health records.  After the examination, Dr. Fason asked for school records and suggested

that Mr. Moncriffe have a psychologist administer a WAIS IQ test and some other tests that

could only be administered by a licensed psychologist.  *Id*.

### Dr. Duncan's Competency Evaluation

On March 6, 2001, during a pretrial conference, Mr. Moncriffe asked the court to order a

competency examination of Mr. Howard by an "independent psychiatrist:"

Mr. Moncriffe:

> Judge, I wanted to bring up one point. . . . I want Mr. Howard examined
> by a psychiatrist, independent psychiatrist because some of his behavior is
> somewhat disturbing to me at times, to test his competency at this point.
> So, I'm going to make that request. I don't know if you have a form for
> that, Judge, or a motion for it.  RR 2:48.

Following a brief discussion about who might be available, the judge asked Mr.

Moncriff, "So you don't care who it is?"  And Mr. Moncriffe responded, "I don't care who it is,

just for the record, an independent examination."  RR 2:49.

The court appointed James Duncan, Ph.D., a Beaumont psychologist, for the purpose of

evaluating Mr. Howard's competency to stand trial. (CR 1:118).   Mr. Moncriffe did not meet or

have any communication with Dr. Duncan before or after his examination of Mr. Howard until

Dr. Duncan testified at trial.  (PP 21:20).

On March 8, 2001, Dr. Duncan conducted an extensive interview of Mr. Howard at the

Hardin County jail and administered portions of the WAIS IQ test. Based on the test results, he estimated that Mr. Howard's IQ was 65-70, (CR 1:126), which is within the range of mental retardation. *See Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).

On March 9, Dr. Duncan advised the court that, in his opinion, "Jamaal Howard's competency to stand trial at this time is questionable." (Dr. Duncan's letter/report to the trial judge, CR 1:126). Dr. Duncan explained:

> Mr. Howard's thought process seem impaired and likely affecting his judgment and reasoning. Given the available history, his intellectual functioning appears to have deteriorated from a previous level and is now in a range that would be considered mildly impaired. There is evidence of flattening or inappropriate affect. Although hallucinations were not acknowledged by Mr. Howard, this examiner observed him responding to apparently internal stimuli. Jail guards report similar behavior. His logic is unusual and at times unintelligible. Given Mr. Howard's age and the nature of the symptoms displayed, he may well be exhibiting an emerging thought disorder, possibly schizophrenia. An organic condition of unknown origin cannot be ruled out. Mr. Howard would appear to be in need of psychiatric treatment.

*Id.* at page 2.

### Dr. Fason's Second Examination

The prosecution began presenting it's guilt phase witnesses on April 9, 200l. On the same day, the prosecutor spoke with Dr. Fason regarding his anticipated testimony for the defense. As of that date, Dr. Fason expected to testify only at the penalty phase with respect to Mr. Howard's "future dangerousness" or "mitigation factors." RR 29:114. Based on his initial examination, Dr. Fason believed that Mr. Howard's competency was a close question, but was of the opinion that he was competent. *Id.* at 114-115. Thereafter, Dr. Fason reviewed Dr. Duncan's report, talked to another doctor who had treated Mr. Howard for depression as a teenager, and conducted a second examined Mr. Howard on April 10, 2001, focused only on

competency.[2]  *Id.*

During the April 10 examination, Dr. Fason "pressed [Mr. Howard] as to what was behind his words and found that his speech and, [he] presume[d], [his] thinking would become disorganized when he was pressed."  *Id.*   Dr. Fason concluded:

> Mr. Howard is suffering from a form of Schizophrenia that markedly impairs his ability to have a rational understanding of the charges against him and the consequences if convicted.  Additionally, he does not possess the ability to cooperate with and communicate with his attorney in planning his defense, therefore he should be considered incompetent to stand trial.  It is possible that after a trial on the newer atypical anti-psychotics that he could become competent to stand trial.

Dr. Fason's Letter to Mr. Moncriffe dated April 11, 2001.

### C.    Competency Trials

The state began presenting it's case on April 9, 2001 and rested the morning of April 10 after calling one witnesses.  Mr. Moncriffe called Dr. Duncan as the first defense witness. During his testimony, Dr. Duncan raised questions about Mr. Howard's competency to stand trial, which led to a competency trial before a different jury.

At the first competency trial, defense counsel called both Dr. Duncan and Dr. Fason to testify.  Dr. Duncan again testified that had questions as to whether Mr. Howard was competent to stand trial.  He also testified Mr. Howard's symptoms were consistent with a thought disorder such as schizophrenia, but acknowledged that there were other things that could cause similar symptoms that had not been ruled out, e.g., brain tumor, or long term drug abuse.  RR 29:67

Dr. Fason described his two examinations of Mr. Howard and provide a long and somewhat rambling description of the history of schizophrenia.  Mr. Moncriffe frequently

---

[2]The second examination took place after the court had recessed the trial while it considered the issue of Mr. Howard's competency to stand trial.

7

allowed him to wander into areas that were tangential as well as confusing.  On several

occasions, Dr. Fason did not seem to know what Mr. Moncriffe was asking him.  *Id*. at 85-110.

Eventually, Dr. Fason testified that in his opinion Mr. Howard

> is not able to cooperate with his attorney in planning his defense and although he
> has a factual knowledge of the charges against him, he does not have a rational
> understanding of the charges against him and the consequences if convicted.
> And, therefore, it is my opinion that he is incompetent to stand trial.

*Id*. at 107-108.  He also testified that Mr. Howard's symptoms clearly fit the classic descriptions

of simple schizophrenia.  *Id*. at 108.

The prosecution presented the testimony of two psychiatrists, Dr. Ed Gripon and Dr. Ned

Groves, both of whom testified that in their opinions Mr. Howard was competent to stand trial.

Following the instructions and deliberations, the jury deadlocked and the court declared a

mistrial.

In the second competency trial, the defense called Dr. Duncan and several lay witnesses

and the prosecution called Dr. Groves and several lay witnesses.  This time the jury found that

Mr. Howard was competent to stand trial.

## D.      Notice of Insanity Defense

On March 15, 2001, after receiving a copy of Dr. Duncan's competency evaluation, Mr.

Moncriffe advised the court and the prosecution that the defense was changing Mr. Howard's

plea from not guilty to not guilty by reason of insanity:

Mr. Moncriffe:

> Judge, I was reserving this plea until I got the information from the
> independent psychiatrist about the behavior of Mr. Howard.  I
> want to change our plea from not guilty to not guilty by reason of
> insanity, Your Honor; and I have given the state notice of that.
> But I  wanted to see the independent examiner's – doctor's
> examination first.  After examining that, it purports  with Dr.

Fason, who has examined him and I have observed, [sic] your
Honor.

RR 10:68.  Mr. Moncriffe still had not met with or communicated with Dr. Duncan regarding his

evaluation, and as their trial testimony makes clear, neither Dr. Fason nor Dr. Duncan ever

evaluated Mr. Howard's with regard to his sanity at the time of the offense, nor were they ever

asked to by Mr. Moncriff.  RR 21: 20.   And it is equally clear from Mr. Moncriffe's opening

statement at the beginning of the trial, that he did not undersand the difference between

competency and instanity nor did he understand the legal requirements for an insanity defense.

RR 15:20.

### E.      Guilt Phase of the Trial

#### State's case

The prosecution's presented it's case in slightly more than one day.  It included

testimony regarding the discovery of Ms. Swartout body, the crime scene and the videotape

showing Jamaal Howard shooting Vicki Swartout, Mr. Howard's arrest and his subsequent

confession that he shot Ms. Swartout.

#### Defense's First Witness

The defense called Dr. Duncan as its first witness.  At the outset, Mr. Moncriffe

established that the two had never met before that day and they had not communicated in

anyway before Dr. Duncan evaluated Mr. Howard. (RR Vol 21:18-44).  Dr. Duncan testified that

he conducted an extensive interview and  mental status exam to determine Mr. Howard's mental,

emotional and intellectual functioning.  *Id.* at 26.  His impressions were that Mr. Howard's

cognitive functioning was inconsistent.  At times,  his responses to questions were lucid, relevant

and coherent.  He described events leading up to this arrest, why he was in jail and what the

9

charges were.  He also provided some information about his past experiences.  At other times, he

was not responsive at all and occasionally his responses were unintelligible.  He mumbled in a

low tone and Dr. Duncan had to ask him repeatedly to repeat what he had said.  He displayed

what is clinically referred to as "inappropriate affect."  For example, he would "suddenly smile

or suddenly chuckle and there was no obvious reason for doing that."

Dr. Duncan also testified that the results of his testing and information he obtained from

Mr. Howard (which was the only background information he had)  suggested a deterioration in

his level of functioning.  He explained that Mr. Howard's symptoms could be caused by various

conditions, including a drug overdose, exposure to a toxic substance, prolonged drug use and

schizophrenia, and he "[didn't] have a conclusion about that."  He also acknowledged that Mr.

Howard appeared to be in need of psychiatric treatment.  *Id.* at 26-29.

On cross-examination, the prosecution established that the purpose of Dr. Duncan's

evaluation was to determine competency to stand trial and not insanity at the time of the crime,

that the two mental conditions were totally different and  that his examination and opinions

stated in his report were not directed at Mr. Howard's mental state at the time of the crime.  *Id*. at

30-31.  Dr. Duncan testified that it was his opinion, based upon what Mr. Howard told him, that

Mr. Howard knew right from wrong (and thus was legally sane) when the crime was committed.

*Id*. at 32.   After reviewing Dr. Duncan's notes, the prosecutor was able to establish, through his

questions, that Mr. Howard denied ever having a problem with anxiety, depression, unusual

fears, temper, and hearing voices.  Dr. Duncan also acknowledged that the symptoms of

schizophrenia could be the result of prolonged drug abuse.  *Id* at 36.

During redirect, Mr. Moncriffe also requested a copy of the doctor's notes.  After

reviewing them for the first time, he questioned Mr. Duncan about the possibility that a person

who is crazy would deny hearing voices even if he did, and Dr. Duncan agreed that he might.  *Id.* at 37-38.  On re-cross, the prosecutor asked Dr. Duncan whether Mr. Howard was competent to stand trial, and the doctor replied:  "I had questions about his functioning . . . at least the day that I saw him, I felt that his judgment and reasoning were impaired."

At the close of Dr. Duncan's testimony, the prosecutor informed the court that he was of the opinion that Dr. Duncan had raised an issue regarding Mr. Howard's competency to stand trial, requiring a separate trial on that issue.  Mr. Moncriffe agreed, but asked that Mr. Howard be placed in a facility to be evaluated over an extended period of time.  Instead, the court ordered a competency trial to begin the next morning at 9:00 a.m.

**Remainder of the Guilt Phase Defense: Defense witnesses' testimony**.

Immediately after the second competency trial, the main trial jury returned, and the trial resumed.  The defense called several family members, a former teacher, two Little League coaches, a neighbor, and a family friend who was a nurse.  Mr. Moncriffe asked the non-family witnesses only a few questions about Mr. Howard, none of which required details. In most instances, the witness' testimony, including their personal data and the nature of their relationship to Mr. Howard, was no more than 2 or 3 transcript pages.  The questions asked and the witnesses' testimony often suggested that defense counsel did not know enough about the witness' relationship and knowledge of Mr. Howard to ask relevant questions.  For example, Lisa Sanchez was Jamaal's fourth grade teacher and she described him as an outgoing and busy child who had trouble staying in his seat.  She testified that he started taking medication that year.  Mr. Moncriff did not ask any other questions.  (RR Vol 21, 6-8).  Her husband, Michael Sanchez, was Jamaal's Little League Coach when he was 8 years old.  He testified that Jamaal was a very good athlete, but he had trouble focusing.  He acknowledged noticing a difference in

11

Jamaal when he was in his wife's class, but he was never asked to explain what that difference was. *Id.* at 10-13. Joel Neely coached Jamaal when he was 11 and testified that he was one of the his top three pitchers. When asked whether he noticed when Jamaal was on medication or off, Mr. Neely said that most of the time he was "just one of the regular kids." Occasionally, he wasn't really motivated, and Mr. Neely didn't know why, but said that it only happened one or two times. *Id.* at 13-17.

Lola Thomas, a nurse who had known Jamaal all of his life, testified that she had noticed changes in him over the past four or five years – he had become "very withdrawn, very isolated within himself; kind of separating himself from friends." She stated that there were times when he didn't recognize her. Defense counsel did not ask for any other information, context, or details about those times. *Id.* at 17-19.

Milton Young was a long time resident of Silsbee who had known Jamaal since he was young boy. He testified about one incident that suggested to him that Jamall had mental problems. He said that he saw Jamaal "walk the street, come down the road walking and just stand up and stare at folks, and [he] figured that [Jamaal] had a little problem." He said that he talked to the Chief of Police about it thinking he could get Mr. Howard some help. Defense counsel asked him what the chief of police told him and the prosecution raised a hearsay objection. Defense counsel didn't ask any other questions. *Id.* at 12-14.

Several family members testified about the night before the offense, when Jamaal had gotten one of his grandfather's guns and fired it in the house, frightening his grandfather. They testified that they called the police, but by the time they arrived, Jamaal had left. They described Jamaal as "wild eyed. . . just wasn't himself," (RR Vol 23, 5), talked about how he would not take baths for days at a time, and wouldn't talk or respond to them. *Id.* at 5, 28. Jerry Howard,

Jamaal's brother testified that he took Jamaal to his cousin's house to take a shower and found him in the shower with his clothes on.

Shirley Howard, Jamaal's mother, recounted Jamaal's initial diagnosis with ADHD and later the diagnosis of depression, the medication he was taking and the problems she had making sure he took his medication regularly.  As Jamaal's condition got worse in his later teens, she noticed things like his spontaneous laughing and his rocking "like an autistic child," bending his whole body.  *Id* at 49-55.  She also described the deterioration of his hygiene and how he had would not talk to anyone.  *Id* at 56.   She also described the events at her father's the night before the offense.  On cross-examination, Mrs. Howard explained that Jamaal stopped taking his medication in 1996, after Dr. Laine moved and his prescription ran out.  To get another prescription, he had to see another doctor and she could not get him to do that. *Id*.  75-76.

Jamaal's 84 year old grandfather R. C. Kyles was the last guilt phase witness for the defense.   Jamaal was living with him at the time of the offense, and had been for the past few years.  Mr. Kyles testified about Jamaal's behavior the night he called the police.  He said Jamaal was looking so strange that he was afraid of him.  "His skin color changed.  His eyes were white.  You could see big white eyes, and he looked just plumb strange."  *Id*. at 84.  When asked about other unusual behavior, Mr. Kyles testified that before Jamaal went to sleep, he would turn on the TV, a small air-conditioner, two fans, and a big heater and have them all going at the same time.  *Id.* at 85.

No other expert testified and no expert, including Dr. Duncan, testified about Mr. Howard's previous mental health history or treatment, nor did any expert address the significance of the unusual behavior described by the defense witnesses.

**State's Rebuttal**

13

In rebuttal, the state called a psychiatrist, Dr. Edward Gripon, who testified that he had examined and evaluated Mr. Howard and found no evidence of any mental disease or disorder that would have prevented him from knowing right from wrong at the time of the offense and that in his opinion he was sane at the time of the crime.  Dr. Gripon also opined that the symptoms described by family members concerning how Jamaal looked the night before were consistent with crack cocaine.  *Id.* at 93-105.

### Closing Arguments

For the initial closing argument, the prosecution, without objection, played the video surveillance tape showing Mr. Howard shooting Ms. Swartout.  For the defense, Mr. Moncriffe argued that Mr. Howard was insane, pointing to testimony about his unusual behavior which demonstrated that there was something wrong with him.

The jury returned a guilty verdict for capital murder.

### E.      Penalty-Phase of the Trial

### Prosecution's penalty phase case.

In an effort to establish that Mr. Howard would constitute a continuing threat of violence unless executed, the prosecution presented the testimony of school teachers and administrators regarding Mr. Howard's defiant behavior in school.  Starla Alexander, who taught in Silsbee ISD in 1993 testified that a fight broke out between two students in the hallway while she was on her way to a teachers' meeting.  To restore order she asked students, including Mr. Howard, to return to their classrooms.  When Mr. Howard did not do as Ms. Alexander had requested, she touched him on the arm and asked him to return to his seat.  Mr. Howard was offended by the touch and hit her in the chest leaving a bruise.  (RR 25:3-4).

Joanne Ferrell, the special services director for Silsbee ISD, testified regarding Mr.

14

Howard's special education records.  Exhibit S-49, (RR 25:8).  Ms. Ferrell testified that Mr. Howard "was always on grade level" and had the ability to conform to the rules, but failed to comply, (RR 25:10).  She said that Shirley Howard was very cooperative, and that the school exhausted every resource it had in dealing with him.  (RR 25:10).

Laura Elizondo, the diagnostician for Silsbee High School, kept the records for Mr. Howard and conducted the ARD meetings.  Accordingly to Ms. Elizondo, Ms. Shirley Howard was very cooperative with the school, and the school used all its resources to get Mr. Howard to comply with the rules. (RR 25:19).   He was moved from regular classes to in-school suspension, to the Student Alternative Center (SAC), to homebound, where a teacher comes to the house and brings assignments to keep the student current, to expulsion.  Later he was returned to school, but repeated the cycle until he eventually quit school.  (RR 25:19, 23, 31).  (RR 25:20).  Ms. Elizondo further testified that Mr. Howard admitted to her that he had been mixing his ADHD medications with illegal drugs and alcohol. (RR 25:21). Ms. Elizondo also testified that records showed that Mr. Howard had written "gang related things on the carrel that he was in, on papers and bookmarks," (RR 25:28), that the C and Hoover refers to the 5-9 Hoover Crypts, a gang out of Beaumont, and that Mr. Howard's "constant and persistent misbehavior, persistent defiance," (RR 25:25-26), was volitional, and not related to his ADHD. (RR 25:30, 31).

Gwen Boyett had been the coordinator for the alternative campus (SAC) at Silsbee ISD. (RR 25:46).  She testified that although Mr. Howard was not disrespectful or belligerent at the SAC, he would not comply with the rules and do the work assigned or follow the dress code, so he was expelled from SAC.  (RR 25:48).   She then testified these were choices that had nothing to do with his handicap,  (RR 25:49), and that his mother did everything she could to ensure his success.  (RR 25:48).

15

Rodney Cavness was the assistant principal at Silsbee High School while Mr. Howard was there, and he was responsible for discipline and enforcement of the rules. (RR 25:57). Mr. Cavness described Mr. Howard as "disruptive," "very defiant," and as one who "did pretty much what he wanted to do when he wanted to do it," (RR 25:57), that his mother, Shirley Howard, is a "good lady," (RR 25:58), and that the school exhausted all its resources to modify his behavior and thereafter, expelled him. (RR 25:58).

Tom Wakefield was the director of SAC for Silsbee ISD and came into contact with Mr. Howard.  (RR 25:100).  Mr. Wakefield described Mr. Howard's behavior as "defiant," that Mr. Howard "would not adhere to even the basic regulations of the alternative program," (RR 25:101), that his behavior had nothing to do with his handicapping condition,  (RR 25:102), that he refused to tuck in his shirt, or take medication, (RR 25:103), and that he was capable of doing the school assignments.  (RR 25:104, 105).  Mr. Wakefield testified that Ms. Shirley Howard did everything she could for her son.  (RR 25:101).

The prosecution also introduced records of juvenile offenses and testimony regarding assaultive behavior, traffic violations and drug offenses.  The juvenile records showed an adjudication for breaking and entering into a vehicle with the intent to commit theft on  June 1, 1993, July 21, 1993, and August 1, 1993. (RR 25:89-90), and a deferred adjudication and placement on community supervision for the offense of delivery of a controlled substance on September 25, 1997.  (RR 25:89).

Chris Robichaux, the jailer for the Hardin County Sheriff's Department, testified that on May 30, 2000, Mr. Howard assaulted another inmate because of remarks the other inmate make to him. Anthony Flowers, a deputy sheriff in Hardin County, testified that on January 4, 2001, Mr. Howard was in a fight with another inmate.  (RR 25:82, 84).

16

Carlos Montalvo, a former Silsbee police officer, testified that on December 30, 1997, he made a traffic stop for a seat belt violation and failure to maintain a single marked lane of traffic. (RR 25:66).  Mr. Howard was a front seat passenger not wearing his seat belt.  (RR 25:67).  He arrested Mr. Howard for failure to identify himself.  (RR 25:68).  When he booked Mr. Howard into jail, he found marijuana on him.  (RR 25:69).   Mr. Howard resisted going into the jail cell, and the officer believed that he was under "the influence of something." (RR 25:70, 71).  Officer Montalvo encountered Mr. Howard again a year later, when he saw Mr. Howard leaning into a car.  (RR 25:72).  According to Officer Montalvo, Mr. Howard was in a known drug area.  Officer Montalvo believed that an illegal drug transaction was going on and took Mr. Howard into custody after a chase.  (RR 25:74).

Andy Cole, a deputy sheriff with the Hardin County Sheriff's Department, testified that while on patrol on April 29, 2000, at about 11:15 pm, he saw Mr. Howard drop his bicycle and run from him.  (RR 25:117).  When Officer Cole patted Mr. Howard down he found a hard rocky substance in his sock and arrested him for possession of crack cocaine. (RR 25:119-120; Exhibit S-52).  Lieutenant Kock transported S-52 to the crime lab, (RR 25:122), where it was tested by Mr. Pham, a chemist for the Texas Department of Safety.  (RR 25:125).  The test showed that S-52 was .40 grams of cocaine. (RR 25:126).

Ed Cain, the elected Sheriff of Hardin County, testified that he had trouble with Mr. Howard when Mr. Howard jerked away from him while he was escorting Mr. Howard in and out of the courtroom during the trial proceedings. (RR 25:92-93).

### The Defense Penalty Phase Evidence

The penalty phase defense witnesses were Dr. Fason, who testified that Mr. Howard suffers from schizophrenia, Shirley Howard (Mr. Howard's mother), two jailers, a teacher (who

testified at the guilt phase), two coaches (who also testified at the guilt phase), and seven other witnesses who knew Mr. Howard.  Excluding the testimony of Dr. Fason and Shirley Howard, defense counsel's direct examination of the remaining 10 witnesses totals 34 pages and averages about 3 pages per witness.  Only one of these witnesses, Lisa Sanchez, provided  relevant, substantive information about Mr. Howard.

Dr. Fason's testimony was much the same as the testimony he gave at the competency hearing.  He gave a lengthy history of schizophrenia (not individualized to Mr. Howard) and described his examinations of Mr. Howard.  (RR Vol 26:13-20).  He acknowledged that when he first examined Mr. Howard on March 6 (the first day of jury selection), he had absolutely no information – no medical records, school records or biography. (RR Vol 26:21).   The information obtained later came from his interviews of Mr. Howard, Mr. Howard's mother, the school records, and an interview with Dr. Laine who treated Jamaal for depression when he was 15 years old.  (RR Vol 26:4-5).  It was apparent on cross-examination that Dr. Fason was not very familiar with Dr. Laine's records and had not talked to him about some significant information contained in them. (RR Vol 26:6-7).

Despite the fact that Dr. Fason had previously told the prosecutor he was expecting to testify about Mr. Howard's future dangerousness, he did not address it in his testimony and did not talk about ways  in which schizophrenia can be treated and controlled with anti-psychotic drugs except in cross-examination.   (RR Vol 26:60-61).

Lisa Sanchez also testified at the first stage of the trial.  She taught Mr. Howard in the fourth grade.  This time, Mrs. Sanchez explained that she was assigned to a transition class and it was her job to take students who were below grade level and work with them in an effort to improve their performance.  Jamaal was in that class "because he had some difficulties."  She

18

said that he had trouble staying in his seat and getting motivated to do his work.   Jamaal had

problems with reading and he didn't like math.   It was hard for him to get his math work done.

Because this was an experiential class, Mrs. Sanchez had more leeway addressing a child's

individual needs, and she tried to find a way to help him.   She and Jamaal worked out an

agreement that provided him a quiet place to work.   When he needed to do his math, she allowed

Jamaal to sit under the table to complete his math – it was "kind of a reward."  (RR Vol 25:147-

149).

Jamaal was on her husband's Little League team and occasionally he came to their home.

Mrs. Sanchez said they had Dalmatians and Jamaal loved their dogs.   "[H]e would draw pictures

of them and draw pictures of himself, of the dogs, for [her] to keep." (RR Vol 25:150.  Mrs.

Sanchez also shed some light on the problems Jamaal began having when he was around 15 and

16.  He was on medication and had developed good rapport with his doctor.   Both he and his

family were in counseling and seemed to be doing very well.   About this time, the doctor moved

away.   At this point defense counsel attempted to ask her what happened with Jamaal during that

period.   Mrs. Sanchez didn't understand the question and asked him to rephrase it, and defense

counsel abruptly concluded his questioning with the mantra he used with all of the remaining

penalty phase witnesses. (RR Vol 25:153).

> Q.    You understand this is some very serious charges.  We have talked
>        about the charges, haven't we?
> A.    Yes.
> Q.    You and I have also talked about that we have sympathy for the
>        other family, too, right?
> A.    Yes, absolutely.
> Q     Do you understand. . . that this jury can literally give this kid a life
>        sentence or the death sentence. Do you still love that kid?
> A.    Yes

> Mr. Moncriffe:    No further questions.

19

(RR. Vol 25:146-153).

Sherry Harrison, a Hardin County jailer testified, in response to three leading questions, that Mr. Howard is "the type of inmate that when you tell him to do something, he will do it," that she had never "had any personal problems with him", and that she, personally, had "[n]ever had a problem with him following [her] directions." (RR Vol 25:136.   Tyre Thomas, a Hardin County correctional officer, testified that he went to church with Mr. Howard when he was younger and played sports with his older brother.  He said the difference in him between then and now is that now "[h]e talks to himself, what I would consider mood swings.  His hygiene, he doesn't do unless you tell him to." Mr. Thomas also testified that Mr. Howard had not given him any problems. (RR Vol 25:138).

The testimony of the two Little League coaches, Michael Sanchez and Joel Neely, was basically the same as their guilt phase testimony.  Both testified that Jamaal was a good athlete.  Mr. Sanchez coached Jamaal when he was 8 years old and remembered him being very rambunctious and very excitable.  He had a lot of nervous energy and didn't have good focus ability.  (RR Vol 25:143.   Mr. Neely coached him when he was around 11 or 12.  He said that Jamaal was one of the best pitchers he had coached.  He got along with Jamaal just like all the other kids.  (RR Vol 26:72-73).

On the last day of testimony, defense counsel called seven lay witnesses, many of whom had known Mr. Howard since he was a young child, but, because of the questions asked they provided very little information (in some cases no information) about Mr. Howard.

William Bass had a son who was Jamaal's classmate and they played on the basketball team together.  Mr. Bass said that when Jamaal got the basketball, he would score.  That's how the team would win.   Mr. Moncriffe concluded:

> Q.      And you and I have talked in the hall; we have talked before.  We feel sympathy for the other family don't we?
> A.      Indeed.  This is one time I wish I could turn back the hands of time.
> Q       But in spite of that, you still support him and his family and the other family, am I correct?
> A.      Yes.  That's more or less like split yourself in between.  You feel sorry for the victim and for him.
>
> Mr. Moncriffe:     No further questions.

(RR Vol 26: 77).

Tonya Moffett testified that she worked at Helena Laboratories in Beaumont, Texas and had two girls, ages 6 & 11.  Jamaal is her first cousin.  In February of 1989, he was a junior groomsman in her wedding and when asked if he'd always treated her with courtesy, she said yes, (RR Vol 26:78-79), and then her testimony concluded:

> Q.      You understand the jury could give him [the death penalty].
> A.      Yes, I do.
> Q.      We feel sympathy for the other family, too, don't we?
> A.      Yes, for both families.
>
> Mr. Moncriffe:     I have no further questions.

(RR Vol 26:79).

Sandra Johnson worked as a correctional officer at the Stiles unit in Beaumont.  Mr. Moncriffe asked her how she knew Jamaal, and she said that his mother and grandmother are her neighbors and live four houses from her, and she's known Jamaal since his mother brought him home from the hospital.  The next and last questions were:

> Q.      You understand the jury here can give this kid life or death?
> A.      Yes.
> Q.      We have talked about that, haven't we?
> A.      Yes.
> Q.      We have also talked about how we feel sympathy for the other family.
> A.      Yes.
> Q.      No further questions.

21

(RR 26:80).

Denise Young was in office administration at a home improvement warehouse in

Beaumont, and she had two children.    She testified that she had known Mr. Howard since "he

was about five days old."  Mr. Moncriffe's next questions were:

> Q.    Do you understand that this jury can give him life or death?
> A.    Yes, sir, I do.
> Q.    We have also talked about how we feel sympathy for the other
>        family?
> A.    Yes, sir, we have.
> Q.    That they're in our prayers, also?
> A.    Yes they are.
>
> Mr. Moncriffe:    No further questions.

(RR 26:83).

Iby G. Young was 14 years old and a "pretty good student" at Silsbee High School.  She

knew Jamaal because "he used to come around [her] house and visit a lot and he used to come

play with [her] and [her] brother."  She testified about what Jamaal had once told her:

> He told me I always try my best and succeed at whatever I do and he told me
> don't let anyone tell me that I can't do or be anything I want to be in life.

(RR Vol 26:84-85).  Defense counsel then asked:

> Q.    We've also talked about how this jury – you and I talked.  You
>        know this jury can give him life or death, don't you.
> A.    Yes, sir.
> Q.    We pray for both families, don't we?
> A     Yes, sir.
>
> Mr. Moncriffe:    No further Questions.

*Id*. at 85.

Keesha McKinney was 22 years old and worked for TDCJ.  Her mother was Sandra

Johnson, he testified earlier.  Keesha had known Jamaal all of her life – they grew up together.

They played everything together, kickball, baseball, volleyball.  Her aunt had a field next to their

house and all of the neighborhood kids came there to play.  They liked having Jamaal on their

team because he could hit so good and he would take the girls turns at bat and they would win

the game.  (RR Vol 26:87-88).  Then her testimony concluded:

> Q.    All right.  You understand this jury can give him life or death,
>         don't you?
> A.    Yes, sir.
> Q.    We pray for both families, don't we?
> A.    Yes, sir.
> Mr. Moncriffe:    No further questions . . .

(RR Vol 26:88).

Shana Howard, Mr. Howard's sister, was 16 years old.  After asking her age and her

relationship to Mr. Howard, Mr. Moncriffe concluded his examination:

> Q.    Do you know he is charged with and convicted of a very serious offense,
>         don't you?
> A.    Yes.
> Q.    And the jury can kill him or they can give him life.  Do you know that?
> A.    (Nods head).
> Q.    Say it for the record.
> A.    Yes.
> Q.    Do you love your brother?
> A.    Yes, I do.
> Q.    We pray for both families, don't we? Yes.
>
> Mr. Moncriffe:    No further questions.

(RR 26:89).

Mrs. Howard was the last defense witness.  She identified pictures of Jamaal as he was

growing up, and she testified about the altercation Jamaal got into with another prisoner in the

jail visitation area in January 2001, while she was visiting him.  During the visit, Jamaal was

looking past her and he said, "What did you say to me."  He clearly thought someone was saying

something that was upsetting to him.  She asked him who he was talking to, and he got up and

went to the far end of the visitation room and stood over another inmate and kept saying, "What

23

did you say to me." Mrs. Howard said there had been other times when she was talking to Jamaal and he was looking past her and it seemed to her that he was hearing things. And, in the past, Jamaal had told her he was hearing voices. (RR Vol 26:94-96).

After Mrs. Howard's testimony, the defense rested.

### The Prosecution's Rebuttal

In rebuttal, the prosecution called four (4) witnesses to refute the defense theory that Mr. Howard suffered from a thought disorder, schizophrenia.

### The Prosecutor's Closing Argument

The prosecutor argued to the jury that Dr. Fason was evasive and not credible. In support, the prosecutor asserted that Dr. Fason "last read any medical materials in 1982," and last had a regular patient 7 or 8 years before this trial. The prosecutor called Dr. Fason's testimony "psycho babble," because Dr. Fason did not use standard medical texts for his diagnosis of schizophrenia. (RR 27:22, 50). The prosecutor told the jury that the use of the DSM-IV was important because "it keeps psychiatrists from doing exactly what [Dr. Fason] was doing, ... referring to old literature and making up what they want to say ...." (RR 27:23).

To drive home the prosecutor's theory of anti-social personality disorder, the prosecutor told the jury: "It says a lot about a man when no one comes and speaks about you in your teenage and adult years and has something good to say about you. Nothing good about him." (RR 27:51-52).

From fourteen (14) prosecution witnesses in its case-in-chief and an additional four (4) prosecution witnesses in rebuttal, the jury was told that Mr. Howard had antisocial personality disorder and his bizarre behaviors were not the result of some mental impairment or disability and could be explained by abuse of alcohol and illegal substances.

### REASONS TO ISSUE THE WRIT OF HABEAS CORPUS

Mr. Howard seeks relief from his unconstitional conviction and death sentence on the grounds set out below.  All factual and legal allegations presented in any claim in this petition are fully incorporated into each and every other claim in this petition.

Grounds One through Six are based on the denial of his Sixth and Fourteenth Amendment rights to ineffective assistance of counsel.

**GROUND ONE: Mr. Howard was denied his Sixth & Fourteenth Amendment rights to effective assistance of counsel when his attorney failed to conduct a reasonable investigation of his life history, including his educational history and mental health history, all of which were crucial and relevant to a complete and reliable evaluation of his mental state at the time of the offense, at the time of his arrest and confession, at the time of trial and as mitigating at his penalty phase defense.**

The Supreme Court recognized long before Mr. Howard's trial that prevailing professional norms require capital defense counsel to conduct a thorough  life history investigation.  In *Wiggins v. Smith,* 539 U. S. 510 (2003), a case that was tried in 1989, the Court found that trial counsel's performance was deficient because counsel failed to investigate a plethora of mitigating evidence that was available at the time of trial.   Drawing upon the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Supreme Court stated:

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable.'  *Strickland, supra,* at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495.  The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).  Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.  Cf. *id.,* 11.8.6, p. 133 (noting that among

25

the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added);  1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 ('The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing.... Investigation is essential to fulfillment of these functions').

539 U.S. at 524-525 (emphasis in original).[3]

Viewing the work of Mr. Howard's lawyers through this lens, it is plain that his lawyers ceased investigating mitigation when, like Mr. Wiggins' attorneys, they "acquired only rudimentary knowledge of his history from a narrow set of sources."  By any measure of effective attorney performance in relation to the sentencing phase of a capital case, Mr. Howard's lawyers performed deficiently.

Family members report that there were few to no questions asked of them about Jamaal's childhood or family history prior to the trial.  The focus of the trial lawyer was on the day before the shooting of the convenience store clerk.  At least one witness, Ms. Sanchez, Jamaal's teacher, reported that she had a brief face-to-face meeting with the trial attorney in a noisy crowded hallway with TV cameras right outside the courtroom.  Because of the noise and so many people, she found it difficult to talk to the trial attorney, who discussed the questions he was going to ask.  Ms. Sanchez reported that she was instructed to answer the questions to the best of her knowledge, and felt unprepared for cross-examination by a tough prosecutor.

Had trial counsel conducted an adequate investigation into Mr. Howard's life history and background, he would have learned about the severity of the ADHD he suffered from an early

---

[3] *See also Porter v. McCollum*, 130 S.Ct. 447, 454 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

age and how that illness was compounded by psychotic behaviors as he moved through adolescence and into adulthood, until he developed full-blown schizophrenia.  He would have learned that Mr. Howard was frequently out of touch with reality, confused, and confusing to others.  He would have learned that Mr. Howard engaged in bizarre and sometimes dangerous behaviors seemingly out of the blue.  In short, had trial counsel conducted a minimally adequate investigation, he would have been able to provide to his experts the information that was critical to their evaluation of Mr. Howard and to present to the jury through the experts and lay witnesses a compelling picture of Mr. Howard's mental-illness-based frailties.  This picture would have stood as a powerful counter to the shallow and misleading picture that he allowed the prosecution to present without rebuttal – of a kid who frequently got into trouble, was combative, and hurt other people – and would have changed the outcome of the trial.

The information counsel would have discovered includes but is not limited to the following:

### 1.      Lack of Self-Care

Jamaal's teacher, Lisa Sanchez, reported that even as a child, Jamaal had difficulty with self-care and that he was not concerned about his appearance.  She opined that Jamaal's ADHD was more severe than any child that she had seen.

In his younger years, Jamaal took great pride in his appearance.  He would clean his shoes and iron until he had perfect creases down his pants.  But as Jamaal aged, his oldest brother Jerry, Jr. saw a noticeable change in Jamaal:  he completely quit bathing, changing his clothing, shaving or cutting his hair.  He would wear the same clothing for weeks.  He also wore a wool beanie even in the summer no matter how hot it was.

### 2.      Bizarre Behaviors

27

Jamaal's oldest brother, Jerry, Jr., remember that "Jamaal used to suck his lip a lot and make a face, like a frown all the time" when he was younger.

Ms. Sanchez, one of Jamaal's teachers, reported that although Jamaal was a cute cut-up on the baseball field, in the classroom he could not stay in his seat.  He would talk out, hit others in horseplay, yell across the room, and had anger problems.  She recalls Jamaal suffering from nervous tics such as blinking his eyes, scrunching up his mouth, and making a noise where he would suck his teeth.  Sanchez said that  Jamaal never had someone to truly assess his behaviors and put together a realistic plan for treatment before it was too late for him.

At least two years before the offense, Jamaal stopped taking medications altogether.  In the weeks before the offense, family members report that Jamaal's behavior deteriorated.  He would ignore people who talked to him, and would sit in the park or in a back room by himself for long periods of time, or he would walk up and down the street talking to himself.  His grandfather would awaken at nights to find Jamaal standing over him, just staring.  When the family tried to help him, Jamaal reacted as though he didn't understand what they were saying.  He would start laughing.  The inappropriate laughing continued to increase.  Shirley Howard observed Jamaal rocking.  "Not like normal.  It was pronounced."

Ms. Sanchez also reported that Jamaal's behavior in the courtroom was bizarre.  She observed him talking to himself, manifesting nervous ticks, and laying over the chair in which he was sitting.  Apparently no one tried to explain his behaviors to the jury, and Ms. Sanchez said that the jury might have thought that Jamaal was faking it.  Ms. Sanchez stated that Jamaal was not faking it.  She had observed these bizarre behaviors by Jamaal since he was 9 years old.

### 3.      Below grade academic ability

Shirley Howard reported that in the first and second grade, Jamaal did well.  However

during the first six weeks of third grade, there was a drastic change and his grades fell to Ds.  At

that time, Jamaal was placed into Lisa Sanchez class.  Ms. Sanchez reported that Jamaal read on

a second grade level as a 4th grader.  Although he enjoyed math, it was very difficult for him and

had problems learning math facts by memory.

### 4.       Drug use : Common in the neighborhood & among family

Drug use was common in Jamaal's neighborhood and among family members, who

reported using primarily marijuana and alcohol, although there were reports of crack cocaine use

as well.  Marijuana and alcohol use were considered normal for the family and the area.

Jamaal's father is reported to be an alcoholic and used drugs and was in and out of jail.

Similarly, Jamaal's oldest brother, Jerry, Jr., was in and out of jail for drug charges as well.

Jamaal's cousin was reported to sell drugs.   Jamaal's uncles were alcoholics and crack addicts.

### 5.       Role models of criminality

Family members modeled criminality.  Jamaal hung around his older brother Jerry, Jr.

frequently.  Jerry was a big influence in Jamaal's life because his father, Jerry, Sr. was in and out

of Jamaal's life and also in and out of jail.  Jerry and his friends were into breaking into places to

steal.  Jamaal got caught up in Jerry's criminality, and acted as their lookout.  Jerry, Jr. served

time in state jail for drug charges. Shirley Howard believes that Jamaal followed his brother

everywhere and wanted to be whatever his brother was, and that Jamaal took the blame for

plenty of stuff that Jerry, Jr. had done.

It was reported that on the maternal grandmother side's of the family, the family would

steal name brand clothing from Dillard's

### 6.       Abuse and Neglect

Shirley Howard, Jamaal's mother, worked, and her mother was supposed to be the

29

caretaker of her children, including Jamaal.  However Jamaal was frequently left alone with his sisters, and there was no one in the home to make sure that he took his medication as a child.

The family reports that Jamaal's maternal grandmother would treat him and his siblings terribly, saying "ugly" things to them.  They attributed it to her having a white father, so "that whole side of the family thought they were too pretty for us."  When Jamaal went to visit her, his maternal grandmother would make him sit outside because he smelled, although the family reports that at that time, Jamaal had good hygiene.  The maternal grandmother treated her other grandchildren differently than the way she treated Jamaal and his siblings.  She would give them presents, but not give any presents to Jamaal and his siblings.  Shirley's father warned Jamaal and his siblings to stay away from their maternal grandmother.

In sum, had counsel undertaken the thorough investigation of Mr. Howard's life history that the constitution requires, he would have enabled his mental health experts to conduct a complete and reliable evaluation of Mr. Howard's mental state at the time of the offense, at the time of his arrest and confession, and at the time of trial.  Counsel would also have been able to present a compelling case in mitigation during the penalty phase.  Had this investigation been done, there is a reasonable likelihood that the outcome of both phases of the trial would have been different.

**GROUND TWO:  Mr. Howard was denied his Sixth & Fourteenth Amendment rights to effective assistance of counsel when his attorney failed to seek timely and relevant evaluations of his mental condition regarding:**
   **a.      the reliability and voluntariness of his confession;**
   **b.      his competency to stand trial;**
   **c.      his criminal responsibility for the death of Vickie Swartout; and**
   **d.      his moral culpability and the appropriate punishment.**

Trial counsel engaged a mental health expert to assist in the defense of Mr. Howard only two months before jury selection began.  This expert first saw Mr. Howard only one month

30

before jury selection began and was tasked to evaluation Mr. Howard's "competency" and determine whether his mental status might provide mitigating circumstances or counter future dangerousness.  In connection with this first examination, the expert, Dr. Fason, was provided no life history information by defense counsel.  As a result, his examination was inconclusive. Demanding from counsel life history information, Dr. Fason gained access only to Mr. Howard's school records and to Mr. Howard's mother.  With that limited additional information and further examination of Mr. Howard, he began to think that Mr. Howard might have a serious mental illness, but he needed more information about Mr. Howard's life.

Thereafter, during jury selection, trial counsel changed Mr. Howard's plea to not guilty by reason of insanity.  He did this despite Dr. Fason's not having examined Mr. Howard for insanity and not having expressed any view that Mr. Howard was insane.  He also moved for the appointment of an independent mental health expert to determine Mr. Howard's competence to stand trial.  Dr. Duncan was appointed to conduct this evaluation, but he received no information from trial counsel – concerning Mr. Howard's life history or what had caused counsel to move for a competency examination.  Nevertheless, Dr. Duncan found that Mr. Howard might be incompetent solely on the basis of his interviews with Mr. Howard.  Called as Mr. Howard's first guilt-phase witness to support an insanity defense, Dr. Duncan testified that he did not find believe that Mr. Howard was insane – though he had not conducted an evaluation of Mr. Howard's mental state at the time of the offense – but he did testify that he believed Mr. Howard could be incompetent to stand trial.  That testimony then led to a separate trial on competency. At no time was either expert asked by defense counsel to examine whether Mr. Howard was competent enough to waive counsel and provide a reliable confession.

In short, trial counsel did virtually nothing to assist the mental health experts that he

eventually called as defense witnesses to conduct complete and reliable evaluations of Mr.

Howard's sanity, competency to confess, and competency to stand trial, or to conduct complete

and reliable evaluation of possible mental-health-based mitigation.  Life history information is

the foundation for a complete and reliable assessment of any forensic matter in a capital case,

and counsel failed to conduct an investigation of Mr. Howard's life history.  When the experts

asked for such information from counsel, he could not provide it and he had no time to develop

it.  As a result, the mental health evaluation were starkly incomplete, unsupported by evidence

independent of the in-person evaluations of Mr. Howard, and easily discredited by the

prosecution.

Had counsel performed effectively, the mental health evaluations of Mr. Howard's

sanity, trial competency, and mental-health-based mitigation would have been much better

developed and supported by credible evidence, and as a result, would reasonably likely have

established insanity, incompetence to stand trial, and mitigation that would have been more

persuasive than the prosecution's case in aggravation.  These assessments would have changed

the outcome of both phases of Mr. Howard's trial, if he had even gone to trial.

**GROUND THREE:  Defense counsel's lack of, and failure to conduct the necessary research to develop, a reasonable understanding of the differences between competency to stand trial and mental defenses to criminal responsibility deprived Mr. Howard of his right to effective assistance of counsel.**

When an attorney undertakes representation in any case, especially a capital case, it is

professionaly incumbant on him or her to become versed in applicable legal principles relevant

to the representation.  Counsel also has a professional responsibility to refrain from accepting

employment or an appointment in areas of practice for which he or she is unqualified.   Early in

his representation of Mr. Howard, Mr. Moncriffe most certainly knew or should have known that

mental illness in general and Mr. Howard's mental condition, in particular, and all available

legal defenses relevant to Mr. Howard's mental conditon would be a critical and central part of

this case.  And yet, it is abundantly clear from the record that as late as April 9, 2001, when Mr.

Moncriffe delivered his opening statement in the guilt phase of Mr. Howard's capital trial, he did

not have a clear and accurate understanding of the legal defenses available to Mr. Howard.

Specifically, he did not understand the differences between competency and insanity — two

issues which had life and death significance in Mr. Howard's case.  Throughout the record, Mr.

Moncriff uses the terms "competent" and "insanity" or "insane" interchangably and inaccurately.

Shortly before trial, Mr. Moncriffe casually retained a mental health expert, requesting a

"competency" evaluation which he apparently believed would enable him to raise an insanity

defense.  At the same time, he failed to provide the expert with any information about his client's

mental condition or how he expected to use the evaluation at trial.

On the eve of trial, Mr. Moncriffe asked the court to appoint an "independent" mental

health expert to conduct a competency evaluation.  When the expert opined that Mr. Howard

might not be "competent," Mr. Moncriffe promptly gave notice, on behalf of Mr. Howard, of

their intent to enter a plea of not guilty by reason of insanity.  In his opening statement to the

jury, Mr. Moncriff talks at length about Mr. Howard's having a history of mental problems and

concludes by telling the jury:

> [W]hen this case is over, we'll show to you that Jamaal Howard was incompetent.
> May the 11th he began to lose his mind.  He was incompetent when he walked into
> that room [at the] Chevron station and shot that girl.  If you watch this trial and if
> that kid ever starts laughing or doing something odd as he sits at that table, you
> will see that he is incompetent as he sits in this courtroom today.

(RR 20:20).

Mr. Moncriffe's failure to become versed in the law application to mental health defenses

33

potentially available to his client in the defense of his life or in the alternative decline the

representation when it was clear that mental illness was the central theme of his defense

constituted deficient performance as did Mr. Moncriffe's handling (more accurately

mishandling) of the development and presentation of available mental health defense during his

representation of Mr. Howard.  The prejudice to Mr. Howard's defense was immense.  It

negatively affected every aspect of the case — pretrial investigation, interviews of witnesses,

assessment of strategies, selection of witnesses, and presentation of testimony.  Given the

importance of Mr. Howard's mental condition to his trial and the volume of information which

would have been available to counsel qualified and able to marshall it, there is a reasonable

possibility – sufficient to undermine confidence in the outcome – that but for Mr. Moncriffe's

deficiencies, the result of the trial or the punishment would have been different.

**GROUND FOUR:  Mr. Howard was denied his Sixth & Fourteenth Amendment rights to effective assistance of counsel when his attorney failed to conduct a reasonable investigation of the circumstances of his "waiver of counsel" and confession and to present available challenges to the "waiver of counsel" and the admissibility of his confession.**

> **A.     Trial counsel's failure to conduct such an investigation was unreasonable.**

Trial Counsel did not conduct an investigation into the circumstances of Mr. Howard's

interrogation, waiver of counsel, or confession and under the circumstances of this case,

counsel's failure constituted deficient performance under *Strickland v. Washington,* 466 U.S.

668 (1984).  Mr. Howard.  Despite counsel's inadequage investigation at every stage of this case,

from the beginning of his representation he was aware that Mr. Howard's behavior in the days

leading up to the offense and around the time of his arrest was very unusual and even bizarre.

He also knew from conversations with Shirly Howard that Mr. Howard had a mental health

history that impaired his ability to function at a normal level in school. Mr. Moncriff also knew

34

or should have known that Mr. Howard's family had information the Mr. Howard was beaten in connection with his arrest and received an injury to his head  Before the confession was introduced, Mr. Moncriffe had the additional information regarding from Dr. Duncan that called into question his competency to stand trial.  (RR Vol 29, 61-69).  A cursory investigation of the offense and Mr. Howard's behavior and mental condition both before and after the crime should have called into question his ability to make a knowing and intelligent waiver of counsel and likewise raised red flags regarding the possible inadmissibility of his confession on both reliability grounds and voluntariness grounds.

Supreme Court law teaches that educational and mental impairment of a defendant are relevant factors in determining voluntariness of waiver of counsel and of the voluntariness of the confession.  "The Supreme Court has recognized educational and mental shortcomings as relevant factors in the voluntariness analysis. *See, e. g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *Clewis v. Texas*, 386 U.S. 707 (1967); *Davis v. North Carolina*, 384 U.S. 737 (1966); *Ward v. Texas*, 316 U.S. 547 (1942). *Fikes v. Alabama*, 352 U.S. 191 (1957), teaches that weakness of will or mind are important considerations in this determination."  *Henry v. Dees*, 658 F.2d 406 (5th Cir. 1981).  See also *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979) ("when a right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.").  Professionally reasonable counsel with this knowledge would have pursued an investigation of the validity of Mr. Howard's waiver of counsel and the admissibility of his confession.

    **B.**    **But for counsel's deficient performance, there is a reasonable possibility that a meritorious challenge to the admissability of the confession would have been granted and in turn, that the outcome of either the guilt or penalty**

35

**phase decision would have been different**.

Dr. Fason and Dr. Duncan found that Mr. Howard suffered from schizophrenia and/or the debilitating symptoms of schizophrenia.  Even though their findings were made in the context of a competency to stand trial evaluation, those findings were directly related to whether Mr. Howard made a voluntary and intelligaent wavier of counsel and made a voluntary and knowing confession.  Most significantly, Mr. Howard's not having a rational understanding of the charges against him and the consequences of a conviction not only made him incompetent to stand trial, but also made him unable to make intelligent and voluntary waivers of his rights under the Fifth, Sixth, and Fourteenth Amendment.

 In addition, Dr. Fason's and Dr. Duncan's findings concerning Mr. Howard's schizphrenia would have explained why his smiling when he was found and arrested and his emotionless account of the murder were in fact manifestations of his mental illness rather than manifestations of a cold and caluclating — and otherwise mentally competent – killer.  As the doctors explained, one of the expressions of Mr. Howard's schizphrenia was an inappropriate affect, or an expression of emotion that is incongruous with the circumstances of the situation.  In particular, Mr. Howard's "smiling, grinning ear to ear" upon arrest, and his flat, emotionless account of the murder were manifestations of mental illness not mental fitness.

Accordingly, had trial counsel reasonable investgated the circumstances of the confession, Mr. Howard likely would have succeeded in having the confession and the fruits of the confession suppressed.

**GROUND FIVE:  Mr. Howard was denied his Sixth & Fourteenth Amendment rights to effective assistance of counsel when his attorney failed to reasonably interview, prepare and present the testimony of the defense witnesses at both phases of the trial.**

Trial counsel conducted no professionally competent preparation of any witness he called

in either phase of the trial.  Most of the witnesses were not interviewed at all before they took the

stand.  The few that were interviewed were interviewed briefly outside the courtroom just before

they testified.  As a result, counsel did not know what relevant information any witness might

have and did not elicit much relevant information from any witness when she or he testified.

The little bit of relevant information he did elicit was merely introductory.  It suggested that the

witness may have had actually substantial information but that information was not developed in

the testimony because trial counsel did not know what information the witness had.

The kind of information that these witnesses had, but that was never elicited by trial

counsel, is highlighted in Ground One, *supra*.  Had these witnesses been prepared to testify by

counsel in a professionally adequate manner, they would have provided the information that was

necessary for the jury to understand that Mr. Howard was severely mentally ill, not mean or evil,

and that with appropriate mental health care he would not have been dangerous in prison.

Effective preparation and examination of these witnesses would have changed the outcome of

both phases of the trial.

**GROUND SIX: Trial counsel's ineffective failure to object to inadmissible evidence by prosecution witnesses allowed highly prejudicial and unreliable information to be considered by the jury**

In numerous instances, trial counsel unreasonably failed to object to inadmissible

evidence presented by the prosecution.  Among the worst of these failures to object involved

testimony by several school administrators and teachers to the effect that the behavioral

problems Mr. Howard engaged in at school had nothing to do with his ADHD.  None of these

witnesses was qualified by training or experience to know what they were talking about, and

none of their testimony was accurate or true.  Virtually all of Mr. Howard's school behavioral

problems were the result of ADHD or the hypersensitivity associated with ADHD.

37

Nevertheless, defense counsel let this evidence come in without objection.

Had counsel objected to this testimony and other inadmissible testimony, the outcome of the trial would have been different.

**GROUND SEVEN: Mr. Howard is mentally retarded.  The imposition of a death sentence violates his 8th amendment rights because he is not eligible for a death sentence under *Atkins v. Virginia.***

### A.    Statement of Facts

At the time of the 2001 trial, *Penry v. Lynaugh*, 492 U.S. 302 (1989) was the operative law.  *Penry* held that the execution of the mentally retarded was not categorically prohibited by Eighth Amendment.  Although a court appointed expert, Dr. Duncan, had administered portions of an I.Q. test to Mr. Howard as part of a competency evaluation, Dr. Duncan did not testify at the trial about the intelligence testing or Mr. Howard's I.Q. score.  *See* Direct Appeal Brief, at p. 35 ("After the competency of appellant had been determined, Dr. James A. Duncan testified again at the guilt and innocence phase of appellant's capital murder trial ... [b]ut did not give any testimony regard the I.Q. test that he had administered to appellant or the results of the test.").

On June 10, 2002, Mr. Howard's direct appeal brief was filed.  The issue of whether the Eigth Amendment prohibited the execution of the mentally retarded was pending before the U.S. Supreme Court at the time that Mr. Howard's direct appeal was pending in the TCCA.  In the direct appeal brief, Mr. Howard raised two points concerning mental retardation, Points of Error Two and Four.  *See* Direct Appeal Brief, at p. 17, 22-28, 34-38.

On June 20, 2002, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), which *overruled Penry v. Lynaugh*, 492 U.S. 302 (1989), and held that the execution of the mentally retarded violated the Eighth Amendment.

On October 13, 2004, the TCCA issued its direct appeal opinion, and as to Point of Error

Two, wrote:

> In his second point of error, the appellant claims that "[a] procedure that permits the death penalty to be inflicted on defendants with mental retardation despite their diminished personal culpability violates the Eighth Amendment to the United States Constitution." The appellant argues that the Eighth Amendment requires that mentally retarded individuals, like himself, be excluded as a class from execution.  ....  *Howard*, 153 S.W.3d at 386.
>
> In this case, ***there was little testimony bearing on the issue of the appellant's limitations in adaptive behavior***, other than the testimony about his lack of personal hygiene which was presented by the defense as indicative of the appellant's alleged schizophrenia. ....  *Howard*, 153 S.W.3d at 386-87.
>
> Although experts for both the State and the defense testified that the appellant's intellectual functioning and adaptive behavior were impaired to some degree, ***the testimony was not sufficiently developed to establish that appellant was "mentally retarded" under the guidelines we set in Briseno***. Because the evidence does not support the appellant's claim that he is mentally retarded, we reject his Eighth Amendment claim. *See Stevenson v. State,* 73 S.W.3d 914, 917 (Tex. Crim. App.2002). Point of error two is overruled.  *Howard*, 153 S.W.3d at 387.

*Howard v. State*, 153 S.W.3d 382, 386, 387 (2004) (Emphasis supplied).

> As to Point of Error Four, the TCCA wrote:

> The appellant claims that, during the hearing on his competency to stand trial, Dr. Duncan testified that he had assessed the appellant's I.Q. in the range of 65 to 70. At the guilt phase of trial, however, although Duncan testified about the appellant's "borderline to mildly impaired functioning," he neither testified specifically to his determination of the appellant's I.Q., nor was he questioned by the appellant's counsel about the I.Q. test he had administered. The appellant claims that his counsel was ineffective in  failing to elicit Duncan's testimony about his I.Q. at the guilt or innocence phase.
> ....
>
> Given that Duncan administered only "portions" of an I.Q. test to arrive at an "estimate" of the appellant's I.Q., ***we presume that the appellant's defense counsel was exercising reasonable trial strategy by not eliciting such testimony*** from Duncan before the jury, in light of the speculative weight of the testimony and its susceptibility to cross-examination. ***Moreover, the appellant has not shown that the outcome of the trial would have been different*** had the testimony been elicited. Points of error four and five are overruled.

(Emphasis supplied).  *Howard*, 153 S.W.3d at 387-388.

A petition for writ of certiorari was filed asking the Supreme Court to GVR the case because the trial concluded in 2001, and *Atkins* had been decided in 2002, but before the direct appeal issued in 2004 from the Texas Court of Criminal Appeals.  The U.S. Supreme Court denied certiorari on February 27, 2006.  *Howard v. Texas*, 546 U.S. 1214 (2006).

The first ground in the State Writ alleged: "Mr. Howard's execution would violate the Eighth Amendment's prohibition against the execution  of the mentally retarded."  CWR at 25; State Writ at 5. No hearing was held on this ground. The Findings of Fact and Conclusions of Law (FFCL) concluded that Mr. Howard's "intellectual functioning and behavior are impaired to a slight degree," (FFCL #19); that his "impairments do not rise to the level of mental retardation, and that applicant is not mentally retarded," (FFCL #20); that "the issue of applicant's mental status has been previously litigated at both trial and direct appeal," (FFCL #21); that Mr. Howard is not mentally retarded for purposes of the Eighth Amendment and his execution is not barred by the Eighth Amendment. (FFCL #24 & 25). The TCCA adopted the trial court's FFCL and denied relief. *Ex Parte Howard*, WR-77,906-01, 2012 WL 6200688 (Tex. Crim. App. Dec. 12, 2012).

**B.    Argument and Authorities.**

In determining whether a person has mental retardation, the courts have been guided by the scientific and clinical definitions of mental retardation developed by the American Association on Mental Retardation ("AAMR"), now the American Association on Intellectual and Developmental Disabilities ("AAIDD"), and the American Psychiatric Association ("APA"). Both organizations recognize that mental retardation is a disability characterized by

(1)    "significantly subaverage" general intellectual functioning,

(2)    accompanied by "related" (AAMR) or "significant" (APA) limitations in

40

adaptive functioning,

(3)     the onset of which occurs prior to the age of eighteen.

*See*  AAIDD Manual and American Psychiatric Association, DIAGNOSIS AND STATISTICAL

MANUAL OF MENTAL DISORDERS ("DSM-IV") (1994).

In *Ex Parte Briseno,* 135 S.W.3d 1, 7 (Tex. Crim. App. 2004), the Texas Court of

Criminal Appeals noted that Texas had adopted the "AAMR three-part definition of mental

retardation" in the "'Persons With Mental Retardation Act,'" citing *Ex parte Tennard,* 960

S.W.2d 57, 60 (Tex. Crim. App. 1997) and Texas Health & Safety Code§§ 591.003(13) & (16).

### 1.     Three Prongs of Mental Retardation

#### a.     "Significantly subaverage" general intellectual functioning

The U.S. Supreme Court recognized in *Atkins*, that after applying the standard error of

measurement:[4]

> "[A]n IQ between 70 and 75 or lower is typically considered the cutoff IQ score
> for the intellectual function prong of the mental retardation definition,"

*Atkins*, 536 U.S. 309 n.5, *citing* 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry

2952 (B. Sadock & V. Sadock eds. 7th ed.2000).

However, the IQ score must also take into account the Flynn Effect.  The WAIS-III

Technical Manual recognizes that there is a real phenomenon of IQ inflation over time and

explains that data suggests the inflation rate is 0.3 of a point per year. It is referred to as the

Flynn Effect.  The manual states:

> Updating of Norms. Because there is a real phenomenon of IQ-score inflation

---

[4]     The DSM-IV recognizes that "there is a measurement error of approximately 5 points in
assessing IQ, although this may vary from instrument to instrument." DSM-IV at 39.

over time, norms of a test of intellectual functioning should be updated regularly (Flynn, 1984, 1987; Matarazzo, 1972). Data suggest that an examinee's IQ score will generally be higher when outdated rather than current norms are used. The inflation rate of IQ scores is about 0.3 point each year.

WAIS-III Technical Manual at 8-9.

### b.   accompanied by limitations in adaptive functioning

The AAIDD Manual definition of mental retardation focuses also on significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. Representative skills in the conceptual category, include:  language, reading and writing, money concepts and self-direction.  Representative skills in the social category, include:  interpersonal, responsibility, self-esteem, gullibility, naivete, follows rules, obeys laws, and avoids victimization.  Representative skills in the practical category, include:  activities of daily living, instrumental activities of daily living, occupational skills, and maintains safe environment. AAIDD, MENTAL RETARDATION:  DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS  82, Table 3.1 at 42 (10th ed. 2002).

The DSM-IV recognizes that people with mild mental retardation, "[b]y their late teens ... can acquire academic skills up to approximately the sixth grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance ... " (DSM-IV at 41).  The focus of an adaptive behavior assessment, therefore, is "on documenting the individual's deficits, not his strengths," J. Gregory Olley, "Knowledge and Experience Required for Experts in Atkins Cases," 16 *Applied Neuropsychology* 135-140 (2009), and the "focus in evaluations and ultimately adjudications under the adaptive prong must remain focused on the individual's limitations, rather than any skills he or she may also possess."  James Ellis, *Mental Retardation and the Death Penalty: A*

42

*Guide to State Legislative Issues,* 27 MENTAL & PHYSICAL DISABILITY L. REP. 11 (2003).

### c.      the onset of which occurs before age 18

With respect to the requirement that the onset of subaverage intellectual functioning and

deficits in adaptive functioning occur before the age of eighteen, it is not required that there be a

diagnosis of mental retardation before the person's eighteenth birthday.  AAIDD Manual at 27-

28.  Rather, it is necessary only that the limitations in adaptive functioning be apparent before

the age of eighteen, that IQ testing sometime during the person's life reliably establish an IQ of

75 or below, and that there be no intervening reason, such as traumatic head injury, for the

person's IQ to have diminished since the age of eighteen. AAIDD Manual at 32.

### 2.      Mr. Howard is likely mentally retarded.

Mr. Howard's death sentence violates the Eighth Amendment's ban on the execution of

persons with mental retardation.  Mr. Howard has had a life-long mental disability:  his

intellectual functioning is sub-average; he has significant deficits in conceptual, social and

practical adaptive behavior skills; and these deficits were present before he turned 18.

### a.      First Prong:  Sub-average Intellect

The Wechsler Intelligence Scale for Children (WISC) is an individually administered

intelligence test for children between the ages of 6 and 16 that generates an IQ score which

represents a child's general cognitive ability.  It does not appear that the schools that Mr. Howard

attended administered the WISC to Mr. Howard.

However, as part of a competency determination, on March 8, 2001, Dr. Duncan

conducted an extensive interview of Mr. Howard at the Hardin County jail and administered

portions of the Wechsler Adult Intelligence Scale (WAIS) IQ test, and he estimated that Mr.

Howard's IQ was 65-70, (CR Vol 1:126), which is within the range of mental retardation.  *See*

43

*Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).  The WAIS is a test designed to measure intelligence in adults and older adolescents.

### b.    Second Prong: Adaptive Deficits

#### (1)    Conceptual skills deficits

Representative skills in the conceptual category, include:  language, reading and writing, money concepts and self-direction. Mr. Howard has conceptual skills deficits, including limitations in cognitive abilities, communication, academic skills, and receptive as well as expressive language skills.

Shirley Howard reported that in the first and second grade, Jamaal did well.  However during the first six weeks of third grade, there was a drastic change and his grades fell to Ds.  At that time, Jamaal was placed into a "transitional" class taught by Lisa Sanchez. Ms. Sanchez taught children with learning difficulties.  As Jamaal's teacher, Ms. Sanchez reported that Jamaal read on a second grade level as a 4th grader.  Although he enjoyed math, it was very difficult for him, and that he had problems learning math facts by memory.

#### (2)    Social skills deficits

Representative skills in the social category, include:  interpersonal, responsibility, self-esteem, gullibility, naivete, follows rules, obeys laws, and avoids victimization.  Mr. Howard also exhibited severe limitations in social adaptive behavior skills.

Jerry Howard, Jr. was Jamaal's oldest brother.  Jerry Jr. was a big influence in Jamaal's life. The family reports that Jamaal followed his brother everywhere and wanted to be whatever his brother was.  As a result, Jamaal did not follow rules or obey laws, and naively tagged along with Jerry, Jr. and his friends who into breaking into places to steal.  Jamaal was victimized by his association with his older brother, and was caught up in Jerry Jr.'s criminality, acting as their

44

lookout.  Jamaal's mother reported that Jamaal took the blame for plenty of stuff that Jerry, Jr. had done.

### (3)      Deficits in practical living skills

The representative skills in the practical domain include activities of daily living (eating, transfer/mobility, toileting, dressing), instrumental activities of daily living (meal preparation, housekeeping, transportation, taking medication, money management, telephone use), occupational skills, and maintaining safe environments.

Jamaal's teacher, Lisa Sanchez, reported that even as a child, Jamaal had difficulty with self-care and that he was not concerned about his appearance.  As Jamaal aged, the family reports that there was a noticeable difference in Jamaal, who completely quit bathing, changing his clothing, shaving or cutting his hair.  Jamaal would wear the same clothing for weeks.  He also wore a wool beanie even in the summer no matter how hot it.

### c.      Third Prong:  Manifesting Before Age 18.

The onset of Mr. Howard's sub-average intellectual functioning as well as limitations in adaptive functioning occurred before the age of 18.

### 3.      The state court ruling is contrary to and an unreasonable application of *Atkins*.

The state court ruling on direct appeal, and in state habeas is contrary to and an unreasonable application of *Atkins*.  The determinations of the state court in both proceedings were limited to the trial record.  No extra-record evidence could be admitted and presented to the TCCA for the first time in direct appeal pursuant to state law.  The State Writ relied on the trial record.  The State Writ contains neither affidavits from family, friends, teachers, and experts, nor other extra-record support to prove adaptive deficits nor does it appear that any IQ testing had

45

been requested or administered as part of the state habeas litigation.

Thus, the evidence on which the TCCA made its ruling for both proceedings was the 2001 trial record.  At the time of the 2001 trial, *Penry v. Lynaugh*, 492 U.S. 302 (1989) was the operative law.  *Penry* held that the execution of the mentally retarded was not categorically prohibited by Eighth Amendment.  Accordingly, trial counsel would not have called witnesses to prove mental retardation because the law allowed the execution of the mentally retarded at that time.

Even the TCCA reflected that "the testimony was not sufficiently developed to establish that appellant was "mentally retarded" under the guidelines we set in *Briseno*."  The state court wrote:

> In this case, ***there was little testimony bearing on the issue of the appellant's limitations in adaptive behavior***, other than the testimony about his lack of personal hygiene which was presented by the defense as indicative of the appellant's alleged schizophrenia. .... *Howard*, 153 S.W.3d at 386-87.
>
> Although experts for both the State and the defense testified that the appellant's intellectual functioning and adaptive behavior were impaired to some degree, ***the testimony was not sufficiently developed to establish that appellant was "mentally retarded" under the guidelines we set in Briseno***. Because the evidence does not support the appellant's claim that he is mentally retarded, we reject his Eighth Amendment claim. *See Stevenson v. State,* 73 S.W.3d 914, 917 (Tex. Crim. App.2002). Point of error two is overruled.

*Howard v. State*, 153 S.W.3d at 387 (emphasis supplied).

Given the inadequate record on which the state court was asked to make an *Atkins* determination, and considering the additional evidence presented in federal habeas, the state court's ruling is contrary to and an unreasonable application of *Atkins*.

**GROUND EIGHT:  The prosecutor's closing argument violated Mr. Freeman's Eighth and Fourteenth Amendment right to have the jury give effect to mitigating evidence even if the mitigating evidence had no causal relationship to the capital crime.**

**A.    Statement of Facts: The prosecutor's punishment phase closing argument emphasized that the defense expert "didn't say that this [the crime] was any way related to someone having schizophrenia."**

The jury instructions in the punishment phase of Mr. Howard's 2001 trial, included a separate instruction for Special Issue No. 2, mitigating evidence.[5]  There was also a separate Verdict Form, Issue No. 2, and the jury answered "no" to Issue No. 2:  whether there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.  (CR Vol 3:577).

However, the prosecutor effectively narrowed the scope of Special Issue No. 2 by arguing to the jury that because the defendant failed to show a nexus between his mental impairment (schizophrenia) and the crime ("Nexus Argument"), the jury should answer "no" to the second special issue:

> Now, the next question that we talked about was mitigation; and that one is whether taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
>
> The answer to this one should be no.  There are no such mitigating

---

[5]    The jury instruction for Issue No. 2 provides in pertinent part:

If the jury has answered Issue No. 1 [future dangerousness] in the affirmative, the jury will answer the following issue, Issue No. 2: Whether taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character, and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant  that a sentence of life imprisonment rather than a death sentence be imposed.  ....

You are further instructed that the term "mitigating evidence" means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

(RR 27:9-10; CR Vol 3:574-575).

47

circumstances.  You will remember  – *and I think I told some of you in voir dire about, you know, to make – be a crime, you have got to have two things*.  You have got to have the mens rea and the actus reaous [sic "reus"]; and what that means, the *evil mind and the evil act*, an evil mind and an evil act.  And, so, we have a video of the evil act, the shooting.  So, how can you attack that?  It's right there for everyone to see, just like you were there as an eyewitness.  So, the only other part of the crime that you can try to attack is the evil mind.

And in the guilt/innocence you were presented with the issue of insanity, and you correctly reject that defense.  *And in the punishment phase you're asked to  – you're asked to find that he has got schizophrenia as a mitigating circumstance.  In the first place, so what?  What if he does have schizophrenia?  Does that reduce his moral blameworthiness?*

*You know, <u>Dr. Fason didn't say that this</u>* [the crime] *<u>was any way related to someone having schizophrenia</u>*.  He didn't say that there was any medication that he could take that would make him a pleasant fellow, get rid of any antisocial disorder.

(RR 27:20-21) (emphasis supplied).

Mr. Howard's defense attorney, Mr. Moncriffe,  objected:   "That's totally improper.  Dr. Fason did not say that."  (RR 27:21).  Mr. Moncriffe did not object on the basis that the defense did not have to prove nexus, or of an Eighth amendment violation.

The judge responded to the defense objection by stating:  "...the jury is going to remember the evidence as they heard it."  (RR 27:22).

In the defense closing argument, Mr. Moncriffe told the jury: "You had three doctors; Dr. Fason, Dr. Duncan, and Dr. Lane, who said this kid is schizophrenic."  (RR 27:30).   However, the prosecutor's Nexus Argument made the evidence of schizophrenia from three defense experts irrelevant because Mr. Moncriffe' closing argument did not tell the jury that the defense did not have to show a nexus between the crime and Mr. Howard's mental illness.  The prosecutor's Nexus Argument created a reasonable likelihood that the jury would have found itself foreclosed from considering schizophrenia as relevant mitigating evidence in answering

48

Special Issue No. 2.

    **B.**      **Argument and Authorities**

        **1.**      **At the time of the 2001 trial, Texas and Fifth Circuit precedent required a nexus showing; the prosecutor's Nexus Argument created a reasonable likelihood that the jury would have found itself foreclosed from considering schizophrenia as relevant mitigating evidence in answering Special Issue No. 2**

As of the 2001 *Howard* trial, both Texas and Fifth Circuit precedent imposed a nexus showing between the crime and the mental impairment. *See Rhoades v. State*, 934 S.W.2d 113, 126 (Tex. Crim. App. 1996) ("if evidence has no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to mitigation."); *Davis v. Scott*, 51 F.3d 457, 460-61 (5th Cir. 1995) *abrogated by Tennard v. Dretke*, 542 U.S. 274 (2004) ("In order to present relevant [mitigating] evidence that one is less culpable for his crime, the evidence must show (1) a "uniquely severe permanent handicap[ ] with which the defendant was burdened through no fault of his own,"... , and (2) that the criminal act was attributable to this severe permanent condition....").

The prosecutor's Nexus Argument emphasized only the aggravating nature of evidence of schizophrenia. *See  Abdul-Kabir v. Quarterman*, 550 U.S. 233, 255 (2007) ("we noted that the evidence of Penry's mental retardation and childhood abuse functioned as a "two-edged sword," because it "may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."). The Nexus Argument emphasized that Mr. Howard's mental illness raised the probability that Mr. Howard might be a future danger (*i.e.,* there was no "medication that [Mr. Howard] could take that would make him a pleasant fellow, get rid of any antisocial disorder." (RR 27:20-21).

At the same time, the Nexus Argument removed from the jury's consideration altogether

49

the mitigating aspect of the mental illness  –  diminishing Mr. Howard's moral culpability and

showing a frailty that called for a life sentence for his crime  –  because "Dr. Fason didn't say

that this [the crime] was any way related to someone having schizophrenia."  (RR 27:20-21). As

a result, the prosecutor's Nexus Argument created a reasonable likelihood that the jury would

have found itself foreclosed from considering schizophrenia as relevant mitigating evidence in

answering Special Issue No. 2.

> **2.      *Tennard*: In 2004, the Supreme Court decided *Tennard*, which rejected the rule that a defendant must establish a nexus between the mitigating evidence and the crime**

On June 24, 2004, the U.S. Supreme Court decided *Tennard v. Dretke*, 542 U.S. 274,

284-285 (2004) in which it announced a new rule of constitutional criminal procedure.  In

*Tennard*, the Supreme Court rejected that a defendant must establish a nexus between the

mitigating evidence and the crime.[6]  *Tennard* held:

> ***When we addressed directly the relevance standard applicable to mitigating evidence in capital cases*** in *McKoy v. North Carolina,* 494 U.S. 433, 440-441 (1990), ***we spoke in the most expansive terms***. .... ***'Relevant  mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'***"  494 U.S. at 440 (quoting *State v. McKoy,* 323 N.C. 1, 55-56, 372 S.E.2d 12, 45 (1988) (opinion of Exum, C. J.)). Thus, ***a State cannot bar "the consideration of ... evidence if the sentencer could reasonably find that it warrants a sentence less than death."*** 494 U.S. at 441.

> Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. *Boyde v. California,* 494 U.S. 370, 377-378 (1990) (citing *Lockett v. Ohio,* 438 U.S. 586 (1978); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Penry I,* 492 U.S. 302 (1989)); see also *Payne v. Tennessee,* 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from

---

[6]     *Tennard*, 542 U.S. at 284-285 ("We cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence-and thus that the *Penry* question need not even be asked-unless the defendant also establishes a nexus to the crime.")

considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death.... *[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"* (quoting *Eddings, supra,* at 114)).

*Tennard v. Dretke*, 542 U.S. at 284-285 (emphasis supplied).

*Tennard* unequivocally prohibited a requirement that Mr. Howard demonstrate a nexus between his mental impairment and the crime before the jury could consider his schizophrenia as mitigating evidence.  Thus, under *Tennard*, the Nexus Argument violated Mr. Howard's Fourteenth Amendment right to due process, and his Eighth amendment right to have the jury consider all relevant mitigating evidence in answering Special Issue No. 2

Even if the special issues provided a basis for the jury to give meaningful consideration and effect to Mr. Howard's mitigating evidence of schizophrenia, the prosecutor's Nexus Argument made it reasonably unlikely that they would.  Accordingly, Mr. Howard is entitled to a new punishment phase hearing.  *See  Pierce v. Thaler*, 604 F.3d 197, 212 (5th Cir. 2010) (affirming the district court's order of resentencing and holding that among other things, "The special issues provided a basis for the jury to give meaningful consideration and effect to the mitigating evidence of Pierce's youth and good behavior in prison. .... [However,] [t]he prosecutor's comments at voir dire may have also undermined the jury's ability to give meaningful consideration and effect under the special issues to the evidence of Pierce's youth.'). *See also McGowen v. Thaler*, 675 F.3d 482, 496 (5th Cir. 2012) ("As in *Brewer,* there is "a reasonable likelihood that the jurors accepted the prosecutor's argument ... that all they needed to decide [were the special issue questions], necessarily disregarding any independent concern that, given [McGowen's] troubled background, he may not be deserving of a death sentence").

    3.      **Teague: Mr. Howard's conviction was not final at the time *Tennard* was decided; thus, *Tennard* is applicable**

51

*Tennard* created a new rule of criminal procedure[7] by unequivocally rejecting the nexus requirement imposed by the lower state and federal courts.  Thus, *Tennard* announced a new constitutional rule of criminal procedure.

Under *Teague v. Lane*, 489 U.S. 288 (1989), constitutional rules of criminal procedure announced before a criminal conviction becomes final apply retroactively to that conviction and sentence.  On June 24, 2004, the U.S. Supreme Court decided *Tennard v. Dretke*, 542 U.S. 274, 284-285 (2004) before Mr. Howard's conviction was final on February 27, 2006, when the U.S. Supreme Court denied the petition for writ of certiorari to the TCCA.  *Howard v. Texas*, 546 U.S. 1214 (2006).  *See Stringer v. Black*, 503 U.S. 222, 226 (1992), *Sawyer v. Smith*, 497 U.S. 227, 232 (1990), and *Saffle v. Parks*, 494 U.S. 484, 487, 489 (1990) (in each of the cases, a defendant had filed a timely petition for writ of certiorari; the conviction became final when it was denied by the Supreme Court).

For all of the aforementioned reasons, Mr. Howard, therefore, requests habeas relief and a new sentencing hearing.

---

[7]    *But see In re Kunkle*, 398 F.3d 683, 685 (5th Cir. 2005), the Fifth Circuit held that because "*Tennard* relied on the same cases in analyzing the relevance of *Tennard*'s mitigating evidence and rejecting this court's "constitutional relevance" standard," that *Tennard* did not announce a new constitutional rule of criminal procedure ***in the context of successive federal habeas petition***.) (Emphasis supplied).  Mr. Howard's case is in federal habeas court for the first time.

**GROUND NINE:  Assuming for the sake of argument that *Tennard* did not create a new rule, Mr. Howard was denied his right to effective assistance of trial counsel because his counsel failed to object to the prosecutor's Nexus argument.**

Assuming for the sake of argument, without conceding, that *Tennard* did not create a new constitutional rule of criminal procedure, then Mr. Howard contends that he is still entitled to a new punishment hearing because his trial counsel was ineffective in failing to object and preserve his Eighth amendment right to have the jury consider his schizophrenia as mitigating in answering Special Issue No. 2.

### A.      Statement of Facts (incorporated from Ground Eight)

Grounds Seven and Eight rely on the same underlying facts. Thus, Mr. Howard relies on, and incorporates by reference, the Statement of Facts in Ground Eight

### B.      Trial Counsel was Constitutionally Ineffective.

#### 1.      Deficient Performance:  Trial counsel failed to object on the basis of a federal Eighth Amendment violation to the prosecutor's assertion that the defense had to establish a nexus between schizophrenia and the crime before schizophrenia could be considered as mitigating.

The performance of Mr. Howard's trial counsel, Mr. Moncriffe, was constitutionally deficient.  Mr. Moncriffe did not object to the prosecutor's Nexus Argument on the basis of an Eighth Amendment violation, nor did he cite existing Supreme Court precedent.  *See  McKoy v. North Carolina,* 494 U.S. 433, 440-441 (1990).  Mr. Moncriffe merely asserted:  "Objection, Your Honor.  That's totally improper.  Dr. Fason did not say that."  (RR 27:21).

At the time of the 2001 trial, the Supreme Court had addressed the Eighth-amendment, relevance-standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina,* 494 U.S. 433, 440-441 (1990).  In *McKoy*, the Court established that to be relevant, mitigating "evidence need not conclusively prove the ultimate fact in issue, but must only have

any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *McKoy v. North Carolina,* 494 U.S. 433, 440 (1990).

> **2.    Prejudice:  The prosecutor's Nexus Argument created a reasonable likelihood that the jury would have found itself foreclosed from considering schizophrenia as relevant mitigating evidence in answering Special Issue No. 2.**

The performance of Mr. Howard's trial counsel, Mr. Moncriffe, was constitutionally prejudicial.  Even though Mr. Howard's evidence of schizophrenia was not concealed from the jury, when the prosecutor argued that the defense failed to show a nexus between the crime and Howard's schizophrenia, there is a reasonable likelihood that the jury would have found itself foreclosed from considering the evidence.  *See  Pierce v. Thaler*, 604 F.3d 197, 212 (5th Cir. 2010) (affirming the district court's order of resentencing and holding that among other things, "The special issues provided a basis for the jury to give meaningful consideration and effect to the mitigating evidence of Pierce's youth and good behavior in prison. .... [However,] [t]he prosecutor's comments at voir dire may have also undermined the jury's ability to give meaningful consideration and effect under the special issues to the evidence of Pierce's youth.'). *See also McGowen v. Thaler*, 675 F.3d 482, 496 (5th Cir. 2012) ("As in *Brewer,* there is "a reasonable likelihood that the jurors accepted the prosecutor's argument ... that all they needed to decide [were the special issue questions], necessarily disregarding any independent concern that, given [McGowen's] troubled background, he may not be deserving of a death sentence"").

## CONCLUSION

For the reasons set forth above, Mr. Howard is entitled to relief from his unconstitutional conviction and sentence.

WHEREFORE, Mr. Howard prays that this federal court issue a writ of habeas corpus to him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

Respectfully submitted,

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR PETITIONER

55

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| **JAMAAL HOWARD** | ) | |
| **Petitioner** | ) | |
| | ) | **1:13-CV-256** |
| **v.** | ) | |
| | ) | |
| **WILLIAM STEPHENS, Director** | ) | |
| Texas Department of Criminal Justice, | ) | **(Death Penalty Case)** |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

## VERIFICATION

I, Lydia M.V. Brandt, pursuant to 28 U.S.C. § 2242, acting on behalf of Petitioner, certify under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus is true and correct to the best of my belief.

DATE:  December 12, 2013

_____
Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

## CERTIFICATE OF SERVICE

This certifies that on December 12, 2013, I electronically filed the foregoing document with the clerk of court using the electronic case filing system of the court.  The electronic case filing system sent a notice of electronic filing to the following attorney of record, who has consented in writing to accept this notice as service of this document by electronic means: Jay Clendenin, Assistant Attorney General, Counsel for Respondent.

_____
Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR PETITIONER

cc:   Mr. Jamaal Howard
      #999-383
      Polunsky Unit, TDCJ
      3872 FM 350 South
      Livingston, TX 77351-8580