**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **JAMAAL HOWARD,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:13-cv-256** |
| | § | |
| **DIRECTOR, TDCJ-CID,** | § | |
| | § | |
| **Respondent.** | § | |

**MEMORANDUM OPINION AND
ORDER OF DISMISSAL**

Petitioner Jamaal Howard ("Howard"), a death row inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is challenging his capital murder conviction and death sentence imposed by the 356th Judicial District Court of Hardin County, Texas, in Cause Number 15114-A, in a case styled *The State of Texas vs. Jamaal Howard*. For reasons set forth below, the Court finds that the petition should be denied.

**I. FACTUAL BACKGROUND OF THE CASE**

The Texas Court of Criminal Appeals discussed the factual background of the case as follows:

> [Howard] stole a gun from his grandfather the night before the murder and hid it. Despite his family's efforts to persuade him to turn over the gun, [Howard] refused. The following morning, [Howard] retrieved the gun and walked several blocks from his house to the Chevron store. After peering in the windows, he entered the store, went into the secured office area where the victim was sitting, cocked the gun, and shot the victim in the chest. [Howard] stole $114.00 from the cash register and reached over the dying victim to steal a carton of cigarettes before leaving. The offense was recorded on videotape. [Howard] denied committing the offense until he was told it was videotaped. He told the officer who took his statement that he was not sorry for committing the offense.

At the punishment stage of the trial, the State presented evidence that [Howard] demonstrated a disregard for authority and school rules despite the continued efforts of his mother and educators. During one incident, [Howard] punched a pregnant teacher in the chest with his fist when she asked him to return to his seat. When [Howard] was assigned to an alternative school, he refused to comply with its rules and standards, and he was defiant and disruptive. The State also presented evidence of [Howard's] possession of controlled substances, his fighting with police officers and resisting arrest, his committing of several burglaries as a juvenile, and his fighting with other inmates. Dr. Edward Gripon testified for the State that [Howard] was not suffering from schizophrenia, but rather was suffering from antisocial personality disorder.

*Howard v. State*, 153 S.W.3d 382, 383–84 (Tex. Crim. App. 2004) (en banc).

## II. PROCEDURAL HISTORY OF THE CASE

Howard was convicted and sentenced to death for the capital murder of Vicki Swartout, a Chevron convenience store clerk, who Howard intentionally killed during the course of a robbery or attempted robbery on May 12, 2000. (1 C.R. 3, 114, 128).[1]

Evidence in the capital murder trial began on April 9, 2001. (20 R.R.). The trial was recessed the following day after defense-sponsored testimony from Dr. James Duncan,[2] a clinical psychologist, in order to determine if Howard was competent. (21 R.R. 47). A separate trial on competency began on April 11, 2001 (29 R.R.), but ended with the jury deadlocked. (30 R.R. 37). A second competency trial began on April 16, 2001 (31 R.R.), and concluded with the jury finding that Howard was competent to proceed. (32 R.R. 134–35).

Trial on the merits resumed on April 18, 2001. (22 R.R.). Defense counsel called an additional eleven lay witnesses to testify about Howard's mental health issues and odd or

---

[1] "C.R." is the clerk's record of pleadings and documents filed with the trial court. Additionally, "R.R." is the reporter's record of transcribed testimony and exhibits from trial, "SH-" or "DX-" are the enumerated exhibits of the State or the Defendant from trial, and "SHCR" is the state habeas clerk's record, and "Supp. SHCR" is the supplemental state habeas clerk's record. Citations are preceded by volume number and followed by page or exhibit number, where applicable. All of the state court records are contained in docket entry number 78.

[2] Dr. Duncan testified that he was court-appointed to evaluate Howard's competency; that during the interview, Howard displayed symptoms of a thought disorder, possibly schizophrenia; and that his competency was questionable. (21 R.R. 18, 20, 23–30, 42).

unusual behavior to support an insanity defense. The State called Dr. Edward Gripon in rebuttal. The jury rejected the defense and on April 20, 2001, convicted Howard of capital murder. (24 R.R. 55; 3 C.R. 601–04). Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure Article 37.071, the trial court sentenced Howard to death on April 25, 2001.

Howard moved for a new trial, but was denied relief following a hearing. (3 C.R. 598–99; 28 R.R. 24). The Texas Court of Criminal Appeals affirmed the conviction. *Howard*, 153 S.W.3d at 389. The United States Supreme Court denied his petition for a writ of certiorari. *Howard v. Texas*, 546 U.S. 1214 (2006).

While his direct appeal was proceeding, Howard applied for a state writ of habeas corpus raising 22 claims. (SHCR 21–183). In June 2012, the trial court issued findings of fact and conclusions of law without conducting an evidentiary hearing. The trial court recommended that relief be denied. (Supp. SHCR 20–36). The Court of Criminal Appeals denied relief based upon the findings and conclusions of the trial court and its own review. *Ex parte Howard*, No. WR–77,907–01, 2012 WL 6200688 (Tex. Crim. App. Dec. 12, 2012) (unpublished).

Howard's federal petition for a writ of habeas corpus was timely filed on December 13, 2013. (Dkt. #16). In order to give Howard the opportunity to develop and prove his claims under *Martinez* and *Trevino*, the Court authorized funding for a mitigation specialist, Gina Vitale, MSW (*see* Dkt. ##7, 15, 32), and for three mental health experts, Dr. George Woods, a neuropsychiatrist[3] (*see* Dkt. #56), Richard O. Temple, Ph.D., a neuropsychologist (Dkt. #56), and James Patton, Ed. D., an intellectual disability expert (Dkt. #56). Howard filed an amended

---

[3] Howard complains that he would have had a finalized report from Dr. Woods but for the Court disallowing the request for additional funds for Dr. Woods' services (Dkt. #76, p. 66). The Court authorized over $36,000 in expert fees for this case (*see* Dkt. ##31, 56, 71). Of this approved funding, more than $20,000 was allocated for Dr. Woods' services.

petition for a writ of habeas corpus (Dkt. #76) on September 25, 2017. The State filed an answer

(Dkt. #79) on November 27, 2017. Howard filed a response (Dkt. #80) on December 22, 2017.

### III. GROUNDS FOR RELIEF

Howard brings the following grounds for relief:

1. Trial counsel provided constitutionally ineffective representation by failing to adequately investigate, develop, and present evidence of Howard's life history and mental health in mitigation of punishment;

2. Trial counsel provided constitutionally ineffective representation by failing to thoroughly investigate Howard's psycho-social history and seek timely and relevant evaluations of his mental condition regarding: (a) competence to stand trial, (b) criminal responsibility for capital murder, and (c) whether his waiver of *Miranda*[4] rights and subsequent confession were knowing and intelligent;

3. Trial counsel's lack of, and failure to conduct the necessary research to develop, a reasonable understanding of the difference between competency to stand trial and mental defenses to criminal responsibility deprived Howard of his right to effective assistance of counsel;

4. The prosecutor's closing argument violated Howard's Eighth and Fourteenth Amendment rights to have the jury give effect to mitigating evidence even if the evidence had no causal relationship to the capital crime; and

5. Assuming the Supreme Court did not announce a new rule in *Tennard v. Dretke*, 542 U.S. 274 (2004), Howard was denied his right to effective assistance of counsel because his attorney failed to object to the prosecutor's nexus argument.

### IV. STATE COURT PROCEEDINGS

In order to discuss and analyze Howard's grounds for relief, the Court reviewed the

evidence presented at the sentencing hearing of Howard's capital trial. Below is a summary of

that review:

_____

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**A.    The State's case-in-chief.**

  **1.    Howard's assault of a teacher, disregard for authority and school rules, and persistent defiance**.

In 1993, when Howard was in middle school, he punched a pregnant teacher in the chest with his fist when she asked him to return to his seat. (25 R.R. 3–5). Starla Alexander testified that she entered a classroom to help get students settled down after a fight had broken out. (25 R.R. 4). Howard was out of his desk and would not return to his seat despite being asked to do so. (25 R.R. 4). Ms. Alexander testified that when she asked Howard if he needed an escort to his seat and touched his arm, he got "very offended" by her touch. (25 R.R. 4). Howard pushed Ms. Alexander and she pushed back. (25 R.R. 4). He then struck her in the chest, leaving a round bruise. (25 R.R. 4). The incident ended when the school nurse arrived and Howard went to the office. (25 R.R. 5).

Joann Ferrell, Special Services Director for the Silsbee Independent School District, testified that Howard was a special education student; his behavior and academic progress were reviewed and discussed at admission, review, and dismissal (ARD) committee meetings; and Howard's mother would attend. (*See* 25 R.R. 7, 9). She agreed that Howard's mother did everything she could to help her son conform to the rules and that the school exhausted every resource it had in dealing with Howard, but Howard failed to comply. (25 R.R. 10). Ms. Ferrell believed that Howard had the ability to follow the rules and pass his classes had he wanted to do so. (25 R.R. 10).

Laura Elizando, an educational diagnostician at Silsbee High School, testified that school records (33 R.R. at SX-49) show Howard was admitted to the special education program on December 15, 1995. (25 R.R. 19). However, by February 1996, Howard was placed in the student alternative center (SAC) as a result of "constant persistent misbehavior." (25 R.R.

19–20). SAC is used when a student's behavior becomes so disruptive that other students can no longer learn. (25 R.R. 22–23). According to Ms. Elizando, Howard refused to comply with the rules at SAC, and was defiant and disruptive. (25 R.R. 20). Howard was also taking medication for ADHD, but admitted to the ARD committee that he was also using alcohol and illegal drugs. (25 R.R. 20–21).

ARD records from April 1996 show that after two months at SAC, Howard was still not conforming to rules, would talk across the room, and laughed and played with his peers. (25 R.R. 22). Nevertheless, Howard passed the math and reading portions of the exit level of the TAAS exam, the Texas Assessment of Academic Skills achievement-type test that a student must pass in order to graduate. (25 R.R. 23; 34 R.R. at SX-49). A passing score meant that Howard had the required minimal competencies, which is another way of saying his learning was appropriate for his grade level. (25 R.R. 23–24). Ms. Elizando testified that in May 1996, Howard was homebound from SAC because his behavior was continually disruptive. (25 R.R. 22). Howard could have been expelled and lost his school credits for the year, but was instead given another chance by being placed on homebound. (25 R.R. 22, 24). In the program, a teacher would meet with Howard for four hours a week at his home, bring his work, and help keep him current in his classes. (*See* 25 R.R. 23).

Ms. Elizando testified that Howard returned to high school from homebound on August 9, 1996, but was placed in SAC because he now had charges against him for delivery of crack cocaine, assault, and criminal mischief. (25 R.R. 24–25). Three weeks later, Howard was homebound again because of his constant and persistent misbehavior and defiance. (25 R.R. 25). However, Howard failed to meet with the homebound teacher. (25 R.R. 26). As a result, he was

dismissed from the special education program on January 23, 1997, for noncompliance and nonattendance, and was expelled. (25 R.R. 26).

According to Ms. Elizando, Howard came back to school briefly in August 1997 and re-entered the special education program. (25 R.R. 26). Howard was placed on in-school suspension (ISS) in September 1997 because of tardiness. (25 R.R. 27–28). While there, he wrote gang-related things on his desk regarding the "5-9 Hoover Crypts," a gang out of Beaumont. (25 R.R. 28–29). By October 1997, Howard was expelled because of his constant defiance and refusal to conform. (25 R.R. 29). Ms. Elizando believed that Howard's actions were volitional because she had other students with ADHD who did follow the rules. (25 R.R. 30).

Gwen Boyett, Assistant Principal for Silsbee High School, testified that she worked for three years as the coordinator at SAC. (25 R.R. 46). Ms. Boyett stated that Howard was not successful at SAC and did not follow the regulations and rules. (25 R.R. 48). She met with Howard and his mother when he was enrolled, gave them a copy of the rules, and discussed the rules with them. (25 R.R. 47). When Howard did not abide by the rules, Ms. Boyett talked with him and to his mother, but Howard continued not to abide so he was expelled from SAC. (25 R.R. 48). Ms. Boyett explained that it is "a continuous misbehavior of not following the rules that will take a student to expulsion." (25 R.R. 53). She testified that Howard was never disrespectful or belligerent, but simply did not want to do the work and follow the rules. (25 R.R. 48). Ms. Boyett did not believe that Howard's actions, such as not following the dress

code, had anything to do with his handicapping condition of ADHD but were instead the result of Howard's choices. (25 R.R. 48–49).[5]

Rodney Cavness, a former Assistant Principal at Silsbee High School, testified that his main responsibility was enforcing discipline for the special education department. (25 R.R. 56–57). In that role, Mr. Cavness had many occasions to interact with Howard and worked with him extensively for about three years. (25 R.R. 57). Mr. Cavness testified that Howard was "very defiant," "chose not to follow the rules," and "[d]id pretty much what he wanted to do when he wanted to do it." (25 R.R. 57). He described Howard's mother as a "good lady" who really tried to help her son and did everything she could to help him succeed. (25 R.R. 57–58). By his account, the school "exhausted all resources that [it] had available to try to modify [Howard's] behavior, from counseling with the young man, involving the parents, in school suspension, suspension out of school, placement in the alternative school, [and] expulsion." (25 R.R. 58). However, Howard's misbehavior persisted and resulted in serious infractions of the school rules. (25 R.R. 58). Mr. Cavness also recalled that during one ARD meeting, Howard admitted to experimenting with illegal drugs and/or alcohol. (25 R.R. 63).

Tom Wakefield, a former director at SAC, testified that Howard was assigned to the school because of a felony offense for distribution of cocaine. (25 R.R. 104). Howard was defiant, completely disregarded the rules, and would not adhere to even the basic regulations of the program. (25 R.R. 100–01, 102). Mr. Wakefield explained that SAC had a rule requiring students to tuck in their shirttails because it allowed teachers to see if weapons were hidden in

---

[5] Ms. Boyett additionally testified that when Howard was about sixteen years old, his mother told her that Howard had heard voices and that Ms. Howard was very concerned. (25 R.R. 51, 56). Ms. Boyett told the director of nurses and the assistant superintendent at SAC about the conversation. (25 R.R. 50). On cross-examination, she stated that she believed Ms. Howard was very sincere about it. (25 R.R. 51). However, Howard never told Ms. Boyett that he heard voices and she never saw Howard talking to himself or acting in such a way that it appeared he was hearing voices. (25 R.R. 51, 54–55).

waistbands or pockets. (25 R.R. 103). When Howard was asked to tuck in his shirttail, he responded by saying he did not give an "F" what he was told to do. (25 R.R. 103). Howard also refused to take his medications and said he did not have to take them. (25 R.R. 103). Mr. Wakefield stated that when Howard wanted to complete his school work, he was capable of doing so. (25 R.R. 104).

### 2. Howard's criminal history and prior bad acts.

The State presented evidence of Howard committing several burglaries as a juvenile, his possession of controlled substances, his fighting with police officers and resisting arrest, and his fighting with other inmates in jail while he was awaiting trial for capital murder.

On December 1, 1993, when Howard was thirteen years old, he was placed on probation for one year after he was found to have engaged in delinquent conduct. (25 R.R. 89–90; 33 R.R. at SX-50). Specifically, Howard committed burglary of a motor vehicle on four separate occasions: at Colvin's Transmission (June 1, 1993 and July 21, 1993), at Boddie's Garage (August 1, 1993), and at Payne and Sons (August 15, 1994[6]).

On September 25, 1997, Howard committed the offense of delivery of a controlled substance, cocaine. (25 R.R. 89; 33 R.R. at SX-51). He was convicted on January 28, 1998, and placed on deferred adjudication probation for four years.

On December 30, 1997, Howard was arrested for possession of marijuana, resisting arrest, and failure to identify. Officer Carlos Montalvo of the Silsbee Police Department testified that he made a traffic stop of a vehicle in which Howard was the front seat passenger. (25 R.R. 65–67). Howard was not wearing a safety belt, which is a violation of Texas traffic laws. (25 R.R. 67). When Officer Montalvo asked Howard for identification, he refused. (25

---

[6] This offense appears to have been committed after Howard was placed on probation.

R.R. 67).  Howard eventually told the officer his name, but cursed at him and refused to give his birth date.  (25 R.R. 67).  Officer Montalvo arrested Howard for failure to identify, placed him in restraints, and took him to jail.  (25 R.R. 67–68).  At book-in, Officer Montalvo found a small baggy of marijuana in the pocket of Howard's jacket.  (25 R.R. 69).  Officer Montalvo testified that Howard refused to enter the jail cell, jerked away from him, and started swinging when the officer grabbed his arm.  (25 R.R. 70).  Howard began fighting and kicking, so Officer Montalvo took him down to the floor.  (25 R.R. 70).  The officers used hand and leg restraints to get Howard into the cell, and monitored his behavior to make sure he did not hurt himself.  (25 R.R. 70).  Officer Montalvo thought Howard was possibly intoxicated and testified that Howard eventually calmed down inside the cell.  (25 R.R. 71).

On January 12, 1999, Howard ran from Officer Montalvo when he was on patrol.  (25 R.R. 71). Officer Montalvo testified that he was patrolling in a marked police vehicle through an area with a lot of drug activity when he saw Howard leaning inside the window of a car.  (25 R.R. 72–74).  When the officer turned around to observe the vehicle, Howard took off running. (25 R.R.72).  Officer Montalvo ordered him to stop but he failed to do so, and a foot chase ensued.  (25 R.R. 72).  Howard jumped over several fences and ran in every direction, but was eventually found behind a house.  (25 R.R. 72–73, 74).  Officer Montalvo had no trouble taking Howard into custody because Howard was tired.  (25 R.R. 74).

On April 29, 2000—less than two weeks before Howard's capital crime—Howard was arrested for possession of crack cocaine.  Deputy Andrew Cole testified that while he was on patrol, he saw Howard riding a bicycle.  (25 R.R. 116).  As the deputy approached, Howard threw down the bicycle and began running.  (25 R.R. 117).  Deputy Cole caught Howard and placed him in handcuffs to find out why Howard ran.  (25 R.R. 118).  During a pat down, Deputy

Cole found a hard, rocky substance in Howard's sock and arrested him for possession of crack cocaine. (25 R.R. 118–19). The DPS Crime Lab analyzed five individuals rocks and reported that it was .40 grams of cocaine. (25 R.R. 125–26).

On May 30, 2000, while Howard was in jail awaiting trial for capital murder, he caused bodily injury to Quincy Dixon, a fellow inmate. Deputy Chris Robichaux, a jailer with the Hardin County Sheriff's Department, testified that he saw Howard with his hands and fists raised, standing over Dixon who was on the floor. (*See* 25 R.R. 78). Deputy Robichaux stated that when he asked Howard what was going on, Howard said he was tired of Dixon mumbling remarks toward him, so Howard assaulted him. (25 R.R. 78).

On January 4, 2001, Howard caused bodily injury to Shawn Benton, an inmate at the Hardin County Jail. Deputy Anthony Flowers testified that he responded to a radio call for assistance to break up a fight in the visitation room. (25 R.R. 82–83). When he reached the location, he saw Howard striking Benton about the face and head with a closed fist. (25 R.R. 84). The officers used pepper spray to break up the fight. (25 R.R. 84).

Sheriff Ed Cain testified to difficulties escorting Howard to court. (25 R.R. 91–92). Once when Howard was being brought from the jail through the sally port, he jerked away when the Sheriff took him by the arm. (25 R.R. 92). Howard also jerked away when Sheriff Cain took hold of Howard's sleeve. (25 R.R. 92). After that incident, the Sheriff ordered that Howard be placed in handcuffs when he was outside the courtroom door. (25 R.R. 93). Sheriff Cain testified that Howard would also stiffen up his arms so the handcuffs could not be positioned to fit the key inside the lock and would jerk away afterwards. (25 R.R. 94–95).

**B.** **Howard's case for mitigation.**

During both stages of trial, Howard presented testimony from lay witnesses and experts regarding his background and mental health history.

**1.** **Testimony of family members.**

**(a)** **Howard's background and mental status.**

Shirley Howard, Howard's mother, testified at both stages of trial. (23 R.R. 49–80; 26 R.R. 90–97). During the guilt/innocence stage, his mother testified that Howard has always had mental problems and that she first began noticing some problems when he was in the 3rd grade. (23 R.R. 50). Howard was diagnosed with ADHD in the 5th grade. (23 R.R. 50). He started taking medication for ADHD in the 6th grade, and it calmed him down a bit. (23 R.R. 51). Ms. Howard testified that Howard had problems in class at times because of his ADHD. (23 R.R. 51). When Howard was in the 7th or 8th grade, they began to see Dr. Laine who diagnosed Howard with depression. (23 R.R. 51). Dr. Laine prescribed Pamelor, but later switched Howard to Prozac. (23 R.R. 52). Ms. Howard testified that Howard took the medication and his behavior became better. (23 R.R. 52). Howard stopped seeing Dr. Laine in October or November of 1996 after Dr. Laine moved from the area. (23 R.R. 52). His mother made an appointment for Howard with a psychiatrist in Beaumont, Dr. Ned Groves, but Howard would not go. (23 R.R. 52–53). When Howard was sixteen years old, his mother learned that Howard was getting more disruptive in his afternoon classes and that he was not taking his 12:00 p.m. medication. (23 R.R. 53). She tried to have Howard hospitalized in order to get him back on his medication, but Howard refused to sign the papers to commit himself. (23 R.R. 53). Ms.

Howard stated that she was told Howard had to voluntarily admit himself to the hospital or else she had to go to a county judge and say Howard was threatening to harm himself or others. (23 R.R. 54).

Ms. Howard further testified that as time passed, her son's mental condition worsened. (23 R.R. 54). When the family would be watching television, Howard would spontaneously laugh out loud for no apparent reason and did so on other occasions. (23 R.R. 54–55). Howard would sit and rock, but would bend his whole body like an autistic child. (23 R.R. 55). Ms. Howard stated that the biggest difference she noticed was the decline in Howard's personal hygiene. (23 R.R. 56). She described Howard as a very clean and neat child who starched and ironed his jeans or shorts every day. (23 R.R. 55). More recently, he wore an old wool hat on his head in summertime, did not change his clothes or wash his clothes for days, and he did not take baths. (23 R.R. 55). The family had to repeatedly ask Howard to take a bath until he eventually did so. (23 R.R. 55). Ms. Howard testified that her son went from always willing to talk with her to where he only answered "yes" or "no," and even that had stopped. (23 R.R. 56). When Howard was placed in the homebound program, he went to live with his grandfather because he could make sure that Howard got up in the morning and took his medications. (23 R.R. 56–57). Howard was also there to help his grandfather, who is legally blind and has arthritis. (23 R.R. 57).

At the punishment stage, Shirley Howard identified pictures of her son as he was growing up. (26 R.R. 90–93; 33 R.R. at DX-2 to DX-6). She also identified five sports trophies of

Howard's when he made All Stars in baseball and basketball. (26 R.R. 93–94; DX-7 to DX-11).

Ms. Howard additionally testified about a fight Howard got into with another inmate while she was visiting him at jail on January 4, 2001. (26 R.R. 94–96). Howard had been looking at his mother during the visitation, but then looked away and started mumbling something. (26 R.R. 95). Ms. Howard asked what he had said, but Howard did not respond and turned away. (26 R.R. 95). She heard Howard saying, "What did you say? I told you to leave my stuff alone," then saw him jump up, go to the far end of the visitation room, stand over one of the other inmates, and heard him keep saying, "What did you say to me?" (26 R.R. 95). By the time the jailer came, Howard had hit the other inmate. (26 R.R. 95). Ms. Howard testified that there have been times when she is speaking to Howard but he does not respond and looks past her. (26 R.R. 95–96). Finally, Ms. Howard testified that she told school officials that Howard told her on one occasion that he heard voices. (26 R.R. 96).

Sheanna Howard, Howard's sixteen-year-old sister, testified at both stages of trial. (23 R.R. 17–26; 26 R.R. 88–89). During the guilt/innocence stage, Miss Howard testified that her brother had always had problems mentally. (23 R.R. 18). On some occasions, he did not take baths and that was not like him to do so. (23 R.R. 18). She agreed that Howard would go for long periods of time without bathing and that her family would have to tell him to take a bath. (23 R.R. 18). Miss Howard denied noticing anything unusual about how Howard would eat. (23 R.R. 19). At the punishment stage, Miss Howard testified that she knows her brother is charged

with a very serious offense, the jury could kill him or give him life, she loves her brother, and she prays for both families. (26 R.R. 88–89).

Pamela Fulton, Howard's cousin, testified at the guilt/innocence stage that she has lived in Silsbee, Texas, all her life. (23 R.R. 2–3). She stated that she has seen Howard's different mental states over his life and noticed recently that Howard would sit alone, talking and laughing to himself. (23 R.R. 3). Ms. Fulton testified that Howard would do this at her house, at his grandfather's house, and while standing outside on the corner. (23 R.R. 3). According to Ms. Fulton, Howard's behavior had started to concern the family. (23 R.R. 3).

Jerry Howard, Jr., Howard's older brother, testified at the guilt/innocence stage that he played basketball, baseball, and football; that Howard played the same sports he did; and that Howard tried to follow him sometimes and do the same things he did. (23 R.R. 27). He agreed that his brother had always had some sort of problem, even when he was really young. (23 R.R. 27–28). Howard was on medication for a long time, sometimes their mother had to force Howard to take his medication, and she gave Howard's medication to the school nurse to make him take it. (23 R.R. 28). He recalled that Howard sometimes wore the same clothes for weeks and would not wash them, and that he gave Howard clothes to wear but Howard would not put them on. (23 R.R. 28). Jerry Howard testified that he would sometimes drive around with Howard and talk, but Howard would just sit there and not say anything in response. (23 R.R. 28–29). He agreed that the family was starting to become concerned about Howard's behavior. (23 R.R. 29).

R. C. Kyles, Howard's eighty-four-year-old grandfather, testified at the guilt/innocence stage that he has eleven grandchildren and loves them all, but is the closest to Howard. (23 R.R. 82–83). He said he felt that way because Howard never could explain himself or defend himself, and other kids would blame Howard for things he did not do. (23 R.R. 83). Mr. Kyles testified that Howard lived with him. (23 R.R. 83). He stated that Howard had a small room air conditioner and two oscillating fans and sometimes would have them all turned on, but then Howard would also turn the big heater on and have it blasting at the same time. (23 R.R. 84–85). If Mr. Kyles was woken up by loud music on Howard's record player, he would go into Howard's room to turn the music down and would cutoff the heater. (23 R.R. 85).

### (b) Howard's behavior the night before the capital crime.

Several of Howard's family members testified regarding his unusual behavior on May 11, 2000, the night before the murder, including his mother (23 R.R. 57–69), grandfather (23 R.R. 85–88), brother Jerry (23 R.R. 29–39), sister Sheanna (23 R.R. 19–22), and cousin Pamela Fulton (23 R.R. 3–10).

Generally, these individuals testified that Howard's grandfather, Mr. Kyles, called 911 to report that Howard had taken one of Mr. Kyles' guns and fired it inside his residence. (23 R.R. 19, 59, 84). Mr. Kyles testified that he was afraid of his grandson that night and that Howard's skin color had changed, his eyes were big and white, and his eyes had rolled up into the back of his head. (23 R.R. 84). When the police arrived at Mr. Kyles' home, Howard was not present. (23 R.R. 19). Howard's family did not want Howard arrested, but wanted help finding him

because they were concerned that he had a gun. (23 R.R. 61). The police officers left, but said they would look for Howard while they were on patrol. (23 R.R. 60). Howard came back to the residence after the police had gone, looking wild eyed. (23 R.R. 19, 62–63). Family members tried to keep Howard distracted while they called the police. (23 R.R. 20, 62–66). No officer appeared and the family did not call the police again. (23 R.R. 21, 66).

Howard's brother, Jerry, testified that when he arrived at their grandfather's house, he talked with Howard to try to calm him down but Howard was "in his own world." (23 R.R. 31–33). Shirley Howard told Jerry to take Howard away from the house because their grandfather was afraid. (23 R.R. 33). Pamela Fulton testified that Howard looked filthy and kept scratching himself, so she suggested they take him to her house so he could take a bath. (23 R.R. 8). Jerry got some clean clothes for Howard and told him to go take a bath, but Howard just stood there so Jerry turned on the water for him. (23 R.R. 35). When Jerry went to check on Howard's progress, he found him standing in the shower fully clothed, with the water running, and acting like he was rubbing himself with soap. (23 R.R. 9, 37). Jerry told his brother to get cleaned up because he was going to get a girl over there for him, and Howard agreed to do so. (23 R.R. 38–39). Jerry ended up taking Howard and a cousin out driving until about 3:00 a.m., then dropped them both off at the cousin's house. (23 R.R. 45). Howard's mother testified that the following day, she was planning on talking with a judge to have Howard committed to a mental hospital because she felt he was a danger to himself and others. (23 R.R. 68–69).

## 2. Testimony of friends and peers.

Lisa Sanchez, Howard's 4th grade teacher, testified for the defense at both stages of trial. (22 R.R. 6–9; 25 R.R. 146–56). During the guilt/innocence stage, Ms. Sanchez testified that when Howard was her student, she taught a self-contained classroom, which meant all subjects, all day long. (22 R.R. 8). Ms. Sanchez testified that she knows Howard very well and had known him and his mother before Howard ever became her student because her husband coached him in Little League the year before. (22 R.R. 9). Howard sometimes came to their home after school and played with their pets. (22 R.R. 9). Ms. Sanchez described Howard as "a very outgoing child, very busy, [who] had difficulty staying in his seat and completing his work. Mostly a happy-go-lucky child, but sometimes easily agitated." (22 R.R. 9). Howard started taking medication for ADHD when he was in her class, and she saw his mental state both on and off medication. (22 R.R. 9).

At the punishment stage, Ms. Sanchez testified that she taught a transition classroom where it was her job to work with students in math and reading to help bring them up to grade level. (25 R.R. 147). Howard was in her class because he had some learning difficulties, was below grade level, and had problems staying in his seat and getting his work done. (25 R.R. 147–48). Ms. Sanchez testified that Howard did not particularly like math and it took him a while to get his work done. (25 R.R. 149). As a reward, she frequently let Howard sit underneath the table beside her desk where it was quiet and he could finish his work. (25 R.R. 149). Ms. Sanchez further testified that Howard would come to their home and play with their

Dalmatians, that he loved the dogs and drew pictures of himself and the dogs, and his pictures were hung up on the walls at school. (25 R.R. 150).

Michael Sanchez, Lisa Sanchez's husband, also testified at both stages of trial. (22 R.R. 10–12; 25 R.R. 141–45). At the guilt/innocence stage, Mr. Sanchez testified that he was Howard's Little League baseball coach when Howard played on the team for eight year olds. (22 R.R. 8). By his account, Howard was a very good athlete and they played him everywhere, from outfield to infield to pitcher. (22 R.R. 11).

Mr. Sanchez testified that when Howard was on his team, it was prior to his taking medication. (22 R.R. 11). Howard had a hard time focusing on the repetitive drills like batting practice, but he was very eager and very excited to play. (22 R.R. 12). The coaches tried to make it as fun as possible but also wanted everyone to learn, and they had a hard time keeping Howard on task. (22 R.R. 12). Mr. Sanchez testified that after Howard was medicated, his behavior settled down. (22 R.R. 12). He witnessed the positive change in Howard's behavior first hand when he accompanied his wife's class on a field trip the following year. (*See* 22 R.R. 12).

During the punishment stage, Mr. Sanchez testified that he first met Howard when he was coaching Howard's older brother, Jerry, and Howard would come out to the practices and ball games to watch his brother play. (25 R.R. 142). He described Howard as "very rambunctious, very excitable" and that he seemed to have a lot of nervous energy. (25 R.R. 143). Mr. Sanchez

testified that he and Howard got along pretty well, that Howard came to the Sanchezes' home a few times, and that Howard was respectful.  (25 R.R. 144).

Joel Neely, a civil structural engineer at DuPont, also testified for the defense at both stages of trial.  (22 R.R. 13–16; 26 R.R. 70–75).  During the guilt/innocence stage, Mr. Neely stated that he coached Little League baseball, softball, and basketball in Silsbee.  (22 R.R. 14).  He remembered Howard as probably one of the top three pitchers on his team and described Howard as a "game winner" and a "real good athlete."  (22 R.R. 15).  Mr. Neely testified that most of the time, Howard was just one of the regular kids who liked to play baseball and have fun.  (22 R.R. 15–16).  However, there were occasions in practice when he could tell that Howard was not really motivated and was "not right" that day.  (22 R.R. 16).  Mr. Neely agreed that Howard's behavior was stabilized on medication, but when Howard did not take his medication, his behavior became erratic.  (22 R.R. 16).

At punishment, Mr. Neely testified that Howard played on his Rangers team when he was ten or eleven years old.  (26 R.R. 71).  Mr. Neely had seen Howard play, knew he was a good athlete, and wanted him on his team.  (26 R.R. 72).  He swapped one of his team's players for Howard's older brother Jerry, who was a catcher, knowing that he would get Howard as a pitcher in a year or two because brothers get to play on the same team.  (26 R.R. 72).  Mr. Neely testified that the Howard brothers were always at practice and always had their gear, and he never had to worry about them being late.  (26 R.R. 73).  After all these years, Mr. Neely still had fond memories of Howard.  (25 R.R. 73).

Lola Thomas, a nurse manager at Christus St. Elizabeth Hospital, testified at the guilt/innocence stage. (22 R.R. 17). She stated that she had known Howard all his life and noticed his behavior changing over the last four or five years. (22 R.R. 18). Ms. Thomas described Howard as having become very withdrawn and isolated, and that he separated himself from his friends. (22 R.R. 19). Based on her training and experience as a nurse, she believed that Howard's behaviors were symptomatic of someone with mental problems. (22 R.R. 19).

Milton Young testified at the guilt/innocence stage that he had lived in Silsbee for the past twenty years, he knows the Howard family, and has known Howard since he was a little boy. (23 R.R. 13). About two weeks before the murder, Mr. Young saw Howard walk down the road and just stand there at the corner staring at folks. (23 R.R. 14). Mr. Young figured that Howard "had a little problem," so he talked to the Chief of Police because he figured that Howard needed some help. (23 R.R. 14–15).

Deputy Sherry Harrison, a jailer with Hardin County Sheriff's Department, testified at the punishment stage that Howard was the type of inmate who would follow directions, Howard followed her directions, and she never had any personal problems with him. (25 R.R. 135–36).

Deputy Tyre Thomas, a jailer with the Hardin County Sheriff's Department, testified at the punishment stage that he went to church with Howard when they were young, and he played baseball with Howard's older brother, Jerry. (25 R.R. 137–38). The deputy saw Howard at the jail and had contact with him. (25 R.R. 138). Deputy Thomas testified that Howard acted differently from how he did years ago—he now talks to himself, has mood swings, and does not

take a bath or brush his teeth unless he is told to do so. (25 R.R. 138). He also testified that he had not had any problems with Howard like fighting at the jail. (25 R.R. 140).

William Bass testified at the punishment stage that he works for the Westvaco paper mill in Evadale. Mr. Bass testified that he was tired because he had been up for about twenty-four hours and, despite being tired, he wanted to come to court to make a statement for Howard. (26 R.R. 75–76). Mr. Bass knew Howard from Little Dribblers, the Little League basketball team. (26 R.R. 76). He stated that he has four sons and the next-to-the-youngest son was Howard's classmate and they played basketball together. (26 R.R. 77). According to Mr. Bass, when Howard got the basketball in his hands, everyone knew he was going to score and that is how the team won games. (26 R.R. 76). Mr. Bass was not a coach but just a parent who watched the kids play. (26 R.R. 77). Mr. Bass stated that he had sympathy for the victim's family and wished he could turn back the hands of time but also felt sorry for both the victim and for Howard. (26 R.R. 77).

Tonya Moffett, Howard's first cousin, testified at the punishment stage that she works at Helena Laboratories in Beaumont. (26 R.R. 78). She stated that in February 1989, Howard was a junior groomsman in her wedding and that he had always treated her with courtesy. (26 R.R. 79). Ms. Moffett understood that Howard's jury could give him the death penalty and stated that both families were in her prayers. (26 R.R. 79).

Sandra Johnson testified at punishment that she works as a correctional officer at the Stiles Unit in Beaumont, Howard's mother and grandmother are her neighbors, and she has

known Howard ever since his mother brought him home from the hospital as a baby. (26 R.R. 80–81). She understood the jury could give Howard life or death, and had sympathy for the other family. (26 R.R. 81).

Denise Young testified at the punishment stage that she works in office administration for a Home Improvement warehouse. (26 R.R. 82). She stated that she has known Howard since he was about five years old. (26 R.R. 83). She understood the jury could give Howard life or death, she had sympathy for the victim's family, and said they were in her prayers. (26 R.R. 83).

Iby G. Young testified at punishment that she was fourteen years old and a "pretty good student" at Silsbee High School. (26 R.R. 84). Her mother is Denise Young, the witness who testified just before her. (26 R.R. 84). Ms. Young stated that she knew Howard "because he used to come around my house and visit a lot and he used to come play with me and my brother." (26 R.R. 85). She testified that Howard told her to "always try my best and succeed at whatever I do" and "don't let anyone tell me that I can't do or be anything I want to be in life." (26 R.R. 85). Ms. Young understood that the jury could give Howard life or death, and would pray for both families. (26 R.R. 85).

Keesha McKinney testified at the punishment stage that she is the twenty-two-year-old daughter of Sandra Johnson, who testified earlier in the penalty phase. (26 R.R. 86–87). She stated that she has known Howard since childhood and they grew up together. (26 R.R. 87). Ms. McKinney testified that they played everything together, including kickball, baseball, and volleyball. (26 R.R. 87). Her aunt had a field right next to her house and all the neighborhood

kids would come down there and play. (26 R.R. 87). Ms. McKinney always liked having Howard on her team because he could hit good, kick good, and they would win the game when Howard came to bat. (26 R.R. 87). She understood Howard could get life or death, and she prayed for both families. (26 R.R. 87–88).

### 3. Testimony of expert witnesses.

Dr. James Duncan, a clinical psychologist, testified for the defense at the guilt/innocence stage. (21 R.R. 18–44).[7] He was appointed by the trial court to conduct a mental status examination of Howard. (21 R.R. 25). On March 8, 2001, Dr. Duncan interviewed Howard for an hour-and-a-half to two hours at the Hardin County Jail and assessed his mental functioning, emotional functioning, intellectual functioning, concentration, and memory. (21 R.R. 20–21). He also provided a written report of his evaluation. (34 R.R. at DX-1). Dr. Duncan found Howard's level of functioning to be inconsistent, i.e., he sometimes gave coherent responses but other times gave unintelligible or inappropriate responses. (21 R.R. 23–24). He testified that Howard would suddenly smile or chuckle when there was no obvious reason for the response. (21 R.R. 24). Dr. Duncan thought Howard might have been responding to an internal stimulus, as if he heard voices. (21 R.R. 25). He also expressed his concern about Howard's ability to maintain concentration and found evidence of flattening or inappropriate affect. (21 R.R. 25). Dr. Duncan's intellectual assessment of Howard was that he operates at a borderline to mildly impaired level of functioning. (21 R.R. 26). In his opinion, Howard had some deterioration in

---

[7] Dr. Duncan's testimony caused the trial to be held in recess to determine if Howard was competent to proceed. (21 R.R. 49–51). Dr. Duncan also testified for the defense during both trials on competency. (29 R.R. 61–84; 31 R.R. 100–36).

intellectual functioning which could be due to an organic condition like a blow to the head or a brain tumor, or else a biological condition like schizophrenia which usually occurs in late teens and early twenties. (21 R.R. 26–27). Given Howard's age and the nature of symptoms displayed, Dr. Duncan thought Howard may well be exhibiting an emerging thought disorder, possibly schizophrenia. (21 R.R. 27–29). Dr. Duncan testified that Howard appeared to be in need of psychiatric treatment, and that he had questions about Howard's competency to stand trial. (21 R.R. 29, 41–42). He also spoke to one of the jailers who had observed Howard and learned that his observations of Howard's behavior were consistent with his own. (21 R.R. 40).

Dr. Fred Fason, a psychiatrist, testified at the punishment stage regarding his mental health evaluation of Howard. (26 R.R. 9–69). Dr. Fason interviewed Howard twice, the first time in February 2001. (26 R.R. 20). When he began to administer one of the psychological tests, Howard did not know some of the words in the first few questions. (26 R.R. 22). Dr. Fason testified that this caused him to conclude that Howard could not read at the 6th grade level and questioned whether he was intellectually disabled. (26 R.R. 22–23).

After reviewing Howard's school records, Dr. Fason discovered, however, that Howard had started out as a "really bright student." (26 R.R. 24). Howard was in the 90% in math in 2nd grade, but had dropped to the 30% in the 5th grade. (26 R.R. 24). Dr. Fason testified that "it was as if some malignant process started affecting [Howard's] brain because he went downhill from there." (26 R.R. 25). Dr. Fason theorized that Howard's declining performance in school was due to the onset of schizophrenia. (26 R.R. 27). He reviewed Dr. Duncan's report

and testing materials, and testified that some of the behaviors observed by Dr. Duncan were characteristic of schizophrenic disorder. (26 R.R. 26). These included poverty of thought, inappropriateness of affect, and loose associations when Howard was pressed on questioning. (26 R.R. 26–27, 30–33). Dr. Fason believed that Howard's diagnoses of ADHD and depression during adolescence were more consistent with schizo-affective schizophrenia, and that Howard possibly should have been hospitalized. (26 R.R. 33–34). Dr. Fason called Howard's physician, Dr. Laine, in Florida, conferred with him about the possibility of schizophrenia, and reported that Dr. Laine thought, in retrospect, that Howard might have had a schizo-affective disorder or prodromal schizophrenia. (26 R.R. 28, 36).

Dr. Fason did not agree with testimony provided at the guilt/innocence stage by the State's expert, Dr. Edward Gripon, that Howard's behaviors were indicative of antisocial personality disorder and instead believed Howard's lack of caring was more consistent with depression. (26 R.R. 57, 65–66). Dr. Fason also testified about medicines used for treating patients with schizophrenia and stated that newer, atypical anti-psychotic medications are becoming available. (26 R.R. 60).

**C.     The State's case in rebuttal**.

Dr. Edward Gripon, a psychiatrist with twenty-six years experience, testified for the State during its case in rebuttal at both stages of trial. (23 R.R. 92–117; 26 R.R. 98–117). In addition to giving his opinion that Howard was not insane at the time of the crime, Dr. Gripon testified at the guilt/innocence stage that many of the symptoms or behaviors attributed to Howard—such as

having wild eyes, flat affect, depression, talking to himself, poor hygiene, and laughing inappropriately—are symptoms of using crack cocaine. (23 R.R. 99–104). Dr. Gripon also found no evidence of Howard having a substantial mental illness or thought disorder when he clinically evaluated Howard in April 2001. (23 R.R. 104). Dr. Gripon stated that Howard's records contained one reference to Howard being clinically depressed five years ago, but Dr. Gripon did not find evidence of clinical depression when he evaluated Howard prior to trial. (23 R.R. 106–07).

During the punishment stage, Dr. Gripon testified for the State that Howard was not suffering from schizophrenia, but instead has antisocial personality disorder. (26 R.R. 101–08). He reported that Howard was diagnosed with ADHD in 1993 and treated until 1996; that Howard's behavior improved and his grades were satisfactory when he took medication; and that when Howard was noncompliant, his grades declined and his behavior deteriorated. (26 R.R. 100–01). Based on his review of Howard's school records, Dr. Gripon did not find anything to indicate that Howard was suffering from the early signs of schizophrenia. (26 R.R. 101). Dr. Gripon explained that in making a mental health diagnosis in 2000, such diagnosis must be based on the DSM-IV criteria—not psychological literature like that relied on by Dr. Fason. (26 R.R. 107). To be diagnosed with schizophrenia under the DSM-IV, a person must have two of the four criteria and must exhibit those behaviors consistently over a thirty-day period. (26 R.R.

107). Dr. Gripon testified that Howard does not suffer from schizophrenia because, although he does have flat affect, he does not exhibit any of the other three DSM-IV criteria.[8] (26 R.R. 107).

Ken Thompson, a criminal investigator with the special prison prosecution unit, testified regarding the different types of prison settings for persons convicted of capital murder versus those convicted of murder and receiving a life sentence. (26 R.R. 117–121, 124–25). He also testified about prison gangs such as the Crips, how they recruit members, and the types of illegal activities that gangs are involved in within prisons. (26 R.R. 121–24). Finally, the State presented victim impact testimony from Joann Swartout, the victim's mother, and Jennifer Buckley, a niece. (26 R.R. 129–37).

At the close of the punishment hearing, the jury answered the special issues on future dangerousness and mitigation in a manner which required the trial court to assess Howard's punishment at death by lethal injection. (27 R.R. 61–63; 3 C.R. 573–77, 601–04).

## D.     Findings of Fact and Conclusions of Law

In addition to reviewing the evidence presented during Howard's capital trial, the Court reviews the Findings of Fact, Conclusions of Law and Order of the 356th District Court of Hardin County, Texas. The state habeas court findings are relevant to the issues of exhaustion and ineffective assistance of counsel. The state habeas court found:

---

[8] According to the DSM-IV, the criteria for schizophrenia is two (or more) of the following: (1) delusions, (2) hallucinations, (3) disorganized speech (e.g., frequent derailment or incoherence), (4) grossly disorganized or catatonic behavior, or (5) negative symptoms, (i.e., affective flattening, alogia (poverty of speech), or avolition (lack of motivation) each present for a significant portion of time during a 1-month period. DSM-IV Criteria for Schizophrenia, DNA Learning Center, http://www.dnalc.org/view/ 899-DSM-IV-Criteria-for-Schizophrenia.html%20 (last visited July 18, 2018).

1.    The applicant, Jamaal Howard, was indicted and convicted of the felony offense of capital murder in cause number 15114 in the 356th District Court of Hardin County, Texas.

2.    The applicant was represented during trial by counsel Tyrone Moncriffe.

3.    On the 25th day of April, 2001, after the jury affirmatively answered the first special issue, and negatively answered the second special issue, the trial court assessed punishment at death.

4.    The Court of Criminal Appeals affirmed [Howard's] conviction in a published opinion delivered October 13, 2004. *Howard v. State*, 153 S.W.3d 382 (Tex. Crim. App. 2004).

**First Ground for Relief**: [Howard's] execution would violate the Eighth Amendment's prohibition against the execution of the mentally retarded.

## Findings of Fact

5.    [Howard] was interviewed by Dr. James Duncan, Ph.D., a licensed clinical psychologist.

6.    During his education years, [Howard] was never placed in any type of class for students requiring special education.

7.    [Howard] never failed any class nor educational year, and thus was never required to repeat any class nor educational year.

8.    At the time of the offense *sub judice*, [Howard] knew the difference between right and wrong.

9.    [Howard] informed Dr. Duncan that he attempted a robbery in Silsbee, Texas.

10.   [Howard] informed Dr. Duncan that he intentionally shot a woman during the robbery, that he saw the shot hit her, and that he saw her fall on the floor.

11.   [Howard] informed Dr. Duncan that he took money from the store and ran to his house.

12.    [Howard] informed Dr. Duncan that he committed the offense because he was attempting to get money.

13.    [Howard] was found to know the difference between right and wrong when he committed the offense.

14.    [Howard] was able to provide Dr. Duncan with detailed familial history and denied any type of mental disorder.

15.    [Howard] acted deliberately in committing the offense of capital murder.

16.    [Howard] was subjected to only a portion of an I.Q. examination, which resulted in only an estimate of [Howard's] I.Q.

17.    [Howard] began as a bright student in school, but suffered from attention-deficit disorder, which responded well to medication.

18.    [Howard's] grades and behavior declined when he refused to take this [*sic*] medication for attention-deficit disorder.

## Conclusions of Law

19.    [Howard's] intellectual functioning and behavior are impaired to a slight degree.

20.    [Howard's] impairments do not rise to the level of mental retardation, and that [Howard] is not mentally retarded.

21.    This issue has been previously litigated on direct appeal before the Court of Criminal Appeals.

22.    The issue of [Howard's] mental status has been previously litigated at both trial and direct appeal.

23.    There is no controverted, previously unresolved factual issue material to the legality of [Howard's] confinement.

24.    [Howard] is not mentally retarded for purposes of the Eighth Amendment to the United States Constitution.

25.    The execution of [Howard] is not barred by the Eighth Amendment to the United States Constitution.

**Second Ground for Relief**: [Howard's] death sentence violated the Sixth Amendment under *Atkins* and *Ring*, because the jury's verdict did not include a determination of an essential element of capital murder that [Howard] is not mentally retarded.

## Findings of Fact

26.    [Howard] was indicted for and convicted of the offense of capital murder for committing the murder of the complainant in the course of committing the robbery of the complainant.

27.    [Howard] explicitly had no objections to the court's charge to the jury at the guilt/innocence phase, which included in its definitions and application paragraph the essential elements of the offense of capital murder.

28.    [Howard] objected to a portion of the court's charge to the jury on punishment, but not regarding the issue of mental retardation.

29.    [Howard] did not request a charge to the jury on the issue of mental retardation.

## Conclusions of Law

30.    Mental retardation is not an essential element of the offense of capital murder.

31.    [Howard] is procedurally barred from raising such a contention on habeas as he did not object to the trial court's charge to the jury on the basis that it did not contain an issue of mental retardation.

32.    The jury is not required to explicitly find [Howard] is not mentally retarded.

32.[9]    [Howard's] sentence of death does not violate the Sixth Amendment to the United States Constitution.

---

[9] The misnumbering is in the original document.  (*See* Supp. SHCR 26–27).

**Third Ground for Relief**: [Howard] was denied a fair and impartial jury trial because of competing actual conflict of interests during his trial.

## Findings of Fact

33.   [Howard] was previously represented by counsel who, at the time of the trial herein, was an Assistant District Attorney for Hardin County, Mr. Henry A. Coe, III.

34.   Coe's representation of [Howard] was prior to his employment as a Hardin County Assistant District Attorney.

35.   Coe had no independent memory of having met nor spoken to [Howard] during his short representation of [Howard].

36.   After learning of his previous representation of [Howard], Coe had no further involvement in the prosecution of [Howard] herein.

37.   Coe did not possess any confidential information which could be used against [Howard] in the prosecution for capital murder.

38.   [Howard] did not object to Coe representing the State of Texas if the extraneous offense in which Coe did represent [Howard] was not used as an extraneous offense herein.

39.   [Howard's] trial counsel was initially retained to represent [Howard] herein.

40.   During the pendency of the trial, [Howard] became indigent and the court appointed [Howard's] trial counsel to continue his representation herein.

## Conclusions of Law

41.   The court finds there was no conflict between [Howard's] previous representation by Henry A. Coe, III, and Coe's employment as a Hardin County Assistant District Attorney.

42.   The court finds there was no conflict between [Howard] and his trial counsel.

43.   The court finds [Howard] was not denied a fair and impartial trial.

**Fourth Ground for Relief**: [Howard's] constitutional rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution were violated by the application of Article 37.071, Tex. Code Crim. Proc.

### Findings of Fact

44.     [Howard] did not object to the court's charge given to the jury in punishment, except for one unrelated issue.

45.     [Howard] did not raise a complaint based upon Art. 37.071. Tex. Code Crim. Proc. during trial.

### Conclusions of Law

46.     The court finds [Howard's] constitutional rights pursuant to Eighth and Fourteenth Amendments to the United States Constitution were not violated.

**Fifth Ground for Relief**: [Howard] was not provided a fair hearing at the guilt/innocence phase because his attorney provided ineffective assistance of counsel.

**Sixteenth Ground for Relief**: [Howard's] trial attorney did not render reasonable effective assistance of counsel at the most crucial state of [Howard's] trial: the punishment phase. This failure actually and substantially prejudiced [Howard] in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Art. I, § 10 and § 19 of the Constitution of the State of Texas.

### Findings of Fact

47.     [Howard's] trial counsel presented evidence to the jury regarding [Howard's] mental state and claim of mental retardation.

48.     [Howard's] trial counsel presented expert testimony regarding [Howard's] mental state from Dr. James Duncan, Ph.D., a licensed psychologist.

49.     [Howard's] trial counsel presented non-expert testimony from [Howard's] prior educators, coaches, friends, and family all regarding [Howard's] behavior and mental capabilities in their individual interactions with him.

50.     [Howard] was provided his *Miranda* rights by law enforcement prior to providing his statement.

51.   [Howard] was cognizant of what he was doing at the time he gave his statement.

52.   [Howard] indicated in writing that he was aware of his *Miranda* rights.

53.   [Howard] did not object to the introduction of his statement into evidence.

54.   [Howard's] trial counsel cross examined law enforcement as to [Howard's] behavior while providing his statement.

55.   [Howard's] trial counsel cross examined law enforcement as to the voluntariness of [Howard's] statement.

56.   [Howard] placed before the jury the issue of [Howard's] mental issues through both cross examination of state's witnesses and direct examination of defense witnesses.

57.   [Howard] challenged before the jury the voluntariness of [Howard's] statement through the cross examination of state's witnesses.

## Conclusions of Law

58.   [Howard's] statement was given knowingly, intelligently, and voluntarily.

59.   [Howard] was not mentally ill nor mentally retarded.

60.   [Howard's] trial counsel's performance did not fall below an objective standard of reasonableness.

61.   [Howard's] trial counsel's performance was not deficient.

62.   [Howard's] trial performance did not prejudice [Howard's] defense.

63.   [Howard's] trial counsel provided effective assistance of counsel.

**Sixth Ground for Relief**: [Howard's] state and federal constitutional rights were violated when his statement was taken involuntarily.

## Findings of Fact

64. [Howard] was provided his *Miranda* rights by law enforcement prior to providing his statement.

65. [Howard] was cognizant of what he was doing at the time he gave his statement.

66. [Howard] indicated in writing that he was aware of his *Miranda* rights.

67. [Howard] did not object to the introduction of his statement into evidence.

68. [Howard's] trial counsel cross examined law enforcement as to [Howard's] behavior while providing his statement.

69. [Howard's] trial counsel cross examined law enforcement as to the voluntariness of [Howard's] statement.

## Conclusions of Law

70. [Howard's] state and federal constitutional rights were not violated as [Howard's] statement was provided intentionally, knowingly, and voluntarily.

**Seventh Ground from Relief**: [Howard] was denied effective assistance of counsel on his appeal.

## Findings of Fact

71. [Howard's] appellate counsel raised nine grounds of error on direct appeal.

72. Two justices dissented to the affirmation of the conviction herein by the Court of Criminal Appeals.

73. The Court finds [Howard's] appellate counsel raised the errors which were arguably supported by the record.

74.     The Court finds the performance of [Howard's] appellate counsel was not deficient.

75.     The Court finds that [Howard] was not prejudiced by his appellate counsel's actions.

Conclusions of Law

76.     [Howard] received effective assistance of counsel on direct appeal.

**Eighth Ground for Relief**: [Howard] was denied due process and a fair and impartial jury trial because of jury misconduct.

Findings of Fact

77.     The Court finds that [Howard] does not claim that any individual juror obtained knowledge about his competency, and that knowledge affected any individual juror's deliberations.

78.     The Court finds that [Howard] does not claim that any individual juror with knowledge of [Howard's] competency shared his independent knowledge with any other juror.

79.     This Court finds that [Howard] does not claim that the jury was aware of [Howard's] competency or that [Howard's] competency entered into the jury's deliberations.

80.     [Howard] does not allege that knowledge of [Howard's] competency affected the jury's verdict in either phase of the trial.

81.     The Court finds that [Howard] has not shown jury misconduct.

Conclusions of Law

82.     [Howard] was not denied due process and did receive a fair and impartial jury, as there was no jury misconduct.

**Ninth Ground for Relief**: Article 37.071 because it prohibits against informing jurors that a single holdout juror could cause the imposition of a life sentence violated [Howard's] rights under the Eighth and Fourteenth Amendments to the United States Constitution.

**Tenth Ground for Relief**: The trial court's instructions at the punishment phase undermined the jury's sense of responsibility for the consequences of its verdict.

**Eleventh Ground for Relief**: In view of the many different capital sentencing schemes that have been in operation in Texas since 1989, the Texas death penalty has been arbitrarily imposed, and thus is unconstitutional under the Eighth Amendment and Equal Protection Clause of the Fourteenth Amendment.

**Twelfth Ground for Relief:** The death penalty, at least as presently administered in Texas, is cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

**Fifteenth Ground for Relief:** The Texas capital murder sentencing statute's definition of "mitigation evidence" is facially unconstitutional because it limits the Eighth Amendment concept of "mitigation" to factors that render a capital defendant less morally "blameworthy" for commission of the capital murder.

## Findings of Fact

83.    The Court finds that [Howard] did not object to the Texas death penalty scheme or the jury charge at punishment on the basis that the trial court allegedly misinformed the jury as to the effect of a single juror's vote at punishment, and [Howard] did not request a jury instruction on such a basis.

84.    The Court finds that the trial court instructed the jury at punishment that if any juror had a reasonable doubt as to whether the answer to a special issue should be "yes," then such juror should vote "no;" and, that only if ten or more jurors vote "no" to a special issue, the answer to the jury shall be "no" to that issue.

85.    The Court finds that [Howard] did not object that the Texas death penalty was arbitrarily imposed in the case at bar.

## Conclusions of Law

85.     Because [Howard] neither objected to the Texas death penalty scheme or the trial court's instructions on the basis that the trial court allegedly misinformed the jury as to the effect of a single juror's vote at punishment nor requested a charge on such basis, [Howard] is procedurally barred from asserting such contention on habeas.

86.     In the alternative, the Texas death penalty scheme does not unconstitutionally mislead the jury as to the effect of a single "no" vote at punishment. [Howard] fails to show that the provisions of Art. 37.071, Tex. Code Crim. Proc., violate [Howard's] rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.

**Thirteenth Ground for Relief**: [Howard's] prosecution, conviction and sentence were the products of improper considerations of race.

## Findings of Facts

87.     The Court finds that [Howard] did not object at trial to the prosecution, conviction, nor sentencing of him as being based upon the considerations of his race, African-American.

88.     The Court finds that [Howard] stated in the hearing on his motion for new trial that the number of African-Americans called for jury service comports with the percentage of African-Americans in Hardin County, Texas.

89.     The Court finds that [Howard] stated in the hearing on his motion for new trial that the number of African-Americans called on the venire panel from which his jury was selected comported with the number of African-Americans called for jury service in prior years.

90.     The Court finds that the number of African-Americans called for jury service in the trial herein was a fair cross section of the Hardin County community, as stated by [Howard].

## Conclusions of Law

91.     Because [Howard] never objected to the prosecution, conviction, nor sentencing of him as being based upon considerations of his race, [Howard] is procedurally barred from asserting such contention on habeas.

92.     Alternatively, because [Howard] stated that the number of African-Americans called for jury service comports with the percentage of African-Americans in Hardin County, Texas, and with the number of African-Americans called for jury service in prior years, [Howard] is barred from asserting his prosecution, conviction, or sentencing was based upon consideration of his race on habeas.

**Fourteenth Ground for Relief**: <u>The due process clause of the Fourteenth Amendment to the Constitution of the United States requires a proportionality review of death penalty verdicts by reviewing courts.</u>

## Findings of Fact

93.     The Court finds that the Court of Criminal Appeals has consistently rejected proportionality reviews of death penalty sentencings.

94.     The Court finds [Howard] has presented nothing to distinguish this cause from other identical claims of proportionality reviews.

## Conclusions of Law

95.     [Howard's] claims of proportionality review is not cognizable on habeas.

**Seventeenth Ground for Relief**: <u>[Howard] was denied the right to a fair and impartial jury trial</u>.

## Findings of Fact

96.     [Howard] voluntarily absented himself from a portion of voir dire based upon his trial counsel's advice.

<u>Conclusions of Law</u>

97. Because [Howard] cannot create reversible error based upon his own actions, [Howard] is barred from asserting that his voluntary absence from a portion of individual voir dire denied him a fair and impartial jury trial on habeas.

98. Alternatively, because [Howard] did not object to the trial court that his absence during a portion of the individual voir dire denied him a fair and impartial jury trial, he is procedurally barred from rising such a contention on habeas.

**Eighteenth Ground for Relief**: <u>[Howard's] conviction and death sentence violated the Due Process Clause of the Fourteenth Amendment to the United Sates Constitution because [Howard] was incompetent to stand trial</u>.

**Nineteenth Ground for Relief**: <u>[Howard's] conviction and death sentence violate the due process clause of the Fourteenth Amendment to the United States Constitution because the trial court failed to conduct a *sua sponte* examination into [Howard's] competency to stand trial</u>.

<u>Findings of Fact</u>

99. Dr. James A. Duncan, Ph.D., a licensed psychologist, raised the issue of competency to stand trial during his testimony.

100. The trial court ordered the District Clerk of Hardin County to immediately summon a panel of jurors to determine the issue of [Howard's] competency.

101. The trial court ordered the Sheriff of Hardin County, Texas, to personally serve the summoned jurors to appear the following morning.

102. [Howard] specifically stated he had no objection to the procedure.

103. A competency hearing was conducted before a jury, which ended in an agreed mistrial when the jury could not reach a conclusion as to competency.

104. The trial court then summoned another jury panel without objection by [Howard].

105. The second jury found [Howard] to be competent to stand trial.

106.     As a competency hearing was conducted before a jury to verdict, and [Howard] was found to be competent to stand trial, his conviction and death sentence does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**Twentieth Ground for Relief**: [Howard's] conviction and death sentence violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because [Howard] is incompetent to meaningfully participate or assist counsel in seeking relief under this application for post-conviction writ of habeas corpus.

Findings of Fact

107.     [Howard] has not demonstrated that he is incompetent, and therefore cannot assist his habeas counsel.

108.     [Howard] has not shown that it is required that he be competent to assist his habeas counsel.

Conclusions of Law

109.     Because there is no requirement that an applicant be competent to assist his counsel in filing a post-conviction writ of habeas corpus, [Howard's] claim is not cognizable, and [Howard] is procedurally barred from raising such contention on habeas.

**Twenty-first Ground for Relief**: [Howard's] execution will violate the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution because [Howard] is incompetent to be executed.

**Twenty-second Ground for Relief**: The infliction of [Howard's] death sentence violates the common law prohibition against executing those persons who are mentally incompetent.

Findings of Fact

110.     [Howard] is under a death sentence; however, no execution date has been scheduled.

111.   [Howard] has previously been found to be competent.

112.   [Howard] has provided nothing to demonstrate he is incompetent to be executed.

113.   The previous common law prohibition against executing incompetent persons has been codified by the Texas Legislature as Art. 46.05, Tex. Code Crim. Proc.

114.   Art. 46.05, Tex. Code Crim. Proc., provides the mechanism for alleging [Howard] is incompetent to be executed.

115.   [Howard] has not complied with Art. 46.05, Tex. Code Crim. Proc.

Conclusions of Law

116.   Because no execution date has been set for [Howard], [Howard's] claim is not ripe for review.

117.   Because there is no common law prohibition against executing incompetent persons apart from Art. 46.05, Tex. Code Crim. Proc., [Howard] is barred from raising any contention under common law on habeas.

118.   Because  [Howard] has not complied with Art. 46.05, Tex. Code Crim. Proc., [Howard] is procedurally barred from raising any contention thereunder on habeas.

119.   [Howard] fails to demonstrate that his conviction and sentence was unlawfully obtained.

120.   [Howard] fails to demonstrate that there are any controverted, previously unresolved factual issues material to the legality of his confinement.

121.   It is recommended to the Texas Court of Appeals that relief be denied.

(Supp. SHCR 23–42).   The Texas Court of Criminal Appeals subsequently denied the application for a writ of habeas corpus "based upon the findings and conclusions of the trial court and its own review." *Ex parte Howard*, 2012 WL 6200688, at *1.  (SHCR 2.).

As discussed more fully below, this Court must give deference to the state court's findings and conclusions as instructed in § 2254(d), and presume the state court's factual findings to be correct unless the petitioner rebuts the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  State court decisions must be given the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citation omitted).

## V.  STANDARD OF REVIEW

1.  <u>Section 2254 standards</u>.

The role of federal courts in reviewing habeas corpus petitions by prisoners in State custody is exceedingly narrow.  A person seeking federal habeas corpus review must assert a violation of a federal constitutional right.  *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993).  Federal habeas corpus relief will not issue to correct errors of State constitutional, statutory, or procedural law, unless a federal issue is also present.  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242 (1997).  In the course of reviewing State proceedings, a federal court does "not sit as a super state supreme court to review error under state law."  *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) (citations omitted), *cert. denied*, 552 U.S. 1314 (2008); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983), *cert. denied*, 466 U.S. 984 (1984).

The petition was filed in 2013; thus, review is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in State court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation and internal quotation marks omitted).

With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the State court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the State court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003)), *cert. denied*, 551 U.S. 1141 (2007). "[R]eview under § 2254(d)(1) is limited to the record that was before the State court that adjudicated the claim on the merits." *Pinholster*, 563

44

U.S. at 180–81. As such, "evidence later introduced in federal court is irrelevant." *Id.* at 184.

"The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011), *cert. denied*, 568 U.S. 828 (2012).

With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citing 28 U.S.C. § 2254(e)(1)). The "standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief." *Id.* (citation and internal quotation marks omitted).

More recently, the Supreme Court held that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted). The Supreme Court has explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Federal habeas corpus relief is not available just because a state court decision may have been incorrect; instead, a petitioner must show that a state court decision was unreasonable. *Id.* at 694. Furthermore, when a state court provides alternative reasons for denying relief, a federal court may not grant relief "unless *each* ground supporting

the state court decision is examined and found to be unreasonable under the AEDPA." *Wetzel v. Lambert*, 565 U. S. 520, 525 (2012) (emphasis in original).

2.      **Exhaustion of state remedies and procedural default**.

The resolution of Howard's amended petition concerns complex procedural issues involving exhaustion of state remedies, procedural default, and whether Howard can overcome the procedural default via *Martinez v. Ryan,* 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). The analysis of Howard's claims should begin with a discussion of the exhaustion requirement.

State prisoners bringing petitions for a writ of habeas corpus are required to exhaust their state remedies before proceeding to federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). In order to exhaust properly, a state prisoner must "fairly present" all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). In Texas, all claims must be presented to and ruled upon the merits by the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985). When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition," and historically federal courts in Texas have dismissed the entire petition for failure to exhaust. *See, e.g.*, *Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (en banc).

The exhaustion requirement, however, was profoundly affected by the procedural default doctrine that was announced by the Supreme Court in *Coleman v. Thompson*, 501 U.S. 722 (1991). The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. As a result of *Coleman*, unexhausted claims in a mixed petition are ordinarily dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995); *see also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims are procedurally barred because if a petitioner attempted to exhaust them in state court, they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642.

The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Id.* (citing *Coleman*, 501 U.S. at 750–51). Dismissals pursuant to abuse of writ principles have regularly been upheld as a valid state procedural bar foreclosing federal habeas review. *See Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008), *cert. denied*, 556 U.S. 1239 (2009); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

**3.**     **Application of _Martinez_ and _Trevino_ standards**.

Howard's amended petition couches some of his claims regarding ineffective assistance of counsel claims in light of _Martinez_ and _Trevino_.  Howard has been given the opportunity to explore new evidence in order to determine whether trial and state habeas counsel were ineffective.  Based on the arguments presented by Howard, his investigation focused on whether trial and state habeas counsel discharged their respective duties to uncover and present mitigating evidence.  This endeavor inevitably involves the discovery and presentation of new evidence that has not been presented to the state courts, particularly the Texas Court of Criminal Appeals.

Until recently, Howard's new evidence and claims would have undoubtedly been dismissed as procedurally barred as an abuse of the writ.  The Supreme Court, however, opened the door slightly for a showing of cause and prejudice to excuse the default in _Martinez_ and _Trevino_.  In _Martinez_, the Supreme Court answered a question left open in _Coleman v. Thompson_: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial."  566 U.S. at 8 (citing _Coleman_, 501 U.S. at 755).  The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

_Id._ at 17.

The Supreme Court extended *Martinez* to Texas in *Trevino*. Although Texas does not preclude appellants from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system—as a matter of its structure, design, and operation—does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 569 U.S. at 428. The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial and whether his initial state habeas attorney was ineffective. *Id.* at 429.

The Fifth Circuit subsequently summarized the rule announced in *Martinez* and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014). "Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1786 (2014). The Fifth Circuit reaffirmed this basic approach in *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir.), *cert. denied*, 135 S. Ct. 435 (2014). The Fifth Circuit has also reiterated that a federal court is barred from reviewing a procedurally defaulted claim unless

a petitioner shows both cause and actual prejudice. *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1760 (2014). To show actual prejudice, a petitioner "must establish not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (citations omitted) (emphasis in original).

The Fifth Circuit has held that "[t]he exhaustion requirement is not satisfied if the petitioner 'presents *material* additional evidentiary support in the federal court that was not presented to the state court.'" *Lewis v. Quarterman*, 541 F.3d 280, 284 (5th Cir. 2008) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000)). A court must accordingly ask whether a claim is "in a significantly different and stronger evidentiary posture than it was before the state courts." *Dowthitt*, 230 F.3d at 746 (citation omitted).

Howard may proceed with an unexhausted and procedurally barred claim if he can satisfy the requirements of *Martinez* and *Trevino*. The question before the Court is whether Howard has made the requisite showing under *Martinez* and *Trevino* as to each of his applicable claims.

## VI. DISCUSSION AND ANALYSIS

Howard alleges his trial counsel provided ineffective assistance of counsel in four out of his five federal habeas claims, in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and a petitioner bears the burden of proving both prongs. 466 U.S. at 687.

Under the first prong, a petitioner must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, . . ." *Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or

prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either.

*Id.* at 697.

The Supreme Court discussed the difficulties associated with proving ineffective assistance of counsel claims as follows:

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland,* 466 U.S. at 689–690. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689; *see also Bell v. Cone,* 535 U.S. at 702; *Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S. at 690.

*Richter*, 562 U.S. at 105. In a separate opinion issued on the same day, the Court reiterated that the "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from the best practices or most common custom." *Premo v. Moore*, 562 U.S. 115, 122 (2011) (citing *Strickland*, 466 U.S. at 690).

In the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded to state court decisions, which has been referred to as "doubly" deferential. *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.

The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.* at 102; *also see Morales v. Thaler*, 714 F.3d 295, 302 (5th Cir.), *cert. denied*, 571 U.S. 883 (2013). The *Strickland* standard also applies to ineffective assistance of counsel claims in the context of *Martinez* and *Trevino*. *See Martinez*, 566 U.S. at 14.

A.    **Howard's First Claim (IATC)**: <u>Trial Counsel provided constitutionally ineffective representation by failing to adequately investigate, develop, and present evidence of Howard's life history and mental health in mitigation of punishment</u>.

Howard's first ineffective assistance of trial counsel ("IATC") claim concerns his trial counsel's investigation and use of mitigating evidence. Howard complains that his trial counsel failed to take steps to discover all reasonably available mitigating evidence and argues that his trial counsel was constitutionally ineffective in investigating, developing, and presenting mitigation evidence at the punishment stage. Howard complains that counsel did not offer known critical mitigating evidence that could have been provided by his mother, sister, other family members, and friends.

1.    <u>Exhaustion of the claim.</u>

As a threshold matter, the Court must determine whether this issue was exhausted or procedurally defaulted. Under the exhaustion requirement, a federal court may not grant habeas relief unless it appears that the applicant has exhausted the remedies available in the courts of the state. *See* § 2254(b)(1)(A); *Richter*, 562 U.S. at 86, 103–04. This requirement is satisfied when a petitioner fairly presents the substance of the federal habeas claim to the highest state court.

*Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (quoting *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999)) *abrogated in part by Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012), *cert. denied*, 569 U.S. 910 (2013).

The Court observes that the issue of whether trial counsel was ineffective during the punishment phase of the trial was fully developed during the state habeas corpus proceedings. Although Howard's grounds for relief during the state habeas corpus proceedings were not specifically worded in terms of ineffective assistance of counsel for not calling additional family and friends regarding Howard's life history and mental health or for failing to provide a more fully developed psycho-social history to the mental health expert, Dr. Fason, state habeas counsel fully explored the possible gambit of Howard's ineffective of assistance claim.

State habeas counsel argued that while trial counsel investigated and determined that Howard had mental deficiencies—and discussed Howard's ADHD and potential diagnosis of schizophrenia—trial counsel did not use of any of this evidence or any of the state habeas counsel's evidence of mental retardation to attack the voluntariness of Howard's confession (claim 5). (SHCR 53). State habeas counsel also argued that trial counsel failed to: (1) handle mental competency issues appropriately; (2) timely raise the notice of insanity; (3) develop the available evidence of mental illness, specifically obtaining the jail records, which included a report from Dr. Guillett that supported a theory of mental illness; and (4) call Dr. Fason (Howard's trial mental health expert) in the second competency hearing (Dkt. 78-46, pp. 53–55).

State habeas counsel also argued that trial counsel failed to investigate and present mitigating evidence at the punishment phase (claim 16) of: (1) Howard's 1997 head injury, (2) medical records and a neurological exam to support the head injury, (3) Howard's jail records, (4) evidence of low I.Q. and mental retardation, (5) request a jury instruction on mitigation, and (6) object to prejudicial improper jury argument by the prosecutor regarding "stalking a young lady." (SHCR 74–79).

After reviewing the pleadings and evidence accumulated in this case, the state trial court issued findings of fact regarding whether trial counsel was ineffective during the sentencing or punishment phase of the trial as it pertains to Grounds Five and Sixteen, which includes the following findings:

> 47.    [Howard's] trial counsel presented evidence to the jury regarding [Howard's] mental state and claim of mental retardation.

> 48.    [Howard's] trial counsel presented expert testimony regarding [Howard's] mental state from Dr. James Duncan, Ph.D., a licensed psychologist.

> 49.    [Howard's] trial counsel presented non-expert testimony from [Howard's] prior educators, coaches, friends, and family all regarding [Howard's] behavior and mental capabilities in their individual interactions with him.

> 56.    [Howard] placed before the jury the issue of [Howard's] mental issues through both cross examination of state's witnesses and direct examination of defense witnesses.

Supp. SHCR 29.

The state habeas court went on to issue the following conclusions of law regarding allegations of ineffective assistance of trial counsel:

59.     [Howard] was not mentally ill nor mentally retarded.

60.     [Howard's] trial counsel's performance did not fall below an objective standard of reasonableness.

61.     [Howard's] trial counsel's performance was not deficient.

62.     [Howard's] trial performance did not prejudice [Howard's] defense.

63.     [Howard's] trial counsel provided effective assistance of counsel.

Supp. SHCR 27.

As noted previously, this Court must give deference to the state habeas court's findings on this issue.  *See Cullen*, 563 U.S. at 181; *Richter*, 562 U.S. at 105 (applying "doubly" deferential when § 2254(d) is applicable).  The Court finds that Howard's first ineffective assistance claim has been exhausted.

## 2.     __Professional norms prevailing at the time.__

Howard's capital trial, including his two competency trials, began and were completed in 2001.  Many of the current legal standards regarding death penalty counsel's obligations regarding investigation of mitigation evidence were not available sixteen years ago when this case was tried.  Cases such as *Wiggins v. Smith*, 539 U.S. 510 (2003) ("not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further"), were not the prevailing standard at the time of Howard's capital trial.  *Strickland* instructs this Court that reasonableness is judged under the professional norm prevailing at the time that counsel rendered assistance.  *Strickland*, 466 U.S. at 688.  The Fifth Circuit has "repeatedly held that 'there is no general duty on the part of

defense counsel to anticipate changes in the law.'" *United States v. Fields*, 565 F.3d 290, 294 (5th Cir. 2009) (internal citations omitted). The Court further found that attorneys are not required to be clairvoyant. *Id*. at 294–95 ("Clairvoyance is not a required attribute of effective representation."). As this Court is required to assess Howard's trial counsel's performance with deference, it is only fitting that this Court apply the standard that was in effect at the time of the trial.

Howard is accurate that the prevailing professional norm at the time was found in *Strickland*, *Williams v. Taylor*, 529 U.S. 362, 390-94 (2000), and *Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000). "It is clear that defense counsel's failure to investigate the basis of his client's mitigation defense can amount to ineffective assistance of counsel." *Lockett*, 230 F.3d at 711 (citing *Williams v. Taylor*, 529 U.S. 362). When considering a failure to investigate claim, the Supreme Court has said,

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 691. In *Lockett*, the Fifth Circuit criticized Lockett's trial counsel for failing to conduct *any* investigation into his client's obvious mental health problems. Unlike Lockett's counsel here, Howard's trial counsel did investigate and provide witnesses and records as to Howard's childhood background, educational struggles, depression, and mental health issues. *See supra*, Part IV, 2 A, B, & C.

As to Howard's suggestion that this Court should apply the American Bar Association guidelines to the analysis of trial counsel's performance, that suggestion is declined. Restatements of professional standards, such as the American Bar Association guidelines, are "only guides" to what is reasonable and are properly considered only to the extent they describe the prevailing professional norms and standard practice, and are not so detailed that they "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *See Bobby v. Van Hook*, 558 U.S. 4, 8–9 n.1 (2009) (per curiam).

The Constitution imposes "one general requirement: that counsel make objectively reasonable choices." *Id*. at 9. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 690). This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did. *Id*. at 196. Regarding counsel's duty to investigate, strategic decisions made by counsel following a thorough investigation are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Id*. at 691.

Interestingly, the *Wiggins* Court, in discussing *Strickland*, stated that the investigation into mitigating evidence has limits:

> [We] emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S. at 689. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgment support the limitations on investigation." *Id*. at 690–91. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id*. at 691.

*Wiggins*, 539 U.S. at 533. This Court will not examine what trial counsel "should have done" as suggested by Howard, but rather, whether trial counsel's actions were reasonable regarding the investigation of mitigating evidence.

### 3. <u>Deficient Representation of Trial Counsel</u>.

Howard argues that his trial counsel's performance fell below an objective standard of reasonableness with respect to the duty to investigate, develop, and present mitigating evidence documenting Howard's unusual behaviors and deteriorating mental condition at the punishment phase of his trial. (Dkt. #76, pp. 23–72). Howard contends that his trial counsel only had a rudimentary knowledge of Howard's psycho-social history and the information that he had obtained was only the "most memorable highlights" and "was the result of perfunctory investigation."

### a. <u>Howard fails to show the state habeas court's decision was unreasonable</u>.

As previously noted, Howard's state habeas application challenged trial counsel's mitigation investigation and argued that the deficiencies led to the failure to locate certain

mitigation records regarding mental deficiencies and previous head injuries (jail records) and for failing to develop evidence of mental retardation (SHCR 50, 94–95, 96–98, 146–55). Howard's state application asserted that the omitted evidence "would have supported a finding of incompetency or [served] as mitigating evidence at the punishment stage." (SHCR 50). In rejecting Howard's claims (claims 5 and 16), the state habeas court found that Howard failed to prove deficient performance and prejudice (Supp. SHCR 26–27), and the Texas Court of Criminal Appeals denied relief. *Ex parte Howard*, 2012 WL 6200688, at *1.

As to performance, the state habeas court found that trial counsel presented evidence to the jury regarding Howard's mental state and claim of mental retardation. (Supp. SHCR 26). Trial counsel did so by presenting expert testimony regarding Howard's mental state and by presenting non-expert testimony from Howard's prior educators, coaches, friends, and family regarding his behavior and mental capabilities in their individual interactions with him. (Supp. SHCR 26). Trial counsel also placed the mental health issue before the jury through cross examination of state's witnesses and direct examination of defense witnesses. (Supp. SHCR 26). The state habeas court found that trial counsel's performance was not deficient and did not prejudice Howard's defense, and that trial counsel provided effective assistance. (Supp. SHCR 27). The Court now turns to whether the state habeas court's denial of relief was unreasonable under § 2254(d).

Howard does not specify how the state habeas court's decision was unreasonable, but simply reasserts his argument that trial counsel's representation was deficient in conducting the

mitigation investigation. Howard asserts that the psycho-social history prepared for trial did not meet prevailing professional standards because (1) trial counsel did not meet long enough with key witnesses or only met with the witnesses on the eve of trial or outside the courtroom; and (2) the investigation failed to locate or did not include all of the people necessary to compile an adequate psycho-social history and overlooked educators, family friends, neighbors, and members of Howard's extended family. He argues that this deficient investigation prejudiced his defense because it led to Dr. Fason having insufficient information of Howard's psych-social history to adequately explain to the jury the depth of Howard's mental illness and how his mental illness shaped him and the murder that he committed.

Howard's claim is essentially a complaint about the strategy employed by his trial counsel. Federal courts "will not question a counsel's reasonable strategic decisions." *Bower v. Quarterman*, 497 F.3d 459, 470 (5th Cir. 2007), *cert. denied*, 553 U.S. 1006 (2008). In applying *Strickland*, the Fifth Circuit has held that "the failure to present a particular argument or evidence is presumed to have been the result of strategic choice." *Taylor v. Maggio*, 727 F.2d 341, 347–48 (5th Cir. 1984). Because of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To the extent Howard now argues that trial counsel should have presented more or different evidence of his mental decline or illness, this argument narrows down to a matter of degrees. Courts must be "particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt,* 230 F.3d at 743). In fact, Howard's trial counsel recognized, developed, and presented evidence of mental illness that Howard now claims counsel overlooked. The record reflects that trial counsel presented a psychologist, a psychiatrist, and nineteen lay witnesses, consisting of close family members, extended family, educators, coaches, neighbors, and friends to testify regarding his mental decline and odd behavior throughout the years. Trial counsel also utilized a trial investigator and obtained Howard's medical and school records.

Under the reasonableness standard, trial counsel is not required to call every known person that has information regarding Howard and have them testify. The Court will not second guess trial counsel's decisions regarding how many witnesses he should have called to present mitigation matters to the jury. Trial counsel is entitled to strategize as to: (1) how many witness are enough, (2) which possible witnesses should be selected to testify as they have better jury appeal, and (3) which possible witnesses should be deselected because trial counsel feels the potential testimony becomes cumulative and duplicitous and is not beneficial to the defense. *Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009) ("[C]umulative testimony generally

cannot be the basis of an ineffective assistance of counsel claim") (citing *United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005) ("This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.")).  Howard fails to show on this record that the Texas Court of Criminal Appeals unreasonably denied his claims challenging trial counsel's investigation into mitigating evidence regarding his metal illness.

      b.      <u>No evidence that Dr. Fason's opinion or testimony was affected by a lack of psycho-social information</u>.

Howard asserts that if Dr. Fason had been provided a better or adequate life history report, Dr. Fason could have offered "insights into the issues that matter most in a capital trial," including how Howard's mental illness shaped the course of his life, his prior misconduct or criminal behavior, and his commission of the murder.  (Dkt. #76, p. 55).  As to his claim that Dr. Fason had insufficient information to form an opinion and explain Howard's mental decline and illness to the jury, Howard is missing a key element.  Howard fails to attach any sworn affidavit or statement from Dr. Fason stating that: (1) he had insufficient information to form an opinion regarding Howard's mental decline and illness or even that he felt if he had more information he could have better formed a diagnosis or explanation to the jury regarding Howard's issues; (2) that he had asked trial counsel to provide additional psycho-social information; and (3) that trial counsel refused or failed to provide him with the requested additional information.

Howard cannot, however, prove that trial counsel was ineffective under *Strickland* for failing to provide an expert with information by merely asserting that the information was necessary for the expert to make a proper determination or even by producing a new expert

opinion that disagrees with his prior expert. To establish that trial counsel's performance was deficient for failing to provide information to one or more of his mental-health experts at trial, Howard must show that his expert requested the information in question:

> To now impose a duty on attorneys to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert, would defeat the whole aim of having experts participate in the investigation. An integral part of an expert's specialized skill at analyzing information is an understanding of what information is relevant to reaching a conclusion.

*Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995). To make a viable claim of the deprivation of the effective assistance of counsel under *Strickland* for failing to provide an expert with information, the petitioner must show that the expert requested the information and that the information would have made a difference to the expert's opinion. *See Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir. 1997); *Roberts v. Dretke*, 356 F.3d 632, 640 (5th Cir. 2004); *Hendricks*, 70 F.3d at 1038; *Fairbank v. Ayers*, 650 F.3d 1243, 1252 (9th Cir. 2011); *Roberts v. Singletary*, 794 F. Supp. 1106, 1131–32 (S.D. Fla. 1992). Howard has not shown that Dr. Fason or any other expert requested additional information from his trial counsel.

Howard's mere speculation that Dr. Fason had insufficient information to form an opinion or testify as to his opinion or explain to the jury the impact that a mental illness would have on Howard's life and criminal conduct, is just that, rank speculation. "While counsel cannot completely abdicate a responsibility to conduct a pre-trial investigation simply by hiring an expert, counsel should be able to rely on that expert to alert counsel to additional needed

information . . ." *Turner v. Epps*, 412 F. App'x 696, 704 (5th Cir. 2011); *see also Segundo v. Davis*, 831 F.3d 345 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1068 (2017) (affirming the rationale that "none of the experts retained by trial counsel indicated that they were missing information needed to form an accurate conclusion that Segundo is not intellectually disabled").

Howard also criticizes his trial counsel (and the prosecution) for failing to ask any questions of Dr. Fason pertaining to his impressions regarding his diagnosis and conclusions regarding Howard's inappropriate behavior and affect (Dkt. #76, pp. 63-64). Howard speculates that trial counsel did not ask any questions regarding Dr. Fason's impressions and Dr. Fason did not volunteer any impressions because Dr. Fason had only rudimentary knowledge of Howard's life history. Howard does not specify or identify which of Dr. Fason's impressions that trial counsel should have questioned Dr. Fason over, and if and how, such information would have been sufficient to change the jury verdict from death to life. The record does not support Howard's speculation and speculation cannot form the basis for habeas relief.

The record reflects that trial counsel provided records from several sources, including medical and school records, to Dr. Fason (29 R.R. 96, 106). Dr. Fason conducted two clinical interviews of Howard. (26 R.R. 20; 29 R.R. 106). He tried to administer the Minnesota Multiphasic Personality Inventory 2 (MMPI-2) to Howard during the initial interview but was unsuccessful, so counsel obtained additional expert assistance. (2 R.R. 48–51). Dr. James Duncan then evaluated Howard's competency and administered some projective psychological tests. (22 R.R. 48–51; 26 R.R. 23). Dr. Fason read Dr. Duncan's report (26 R.R. 63; 29 R.R.

101) and talked with Dr. Duncan (26 R.R. 26). Dr. Fason examined Howard's school records and medical records and relied on them in reaching his opinion (26 R.R. 4, 24–26, 28; 29 R.R. 101). Additionally, Dr. Fason had Howard's mother fill out a three or four page autobiographical form regarding her son's history and relied on it in forming his opinions. (26 R.R. 4–5; 29 R.R. 89). Dr. Fason reviewed the medical file of Dr. Laine (Howard's therapist for three years in adolescence), called Dr. Laine, and discussed the case with him. (26 R.R. 4, 6–8, 28, 36, 54; 29 R.R. 91, 101). He talked with Howard's mother (26 R.R. 29; 29 R.R. 88, 91), one of Howard's sisters (26 R.R. 5), and a nurse at the jail (26 R.R. 56, 31). Dr. Fason also apparently did a "total history of the case" and reviewed Howard's "psychological profile." (29 R.R. 114).

There is no indication from the record that Dr. Fason stated or believed he had insufficient information from trial counsel to form an opinion or testify on Howard's behalf. Even if Dr. Fason had additional psycho-social information from trial counsel, even the information attached to Howard's amended petition (Dkt. #76-1 – #76-9), there is no indication that the additional psycho-social evidence would have altered the outcome of the trial. *See Anderson v. Collins*, 181 F.3d 1208, 1221 (5th Cir. 1994) (requiring petitioner to show with specificity: (1) what the investigation would have revealed, (2) what specific evidence would have been disclosed, and (3) how the evidence would have altered the outcome of the trial); *Hernandez v. Thaler*, 398 F. App'x 81, 88 (5th Cir. 2010). Additionally, "[c]ounsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses

without worrying that a reviewing court will substitute its own judgment . . . and rule that his performance was substandard for doing so." *Smith v. Cockrell*, 311 F.3d 661, 676–77 (5th Cir. 2002), *overruled in part on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); *Wilson v. Sirmons*, 536 F.3d 1064, 1089 (10th Cir. 2008) (noting that, to a degree, counsel should be able to rely on an expert to determine what evidence is necessary to an effective evaluation, and what additional evidence the expert needs to complete testing).

Ultimately, Dr. Fason opined that Howard was suffering from schizophrenia and offered that opinion during the first trial on competency and at the punishment phase proceedings. (29 R.R. 106–08; 26 R.R. 33). Dr. Fason also testified that Howard's diagnoses of ADHD and depression as an adolescent were much more consistent with a diagnosis of schizo-affective schizophrenia or simple schizophrenia (26 R.R. 33–34). Dr. Fason also gave an opinion stating that Howard was incompetent to stand trial. (34 R.R. at DX-2). He testified in a similar manner during the first trial on competency, which ended with the jury deadlocked. (29 R.R. 85–118; 30 R.R. 37).

The record reflects that trial counsel provided Howard's medical and school records to Dr. Fason, a licensed mental health expert. In turn, Dr. Fason conducted two clinical evaluations of Howard and collected information from various sources that he deemed necessary to forming his opinions. There is no indication that he requested information from trial counsel that trial counsel refused to provide. Trial counsel was entitled to rely on the expertise of his expert who diagnosed Howard as schizophrenic. *See Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011)

("[T]rial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating trial strategy."); *Sims v. Brown*, 425 F.3d 560, 585–86 (9th Cir. 2005) ("[A]ttorneys are entitled to reply on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would defeat the whole aim of having experts participate in the investigation.") (internal citation omitted). Based on this record, Howard has failed to show that the state habeas court was unreasonable in finding that his trial counsel did not render ineffective assistance of counsel. Furthermore, Howard has failed to show that his trial counsel's performance was deficient.

      c.      <u>Howard must demonstrate prejudice</u>.

When a petitioner fails to meet the deficiency prong of *Strickland*, a court is not required to proceed further in its *Strickland* analysis. *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). In the interests of completeness and justice, this Court will examine whether Howard has demonstrated that his trial counsel's performance caused him prejudice.

To demonstrate prejudice, the second prong of *Strickland*'s test, Howard must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The "reasonable probability" standard is less demanding than a "more likely than not" standard, and the

defendant does not need to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Similarly, when the defendant challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweigh[ed] the evidence—would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Id.* The Supreme Court has further held that the likelihood of a different outcome must be "substantial, not just conceivable." *Richter*, 562 U.S. at 112.

In evaluating the issue of prejudice at capital sentencing, courts must reweigh the quality and quantity of the available mitigating evidence, both that adduced at trial and that adduced in the state habeas proceeding, against the aggravating evidence. *Williams*, 529 U.S. at 397–98; *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009). A court then should ask whether the changes to the mitigation case would have a reasonable probability of causing a juror to change his or her mind about imposing the death penalty. *See* Tex. Code Crim. Proc. art. 37.071, § 2(f)(2) (stating that the jury must unanimously answer "no" to the mitigation special issue to impose the death penalty); *Neal v. Puckett*, 286 F.3d 230, 241 (5th Cir. 2002), *cert. denied*, *Neal v. Epps*, 537 U.S. 1104 (2003). "[T]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decision-maker." *Sears v. Upton*, 561 U.S. 945, 954 (2010) (citing *Strickland*, 466 U.S. at 700).

The inquiry requires a court to engage in a "probing and fact-specific analysis." *Id.* at 955. The *Strickland* standard in analyzing the prejudice prong "necessarily requires a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Id.* at 956.

In the present case, the evidence at trial showed a cold and deliberate murder. The evidence showed Howard stealing the gun from his grandfather's room and walking several blocks to the convenience store. The convenience store video tape showed Howard peering through the window several times to ensure that no other persons were present before entering the store (SX-1). The video tape showed Howard entering the store and walking to the secured office area where the victim was sitting, cocking the gun, and shooting the victim in the chest. As she lay screaming in pain on the floor, Howard asked "Do you have any more money in here?" (20 R.R. 112). Howard then reached over the victim to steal a carton of cigarettes and taking money from the cash register before leaving through the back door. (20 R.R. 112–13). The video tape is a compelling and powerful piece of aggravating evidence. The jury is able to visually assess what they perceive as to the defendant's mental status, intent, motive, and deliberateness. The visceral effect on a jury watching such a scene play out on the video as described above is difficult to overcome for any defense counsel.

The additional aggravating evidence showed that Howard had: (1) possible gang ties, (2) was taking crack cocaine at least two weeks prior to the murder, (3) was dealing and selling crack cocaine (e.g., conviction for delivery of a controlled substance, and arrest for possession of

5 rocks of crack cocaine two weeks prior to the murder), (4) had been arrested several times for various crimes (burglary of a habitation, delivery and possession of a controlled substance), (5) defiance with authority and police officers, (6) tendencies toward violence (punching a teacher in the chest, fighting while in jail awaiting trial), and (7) had been expelled from school despite efforts by his mother and educators to help him complete his education. The aggravating evidence also included the police officers testifying that Howard expressed no remorse for the murder and telling the officers that he was not sorry for his actions (20 R.R. 126, 129; *see* 33 R.R. at SX-46). Finally, the state's mental health expert witness testified that Howard's behavioral issues derived from anti-social personality disorder, rather than from prodromal symptoms prior to the onset of schizophrenia. (26 R.R. 112–15, 26 R.R. 57, 65–66).

The mitigating evidence presented at trial derived from the nineteen lay witnesses consisting of family members, friends, educators, coaches, jailors, and two defense mental health experts. The friends and family testimony focused on Howard's declining mental health and odd behaviors while growing up, while the expert testimony focused on an explanation for Howard's odd behavior, diagnosing him with prodromal symptoms[10] of schizophrenia.

The "new" mitigating evidence submitted by state habeas counsel consisted of Hardin County jail records while Howard was awaiting trial for murder and TDCJ medical records. The Hardin County jail records reflects that a "mental deficiency" was noted on the day of the arrest.

---

[10] The "prodromal syndrome or symptoms" is not a diagnosis, but the technical term used by mental health professionals to describe a specific group of symptoms that may precede the onset of a mental illness. For example, a fever is "prodromal" to measles, which means that a fever may be a risk factor for developing this illness. Prodrome, Wikipedia, https://en.wikipedia.org/wiki/Prodrome (last visited July 18, 2018).

(SHCR 54, 157). Additionally, a Physician's Certificate of Medical Examination for Mental Illness report from Dr. Guillett, presumably a Hardin County Jail medical provider, was a part of the jail records (SHCR 151–54). State habeas counsel characterized this document as one which could have supported a theory of mental illness (SHCR 54). The Physician's Certificate, however, appears to be double-edged. The Certificate reflects that Howard was "oriented as to time and place," "aware of having premeditatedly [*sic*] robbed a store," "aware of having shot the clerk," and "is likely to cause serious harm to others." (SHCR 151–54). Likewise, the jail records also are double-edged as they reflect that Howard was designated as representing: (1) an escape threat, (2) a serious threat of violence, and (3) having substance abuse issues. (SHCR 157).

The Fifth Circuit recently reiterated that it has held that "double-edged evidence cannot support a showing of prejudice under *Strickland*." *Reed v. Vannoy*, 703 F. App'x 264, 270 (5th Cir. 2017) (citing *Dowthitt*, 230 F.3d at 745); *see also Matthews v. Davis*, 665 F. App'x 315, 319 (5th Cir. 2016) (trial counsel's failure to investigate and introduce evidence was not prejudicial because it would be double-edged); *Gray v. Epps*, 616 F.3d 436, 449 (5th Cir. 2010), *cert. denied*, 563 U.S. 905 (2011) (petitioner could not show prejudice because much of the new evidence was double-edged and could be interpreted as aggravating).

State habeas counsel also presented Howard's incarceration medical records collected from TDCJ. These incarceration medical records reflect a five year period of time from 2001 to

2006.  These medical records show that prison doctors diagnosed and treated Howard for schizophrenia.  These records did not exist at the time of Howard's capital trial.

Even assuming, *arguendo*, that trial counsel should have done more to create a more complete life history of Howard's mental illness to provide to Dr. Fason, the jury heard Dr. Fason's testimony regarding his opinion that Howard suffered from schizophrenia.  Howard's federal habeas counsel summarized Dr. Fason's testimony as follows:

1. The first factor was Howard's stark decline in standardized math scores in school, going from the 91st percentile in the second grade to the 23rd percentile in the eighth or ninth grade.  26 R.R. 24–25.  Dr. Fason explained that "it is not normal" for a child to have this kind of precipitous decline in these scores.  *Id*.  "[I]t was as if some malignant process started affecting his brain because he went downhill."  *Id*. at 25.  This caused Dr. Fason to look for that malignant process.

2. Dr. Fason then talked with Dr. Duncan, who informed him that "there was a poverty of information on the psychological test that Dr. Duncan gave Howard; the inkblot test."  *Id*.  at 26.  Learning of "this poverty of thought . . . I began to move towards the schizophrenia disorder because that's the characteristic."  *Id*.

3. Dr. Fason then explained that the "thought disorder" of schizophrenia "usually goes back to prepuberty . . . [where] [y]ou begin to see not only a certain weirdness in the individual beginning to develop, but you see a decline in cognitive abilities."  *Id*. at 27.  Dr. Fason affirmed that Howard's "third or fourth grade [teacher]" having "to put him under the table so he could focus and read" would be an example of such weird behavior.  *Id*. at 27–28.

4. Dr. Fason also found that Dr. Laine's diagnosis of Howard having ADHD in childhood and depression in adolescence was likely a sign of the early onset ("prodormal" phase, *id*. at 28) of schizophrenia.  *See also id.* at 36.

5. Dr. Fason found additional confirmation for his diagnosis in Howard's "inappropriate affect," *e.g.*, laughing or smiling when the situation called for a different emotion, *id*. at 30–31—a feature that he called "one of the cardinal signs of schizophrenia," *id.* at 31—and also, in Howard's "looseness of associations when he is pressed on things," *id*. at 33, like his understanding of the punishment

he could receive, *id*. at 30, or his two differing accounts of what happened at the time of the crime, *id*. at 31–33.

The record demonstrates that Howard's trial counsel's mitigation investigation was reasonable and supported by qualified experts and records provided. The jury was aware of Howard's mental state and mental health decline, and counsel formulated an objectively reasonable strategy to counter the aggravating evidence in an attempt to obtain a life sentence. The claim that trial counsel's investigation was deficient is a simple disagreement with trial counsel's chosen tactics, belies the wealth of contrary evidence in the record, or is a matter of degrees that this Court will not second-guess. Howard has failed to demonstrate that it was unreasonable for the state habeas court to conclude: (1) that he did not overcome the strong presumption of trial counsel's competence, and (2) that he failed to undermine confidence in the jury's sentence of death. *See* § 2254(d).

Howard's assertion that he was prejudiced by trial counsel's failure to present all possible mitigation evidence regarding his possible diagnosis of schizophrenia is wholly conclusory. There is no method by which to gauge the weight the jury might have given additional testimony regarding his behavior. There is no magical equation which guarantees that testimony from additional witnesses would have resulted in a substantial change in the outcome of the sentencing. Based on the weighing of the available mitigating evidence, both that adduced at trial and at the state habeas proceeding, against the aggravating evidence, Howard cannot show that there was a reasonable probability that, absent the perceived errors, that the outcome would

have substantially changed.  Howard has failed to show that his trial counsel's performance caused him prejudice.

       4.      <u>Howard's new evidence in light of *Martinez* and *Trevino*.</u>

Although this Court finds that Howard's first IATC claim was exhausted, and not procedurally defaulted, this Court will consider Howard's *Martinez* and *Trevino* argument as it applies to his first IATC claim. Howard attached new evidence to his federal habeas petition asserting that it supports his claim of ineffective assistance of counsel.  Specifically, his claim that his trial counsel failed to provide a complete psycho-social history to Dr. Fason.  The *Strickland* standard applies to ineffective assistance of counsel claims in the context of *Martinez* and *Trevino*.  *See Martinez*, 566 U.S. at 14.  Assuming, *arguendo*, that the Court can consider this new evidence that Howard attached to his federal habeas petition, the new evidence is as follows:

      1.      Shirley Howard Declaration,

      2.      Gina Vitale Declaration,

      3.      Sheanna Howard Declaration,[11]

      4.      Kim Lewis Declaration,

      5.      Gaye Lokey Declaration (#1),

      6.      Gaye Lokey Declaration Exhibit School Records (#2),[12]

---

[11] The medical and school records for Howard attached to Mrs. Howard's declaration are already included in the state court record.  *Cf.* Dkt. #76-1, pp. 14–79 with 35 R.R. at DX-3 and DX-4.

[12] The school records presented with this declaration are already included in the state court record.  *Cf.* Dkt. #76-6, pp. 1–32 with 35 R.R. at DX-3 and DX-4.

7.     Lisa Sanchez Declaration,

8.     Linda McCarter Declaration,

9.     Thomas Tyler Declaration,

10.    TDCJ Jester Unit Medical Records (Part 1),

11.    TDCJ Jester Unit Medical Records (Part 2),

12.    TDCJ Jester Unit Medical Records (Part 3),

13.    George Woods, M.D., Declaration,

14.    George Woods, M.D., Preliminary Report,

15.    J. Howard Voluntary Statement (Confession),

16.    Hamm [state habeas counsel's] Billing Records, and,

17.    Milstein Funding Request & Judge's Order.

     a.     <u>New testimonial evidence of family and friends</u>.

Howard asserts the individuals identified within his new evidence "had significant and relevant information regarding his life history that is critical to the development of an accurate and reliable life history and proper mental health evaluation." (Dkt. #76, p. 35). Howard names Shirley Howard (Howard's mother), Sheanna Howard (Howard's sister), Jasmonique ("Treci") Howard (Howard's youngest sister), Jerry Howard, Sr. (Howard's biological father), Patricia Robertson (Howard's paternal aunt), Karrion Cartwright (Howard's best friend), George Desha (a neighbor), Jinneh Dyson (a neighbor), Kim Lewis (a friend), Michael Lewis (a friend), Alfredrick ("Fred") McGrue (a friend of Howard's older brother), James A. Duncan, Ph.D.

(clinical psychologist), Gaye Lokey (Assistant Principal at Silsbee Middle School when Howard was in 7th grade), and Lisa Sanchez (Howard's 4th grade teacher). Howard contends that trial counsel either did not interview the above persons at all or the interviews were perfunctory and conducted on the eve of trial, sometimes taking place outside the courtroom just before they testified.

In response, the Director contends (and the record supports) that family members testified on Howard's behalf: his mother, Shirley Howard (testified four times), his sister, Sheanna Howard (testified twice), his older brother, Jerry Howard, Jr., his grandfather, R. C. Kyles, cousin Pamela Fulton, and cousin Tonya Moffett. Additionally at least ten of Howard's friends, neighbors, and peers testified including Lola Thomas, Milton Young, Tyre Thomas (testified three times), William Bass, Sandra Johnson (testified twice), Denise Young, Iby G. Young, Keesha McKinney, Deanne Johnson, and Linda Lacy. Howard's 4th grade teacher, Lisa Sanchez, and two of his coaches Michael Sanchez, and Joe Neely, also testified for the defense at both stages of the trial. Moreover, clinical psychologist James A. Duncan, Ph.D., testified during Howard's capital trial.[13] The Director also correctly points out Howard's new "evidence . . . suffers from a host of problems that largely render it inadmissable. Counsel cannot perform deficiently for failing to discover inadmissible evidence nor can Howard [show] prejudice by its omission." (Dkt. #79, p. 64).

---

[13] Dr. Fason testified that he relied on Dr. Duncan's psychological testing and interviews with Howard, and consulted directly with Dr. Duncan regarding Howard's issues and symptomology.

Howard claims that several individuals had significant and relevant information pertaining to Howard's life history that was critical to the development of an accurate and reliable life history and proper mental health evaluation. "To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Trevino v. Stephens*, No. SA-01-CA-306-XR, 2015 WL 3651534 at *7–8 (June 11, 2015) (unpublished) (citing *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir.), *cert. denied*, 562 U.S. 911 (2010)). "An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Id*.

Howard contends his trial counsel failed to locate and obtain psycho-social information from several "key persons;" however, Howard did not submit a sworn affidavit or declaration from all of the alleged "key persons." Rather, Gina Vitale, Howard's federal habeas investigator, provided a declaration summarizing her interview of nine "key persons:" Karrion Cartwright, George Desha, Jinneh Dyson, Ph.D., Jasmonique "Treci" Howard, Jerry Howard, Sr. (Howard's father), Alfredrick McGue, Patricia Robertson, and Towona Washington.[14] Howard, however, did provide a signed declaration from Kim Lewis, Gaye Lokey, Linda McCarter, and Thomas Tyler. None of these particular "key" witnesses testified during Howard's capital trial.

---

[14]The State identifies Jerry Howard, Jr., Howard's older brother, as one of the key persons whom did not provide an affidavit. The Court notes that Jerry Howard, Jr. testified at Howard's trial on his behalf.

Howard does not provide any explanation of how the testimony from these additional thirteen "key persons" is different from the nineteen persons who testified at various stages of his trial on his behalf. Furthermore, Howard does not explain how the proposed testimony from the thirteen "key persons" would not have been cumulative or duplicative of the testimony that was presented at trial or only of collateral significance. Moreover, the failure to produce an affidavit from each of the nine uncalled witness, identified by Gina Vitale, severely undermines a claim of ineffective assistance. *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001).

Another deficiency noted in the affidavits or the interview notes is a lack of any statements indicating any of these nine witnesses above (identified by Gina Vitale), and Kim Lewis, Linda McCarter, and Tyler Thomas were available and willing to testify during Howard's 2001 capital murder trial.[15] *See Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (holding petitioner complaining of uncalled witness must show the witness was available and willing to testify to satisfy the prejudice prong of *Strickland*); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (holding the same). Moreover, the Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day*, 566 F.3d at 538 (citation omitted); *see also Charles v. Stephens*, 736 F.3d 380, 390–91 (5th Cir. 2013), *cert. denied*, 135 S. Ct. 52 (2014). Although the statements of these nine key persons were presented through the declaration of Gina Vitale, and the other four "key" witnesses through each's own declaration, the above noted deficiencies

---

[15] Ms. Lokey is the only new witness who stated under oath that she was willing and able to testify.

requires the Court to exclude the statements of these thirteen "key persons" from consideration as presented. Gina Vitale's summary of information collected from these "key persons" is not competent evidence. *See Bruce v. Cockrell*, 74 F. App'x 326, 335 (5th Cir. 2003) (criticizing reliance on the "affidavit of federal habeas counsel's investigator, relating statements allegedly made to her by [the defendant's family]" instead of relying on "any affidavits by the uncalled witnesses themselves or offer any evidence that they would have been willing to testify at the punishment phase of his trial"). To the extent that the Court may review Howard's new evidence, there are deficiencies that render this new testimonial evidence inadmissible. Furthermore, Howard has not shown that his claims concerning uncalled witnesses are not merely a disagreement regarding strategic choice by trial counsel. The above-described new evidence is unreviewable by the Court.

As to the witnesses that testified during Howard's capital trial that Howard now claims their individual testimony was not sufficiently flushed out in questioning,[16] the Fifth Circuit has held that "the failure to present a particular argument or evidence is presumed to have been the result of strategic choice." *Taylor*, 727 F.2d at 347–48. Howard argues that trial counsel did not elicit enough or more information regarding his mental decline from his testifying witnesses. Howard is particularly critical of his trial counsel for questioning each witness as to their empathy for him, the victim, and her family. Questions designed to elicit empathetic responses from witnesses before a jury are not unusual in criminal cases and are a matter of strategy. A federal court will not question counsel's reasonable strategic decisions. *Bower*, 497 F.3d at 470.

---

[16]Shirley Howard (testified four times), Sheanna Howard (testified twice), and Lisa Sanchez (testified twice).

Habeas corpus relief is unavailable if a petitioner fails to overcome the presumption that counsel made sound strategic decisions. *Del Toro v. Quarterman*, 498 F.3d 486, 491 (5th Cir. 2007), *cert. denied*, 552 U.S. 1245 (2000).

Assuming, *arguendo,* that trial counsel's representation was deficient for failing to interview and call the additional thirteen "key witnesses," Howard is not entitled to relief because he has not shown prejudice. There is no reasonable probability that the outcome of the trial would have been different if trial counsel had interviewed and called the additional thirteen "key witnesses" and each had testified in a manner consistent with his affidavit or interview with the federal habeas investigator. There is no reasonable probability that this additional information as part of a more complete psycho-social history would have advanced Dr. Fason's understanding or testimony regarding Howard's condition—especially because evidence was presented on these issues, which the jury rejected.

Furthermore, the Court further notes that the additional thirteen key witnesses' potential testimony was "double-edged." Any benefit Howard may have had by presenting more witnesses as to his life history may have been outweighed by the negative things each witness would have said regarding his inappropriate behaviors and responses. "[D]ouble-edged evidence cannot support a showing of prejudice under *Strickland*." *Reed*, 703 F. App'x at 270 (citing *Dowthitt*, 230 F.3d at 745); *see also Matthews*, 665 F. App'x at 319 (trial counsel's failure to investigate and introduce evidence was not prejudicial because it would be double-edged); *Gray*, 616 F.3d at 449 (petitioner could not show prejudice because much of the new evidence was

double-edged and could be interpreted as aggravating). "Mitigation, after all, may be in the eye of the beholder." *Martinez v. Cockrell*, 481 F.2d 249, 258 (5th Cir. 2007) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)), *cert. denied*, 552 U.S. 1146 (2008). The Fifth Circuit has observed that evidence of "brain injury, abusive childhood, and drug and alcohol problems is all 'double-edged.' In other words, even if the jury heard this additional testimony, it could have been interpreted by the jury to support, rather than detract, from his future dangerousness claim." *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002), *cert. denied*, 538 U.S. 926 (2003). Had trial counsel presented the new proposed mitigating evidence at trial, the prosecution would have had additional evidence to explain why Howard would pose a future danger—e.g., his refusal to take his medication, his refusal to seek help for his mental issues, his disassociation from his behaviors, etc. The new proposed mitigating evidence submitted by federal habeas counsel is "double-edged," and could be viewed as more aggravating than mitigating. For these reasons, Howard cannot demonstrate prejudice.

b.     Reports and statements of Dr. George Woods.

Howard attached a June 20, 2014 declaration (Dkt. #76-13) and an unsworn September 16, 2015 expert witness report (Dkt. #76-14) from Dr. George Woods, a neuropsychiatrist, to his amended petition. Both of these documents suffer from fatal deficiencies that do not promote Howard's position in his federal habeas petition.

In the declaration, Dr. Woods opines about two questions: (1) whether the evaluation conducted by the defense mental health expert was adequate under the standards required for

forensic mental health evaluation, and (2) whether a professionally adequate evaluation be conducted now and what would such an evaluation entail. The issues that Dr. Woods addressed in his declaration do not support any issue for federal habeas relief raised by Howard in his federal habeas petition. Essentially, the expert opinions raised by Dr. Woods in the declaration are not relevant to the live issues before the Court.

In the expert witness report, Dr. Woods recommended further evaluation and testing of Howard's intellectual disability and adaptive abilities. In his September 12, 2017, second motion for additional funding for previously-authorized expert, Howard, however, conceded that an intellectual disability claim was not a viable claim. (Dkt. #74, p. 2). As such, Dr. Woods' recommendations are not relevant to the live issues before the Court.

Moreover, the expert witness report is not sworn or verified in any acceptable manner. *See* 28 U.S.C. § 1746. As a result, the unsworn expert report is not admissible evidence in this proceeding. *See* FED. R. CIV. P. 56(c), (e); *see also Payne v. Collins*, 986 F.Supp. 1036, 1054 n.41 (E.D. Tex. 1997) ("[S]*ua sponte* evidentiary rulings fulfill the court's duty to 'assess the evidence presented upon the motion for summary judgment to determine its admissibility.'") (quoting *Gauck v. Meleski*, 346 F.2d 433, 436 (5th Cir. 1965)).

In addition to the above issues, neither the declaration nor the expert witness report state that Dr. Woods, as an uncalled witness, could have or would have been available and testified as to his opinions at Howard's trial. As discussed, *supra*, a witness must assert that she is available and willing to testify on behalf of the defendant. *See Woodfox*, 609 F.3d at 808 (holding

petitioner complaining of uncalled witness must show the witness was available and willing to testify to satisfy the prejudice prong of *Strickland*); *Day*, 566 F.3d at 538. The failure of the declaration and the expert witness report to include this assertion precludes a showing of prejudice under *Strickland*.

Furthermore, additional opinion testimony that Howard suffered from prodromal schizophrenia or schizophrenia is cumulative of the testimony of provided by Dr. Duncan (21 R.R. 26, 29, 36) and Dr. Fason (26 R.R. 3–4, 26, 33) at the trial and punishment phases. Howard cannot demonstrate that he was prejudiced by the absence of another opinion regarding a diagnosis of schizophrenia.

Throughout multiple places in Howard's briefing, Howard summarizes information provided by Dr. Woods during phone calls to Howard's counsel and offers the summarized information to prove the truth of the matters asserted. (Dkt. #76, pp. 57–62, 66–71). Howard's federal habeas counsel's reporting of her telephone conversations with Dr. Woods regarding his opinions pertaining to Howard's mental illness, organic brain impairments, cognitive deficits, competency to stand trial in 2001, waiver of Howard's *Miranda* rights, and subsequent confession are nothing more than hearsay. *See* FED. R. EVID. 801(c). Dr. Woods' statements, through counsel, do not qualify for an exception under FED. R. EVID. 803; and thus, they are not allowed to be considered by this Court. Howard cannot demonstrate that he was prejudiced by the absence of inadmissible, hearsay testimony.

c.     <u>Conclusion regarding new evidence</u>.

Having reweighed all of the mitigating evidence, both old and new, against the aggravating evidence, the Court is of the opinion–and so finds–that there is *no* reasonable probability that a juror would have found that the mitigating evidence outweighed the aggravating evidence. The following conclusion by the Fifth Circuit is equally applicable to the present case: "the additional mitigating evidence was not so compelling, especially in light of the horrific facts of the crime, that the sentencer would have found a death sentence unwarranted." *Martinez*, 481 F.2d at 259. Howard has not proven prejudice. He has not shown that he is entitled to federal habeas corpus relief on this issue.

**5.**     **<u>Perceived under-funding of an expert</u>**.

In multiple places throughout Howard's habeas petition, Howard states that his expert, Dr. George Woods, was partially funded or under-funded (Dkt. #76, pp. 61, 65, 66, 72). Howard asserts that Dr. Woods needed additional funding to interview Howard again and draft and discuss his final report with Howard's counsel. (Dkt. #76, p. 66). Howard also asserts that the Court twice denied additional funding for Dr. Woods. As a result of this perceived under-funding, Howard implies that he has been hindered in the presentation of his federal habeas petition, and thus, he must rely upon the hearsay conversations between Dr. Woods and his counsel to present Dr. Woods' opinions as evidence in support of his grounds for relief. (Dkt. #76, pp. 66–67, *et seq*.). Howard complains that he would have had a finalized report from Dr.

Woods but for the Court disallowing the request for additional funds for Dr. Woods' services (Dkt. 76, p. 66).

In pertinent part, 18 U.S.C. § 3599 states:

> Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g).

The Court is mindful that it is required to evaluate funding requests in light of whether the requested funding for a particular expert's service is "reasonable and necessary to provide fair compensation for services of an unusual character or duration." The Court does not view the *Martinez*/*Trevino* cases as opening the door for unlimited investigation, especially where the goals are not clearly articulated and supported with evidence. The Court authorized over $36,000 in expert fees for this case (*see* Dkt. ##31, 56, 71). Of this approved funding, more than $20,000 was allocated solely for Dr. Woods' services.

Howard's requests for funding began with his September 23, 2013, budget letter. (Dkt. #14). Howard proposed funding in the amount of $33,750 for expert and investigative assistance. (Dkt. #14). Specifically, Howard proposed that $26,250 would be expended for the mitigation investigator and $7,500 for a forensic psychological expert. (Dkt. #14, p. 19).

On October 30, 2013, the Court issued a Sealed *Ex Parte* Memorandum Opinion and Order (Dkt. #15) addressing Howard's specific funding motion for mitigation investigator services. In that Memorandum Opinion and Order, the Court expressed concerns about the

intent of the various investigatory aims. The Court specifically inquired whether some claims—such as a claim pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002)—have previously been presented to and ruled upon by the state courts in this case, and, whether the scope and breadth of the mitigation investigation in support of ineffective assistance of counsel claims related to the analysis under *Martinez* and *Trevino*. The Court granted Howard's request for an initial funding of $7,500 for mitigation investigation services but directed Howard, through counsel, to submit certain reports to the Court based on the results of that initial investigation before the Court would recommend further funding in that vein. (Dkt. #15, p. 10). The Court also ordered that any further *ex parte* proceedings and funding beyond that already granted was subject to Howard's compliance with the reporting standards set out in the order. (Dkt. #15, p. 11).

In the January 30, 2014 Memorandum Opinion and Order, the Court explained that it provisionally denied Howard's budget request to the extent his Budget Letter: (1) sought a forensic psychological expert in pursuit of an *Atkins* type claim that has already been ruled upon by the state court, and (2) sought further mitigation investigation services, pending a justifiable reason for the additional funding supported by the requested reports. (Dkt. #18, p. 2).

In Howard's Second Application for Authorization for Additional Funding (Dkt. #23, p. 29), Howard requested $14,000 (40 hours x $350 per hour) for a preliminary evaluation conducted by Dr. Woods. This Court recommended to the Chief Circuit Judge of the United States Court of Appeals for the Fifth Circuit that the amount of $14,000 for expenses for the

services of a mental health consultant was reasonable and necessary to provide fair compensation for services of an unusual character and duration. (Dkt. #31, p. 3). The Chief Circuit Judge of the Fifth Circuit approved the amount of $14,000 for Dr. Woods' services. (Dkt. #55).

On September 22, 2015, Howard filed his opposed motion for funding for two additional experts. (Dkt. #44). Howard asserted that Dr. Woods believed that Howard suffered from an intellectual disability or mild mental retardation and he should be examined by a neuropsychologist, Dr. Richard Temple, and by a intellectual disability expert, Dr. James Patton. Howard requested that the Court authorize $4,000 for each expert plus reasonable expenses for each expert for his services. On September 30, 2016, the Court approved funding for Dr. Patton and Dr. Temple in the amount of $4,000, for each expert, plus reasonable expenses for each expert. (Dkt. #56).

On December 28, 2015, Howard filed his motion for additional funding for previously-authorized expert (Dkt. #50). Howard stated that the time for Dr. Woods to perform his services in evaluating Howard and court and medical records had been underestimated and that an additional 18.75 hours were needed. Howard requested additional funds in the amount of $6,562.50 (18.75 x $350) to pay Dr. Woods for services performed over the $14,000 that had been previously authorized. Without meeting the Court's reporting requirements articulated in Dkt. #15, Howard also requested funding for an additional 10 hours of time for a total amount of $3,500 for Dr. Woods.

On September 30, 2016, the Court approved the amount of $6,562.50 for Dr. Woods' previously performed services. (Dkt. #56). The Court denied the request for the additional $3,500 for Dr. Woods for possible work that might be needed in the future because Howard did not demonstrate that there was a need for additional services service by Dr. Woods at that time. (Dkt. #56, pp. 5–6).

Approximately eight months later, on May 24, 2017, Howard filed his renewed motion for additional funding for previously-authorized expert, Dr. Woods (Dkt. #66). In his motion, Howard requested an additional $5,000 in funding so that Dr. Woods could review the work of experts, Drs. Temple and Patton, and complete a final report concerning the mental health issues of Howard. Once again, Howard did not address the necessary reporting standards set out in Dkt. #15, pp. 10–11.

On June 15, 2017, the Court issued its order on Howard's renewed motion (Dkt. #66) and found that of the approved $36,000 in experts fees that more than $20,000 had been allocated for the services of Dr. Woods. (Dkt. #71). The Court held that the request for additional funding in the amount of $5,000 for Dr. Woods for developing the potential claim did not rise to the level of "reasonable and necessary to provide fair compensation for services of an unusual character or duration," and, as such, did not meet the standard for authorizing the additional funds. (Dkt. #71, p. 2).

On September 12, 2017, Howard filed his second motion for additional funding for previously-authorized expert, Dr. Wood. (Dkt. #74). Howard requested additional funding in

the amount of $21,350 for Dr. Woods to compensate him for the time had already spent investigating the possibility that Howard has an intellectual disability, and to permit him to conduct an in-depth review of the trial record, and materials generated in the course of the federal habeas investigation, and complete a final report addressing the mental health issues.

In his motion, Howard conceded that although his three experts investigated the viability of an Intellectual Disability (formerly mental retardation) claim from each's perspective specialty, the experts concluded that an intellectual disability claim was not feasible. (Dkt. #74, p. 2). Howard stated that since the intellectual disability claim was not feasible, that Dr. Woods needed to assess the effect of the psychotic mental illness Howard suffers, schizophrenia, and his neuropsychological impairments on his functioning at the time of crime, at the time his confession was taken by the police, and at trial, and how Howard's illness and brain impairments would have reduced his moral culpability for the crime. (Dkt. #74, p. 3).

On September 13, 2017, the Court's Order (Dkt. #75) found that Howard acknowledged that there was no basis for a claim under *Atkins*. The Court noted that the Fifth Circuit has declined to extend *Atkins* further to claims of mental illness and has rejected a claim that counsel was ineffective for failing to investigate "organic brain damage" and obtaining a proper neuropsychological exam. *Mays v. Stephens*, 757 F.3d 211 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 951 (2015). The Court found that the pending request for $21,350 for additional services by Dr. Woods did not rise to the level of "reasonable and necessary to provide fair compensation for services of an unusual character or duration," and, as such, did not meet the standard for the

authorization of additional funds because he was seeking funding for a claim that was not cognizable.

Howard was provided a total of $36,000 in expert funding to explore viable areas pertaining to cognizable claims to assist his efforts in obtaining federal habeas relief. Howard's requests for additional funding after it was determined that his *Atkins*' claim was not viable was nothing more than a fishing expedition in the hopes of uncovering evidence, which may or may not be admissible in a federal habeas proceeding. Howard's ancillary complaints of harm pertaining to the denial of his additional requests for funding for Dr. Woods is considered specious and disingenuous.

### 6. Further Application of *Martinez* and *Trevino* to Howard's claim.

While this Court remains unconvinced that Howard's first IATC claim is procedurally defaulted, the Court will assume, *arguendo*, that the claim is unexhausted and will examine his arguments on the merits. To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that: (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

As to his *Martinez* and *Trevino* claim, the controlling question is simply whether the petitioner fairly presented the substance of the federal habeas claim to the state court. Claims

made under *Strickland* and *Wiggins* challenge "counsel's decision to limit the scope of their investigation into potential mitigating evidence" and focus on the adequacy of the investigation supporting counsel's strategic decisions to direct their limited resources for further investigation and trial preparation. *See Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 673, 699–700.

Although Howard's federal Petition contends his trial counsel overlooked additional evidence, it alleges the same deficiencies and necessarily challenges the same strategic decisions challenged in his state habeas proceeding based on the same investigation conducted by trial counsel up to that point. As demonstrated at considerable length above, *see supra*, Howard fairly presented the substance of the claim in state court and it is exhausted. This Court may not consider the new evidence submitted by Howard. *See Escamilla v. Stephens*, 749 F.3d 380, 394–95 (5th Cir. 2014) ("We conclude that *Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted.…Thus, once a claim is considered and denied on the merits by the state habeas court, *Martinez* is inapplicable, and may not function as an exception to *Pinholster*'s rule that bars a federal habeas court from considering evidence not presented to the state court."). (citations omitted).

In his briefing, Howard discusses *Sorto v. Davis* regarding the issue of whether the court may consider evidence that was not presented to the state court. 859 F.3d 356 (5th Cir. 2017), *opinion withdrawn on grant of rehearing,* 881 F.3d 933 (5th Cir. 2018). *Sorto* dealt at length with the issue of whether evidence that was not presented to the state courts may be considered

by a federal district court. The Fifth Circuit observed that only the record that was before the state court is exhausted and ordinarily only such evidence may be considered by a federal district court. *Id.* at 361 (citations omitted).

The Fifth Circuit, however, recognized an exception. Exhaustion is not required if "circumstances exist that render [the available state corrective] process ineffective to protect the rights of the applicant." *Id.* at 363 (citing § 2254(b)(1)(B)(ii)). It was noted that "Texas law does not provide for 'investigative or expert funding . . . for the preparation of subsequent writ applications, as it does for preparation of an initial writ application.'" *Id.* at 364 (quoting *Ex parte Blue*, 230 S.W.3d 151, 167 (Tex. Crim. App. 2007)). Due to the lack of funding, the Fifth Circuit found that "Texas procedures did not afford Sorto an adequate opportunity to vindicate his federal rights." *Id.* The Court accordingly held that he was excused from the exhaustion requirement. *Id.* at 365.

As was previously noted, the Fifth Circuit subsequently withdrew the *Sorto* opinion and remanded the case to the district court because of the funding issue in light of the Supreme Court's recent decision in *Ayestas v. Davis*, 138 S. Ct. 1080 (2018). *Sorto v. Davis*, 716 F. App'x 366 (5th Cir. 2018). Despite the withdrawal of the opinion, the opinion is noteworthy in recognizing once again that exhaustion is ordinarily required, in the absence of an exception. In the present case, Howard did request and receive funding for a mitigation investigator at the state habeas level. (Dkt. #76-17). Howard also received significant funds for a mitigation investigator and experts at the federal habeas level. (*See* Section V.A.5). He is not in the same

posture as the petitioner in *Sorto*. He has not shown a basis for being excused from the exhaustion requirement.

Having re-weighed the "new" mitigating evidence together with the mitigating evidence actually presented to Howard's jury at trial against: (1) the facts and circumstances of Howard's offense and (2) Howard's history of criminal and antisocial behavior detailed in Howard's new evidence, this Court finds there is no reasonable probability that, but for the failure of Howard's trial counsel to more fully investigate Howard's background, develop, and present any of the "new" evidence contained in Howard's amended petition and the exhibits accompanying same, the jury's answers to any of the Texas capital sentencing scheme's special issues would have been any different. In fact, as explained above, much of this "new evidence" would likely have assisted the prosecution in obtaining an affirmative answer to the future dangerousness special issue. Howard's ineffective assistance claim in his amended petition fails to satisfy the prejudice prong of the *Strickland* analysis. Since Howard has not show prejudice, he has not satisfied the requirements of *Martinez/Trevino*.

### 7.      Review of State Habeas Counsel's performance.

Although this Court finds that Howard's trial counsel was not deficient in his performance nor prejudiced Howard's defense, this Court will review Howard's claim that his state habeas counsel provided ineffective assistance of counsel post-conviction. Specifically, Howard claims his state habeas counsel was purportedly ineffective for failing to conduct any meaningful extra-record investigation of Howard's life history. Howard asserts that state habeas

counsel's purported ineffective of assistance of counsel is "cause to excuse any procedural default of the substantial, underlying clam that trial counsel was ineffective in failing to investigate, develop and present an adequate life history and to undertake the mental health assessment called for by the life history." (Dkt. #76, p. 66).

Howard contends that his state habeas counsel failed to: (1) adequately reinvestigate Howard's mitigation evidence, (2) attach adequate extra-record evidence to the state habeas petition to support the raised challenges to the ineffective assistance of counsel claims against trial counsel, (3) have any evidence in his [state habeas counsel] files of affidavits or memos to the file of interviews of family, friends, educators, or other persons who had knowledge of Howard's psycho-social history, including no evidence that any expert witnesses, particularly those with mental health expertise, had been consulted or hired, despite claims raised in the state writ application pertaining to competency, the insanity defense and mental retardation, (4) have his billing records show that he independently investigated Howard's psycho-social history, and (5) preserve for the record any external impediment that prevented state habeas counsel from investigating and developing crucial evidence of Howard's psycho-social history. (Dkt. #76, pp. 66–70).

Much of Howard's argument is based on the assumption that state habeas counsel is ineffective if his billing records and file documentation are not detailed enough to show that counsel conducted a comprehensive inquiry into Howard's life and background.[17] Howard also

_____

[17]To the extent that Howard asserts a claim of ineffective assistance of post-conviction counsel, he fails to state a claim for which relief may be granted. Title 28 U.S.C. § 2254(I) provides, "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." *See also Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("[W]hile § 2254(i) precludes Martinez from

presents an underlying theme that if state habeas counsel did not spend at least a set amount of time researching Howard's background and psycho-social history that state habeas counsel is *per se* ineffective in providing representation. There is no case law that supports a *per se* finding of ineffective assistance of counsel based on the amount of time that counsel spends researching a criminal defendant's background.

The precise issue before the Court with respect to Howard's claim, however, is whether Howard can satisfy the requirements of *Martinez* and *Trevino*. He has not satisfied his burden of showing that: (1) his underlying claims of ineffective assistance of trial counsel are substantial, *see discussion supra*, and (2) his state habeas counsel was ineffective in failing to present those claims in his state habeas application. *Preyor*, 537 F. App'x at 421. Specifically, Howard fails to satisfy *Martinez's* and *Trevino's* test for establishing cause. Under those decisions, Howard may show cause for his default by demonstrating that his underlying ineffective assistance of trial counsel claim is substantial and that his state post conviction counsel was ineffective under *Strickland*. The problem for Howard, however, is that his claim of ineffective assistance of trial counsel is not substantial.

To demonstrate that it is substantial, Howard would have to show that he might be able to satisfy *Strickland*, 466 U.S. at 687, which requires a prisoner to prove both deficient performance and actual prejudice. As discussed previously, Howard failed to demonstrate that his trial counsel's performance was deficient and caused him actual prejudice. Moreover, even

---

relying on the ineffectiveness of his post conviction attorney as a 'ground for relief,' it does not stop Martinez from using it to establish 'cause.'").

considering the admissible[18] new evidence Howard attached to his federal petition, Howard still fails to show that his IATC claim against his trial counsel was substantial. As the Court did not find that Howard's trial counsel was deficient, Howard is "preclude[d] [from] a finding of cause and prejudice," sufficient to trigger the application of *Martinez* and *Trevino*. *Sells*, 536 F. App'x at 492. For reasons heretofore explained, the Court is of the opinion, and so finds, that Howard has not satisfied either requirement in order to overcome the purported procedural default with respect to his ineffective assistance of counsel claims.

The Supreme Court has held that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). In order to prove ineffective assistance, the defendant must demonstrate that "a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Id*. Moreover, "[c]ounsel cannot be deficient for failing to press a frivolous point." *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995); *see also Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

Howard has not attempted to demonstrate that his ineffective assistance of trial counsel claims were "clearly stronger" than the claims raised by his state habeas counsel. Additionally, as already discussed, the ineffective assistance claims that Howard asserts should have been raised are without merit. Accordingly, state habeas counsel did not perform deficiently by failing to raise those claims.

---

[18]The Court will not consider the inadmissible evidence for purposes of this analysis.

Deference is owed to the strategic decisions of state habeas counsel in deciding which claims to raise. *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983). State habeas counsel is not ineffective and a petitioner is not prejudiced for failing to raise meritless claims. *Segundo*, 831 F.3d at 350–51.

For reasons heretofore explained, the Court is of the opinion, and so finds, that Howard has not satisfied the necessary requirements in order to overcome the alleged procedural default. Nonetheless, to the extent that Howard's ineffective assistance of counsel claims overlap with claims that were actually raised by state habeas counsel, he has not satisfied the requirements of § 2254(d). Howard has not shown that he is entitled to relief on his first IATC claim.

**B.    Howard's Second Claim (IATC)**: Trial counsel provided constitutionally ineffective representation by failing to thoroughly investigate Howard's psychosocial history and seek timely and relevant evaluations of his mental condition regarding (a) competence to stand trial; (b) criminal responsibility for capital murder; and (c) whether his waiver of *Miranda* rights and subsequent confession were knowing and intelligent.

Howard's second ineffective assistance of counsel claim asserts that his trial counsel's alleged failure to adequately investigate Howard's psycho-social history and mental disorders prevented trial counsel from making a successful challenge to Howard's: (1) competency to stand trial, (2) his criminal responsibility for capital murder, and (3) whether his waiver of his *Miranda* rights and subsequent confession were knowing and intelligent. In his amended petition, Howard further explains the "criminal responsibility for capital murder" issue as his trial counsel's alleged failure to adequately investigate Howard's psycho-social history and

mental disorder; thus, preventing trial counsel "from presenting a potentially successful insanity defense." (Dkt. #76, p. 81).

1. **Exhaustion of the claim.**

As noted previously, this Court must determine whether these three sub-issues of Howard's second IATC claim were exhausted or procedurally defaulted. A federal court may not grant habeas relief unless it appears that the applicant has exhausted the remedies available in the courts of the state. *See* § 2254(b)(1)(A); *Richter*, 562 U.S. at 86, 103–04. Howard's amended petition is silent as to the issue of exhaustion of his second IATC claim or the sub-issues raised under his second IATC claim. The Director contends that Howard's IATC claims regarding competency and his confession under *Miranda* were reasonably adjudicated in state court, and thus, exhausted. (Dkt. #79, p. 78). The Director also contends that Howard's IATC claim regarding criminal responsibility is unexhausted, defaulted, and meritless. (*Id.*).

In the state court below, state habeas counsel raised the argument that while trial counsel investigated and determined that Howard had mental deficiencies, and discussed Howard's ADHD and potential diagnosis of schizophrenia, trial counsel did not use of any of this evidence or any of the state habeas counsel's evidence of mental retardation to attack the voluntariness of Howard's confession (claim 5). (SHCR 53). State habeas counsel also argued that trial counsel failed to: (1) handle mental competency issues appropriately, (2) raise the notice of the insanity defense timely, (3) develop the available evidence of mental illness, specifically obtaining the jail records, which included a report from Dr. Guillett, the Hardin County Jail medical provider,

that supported a theory of mental illness, and (4) call Dr. Fason (Howard's trial mental health expert) in the second competency hearing (SHCR 53–55).

After reviewing the pleadings and evidence accumulated in this case, the state trial court issued findings of fact regarding whether trial counsel was ineffective regarding the issues of mental competency and the voluntariness of Howard's confession responsive to Grounds Five and Sixteen, which includes the following findings:

47. [Howard's] trial counsel presented evidence to the jury regarding [Howard's] mental state and claim of mental retardation.

48. [Howard's] trial counsel presented expert testimony regarding [Howard's] mental state from Dr. James Duncan, Ph.D., a licensed psychologist.

49. [Howard's] trial counsel presented non-expert testimony from [Howard's] prior educators, coaches, friends, and family all regarding [Howard's] behavior and mental capabilities in their individual interactions with him.

50. [Howard] was provided his *Miranda* rights by law enforcement prior to providing his statement.

51. [Howard] was cognizant of what he was doing at the time he gave his statement.

52. [Howard] indicated in writing that he was aware of his *Miranda* rights.

53. [Howard] did not object to the introduction of his statement into evidence.

54. [Howard's] trial counsel cross examined law enforcement as to [Howard's] behavior while providing his statement.

55. [Howard's] trial counsel cross examined law enforcement as to the voluntariness of [Howard's] statement.

56. [Howard] placed before the jury the issue of [Howard's] mental issues through both cross examination of state's witnesses and direct examination of defense witnesses.

57.     [Howard] challenged before the jury the voluntariness of [Howard's] statement through the cross examination of state's witnesses.

Supp. SHCR 29.

The state habeas court went on to issue the following conclusions of law regarding allegations of ineffective assistance of trial counsel pertaining to the issues of mental competency and voluntariness of Howard's confession:

58.     [Howard's] statement was given knowingly, intelligently, and voluntarily.

59.     [Howard] was not mentally ill nor mentally retarded.

60.     [Howard's] trial counsel's performance did not fall below an objective standard of reasonableness.

61.     [Howard's] trial counsel's performance was not deficient.

62.     [Howard's] trial performance did not prejudice [Howard's] defense.

63.     [Howard's] trial counsel provided effective assistance of counsel.

Supp. SHCR 30.

This Court must give deference to the state habeas court's findings on these issues. *See Cullen*, 563 U.S. at 181; *Richter*, 562 U.S. at 105 (finding that courts must be "doubly deferential when § 2254(d) applies). The Court finds that two of Howard's three sub-claims raised in his second ineffective assistance claim have been exhausted—(1) mental competency to stand trial and (2) the voluntariness of his confession.

While the state habeas record establishes that Howard's state habeas counsel did raise an issue as to the timeliness of asserting an insanity defense by trial counsel, the state habeas record

does not reflect that an issue for failing to raise a potentially successful insanity defense was presented to the state habeas court. It does not appear from the state habeas record that Howard exhausted the claim that his trial counsel was ineffective because his trial counsel failed to "present[] a potentially successful insanity defense."[19] As such, this sub-claim is unexhausted and procedurally defaulted.

## 2. <u>Deficient Representation of Trial Counsel</u>.

Howard's second IATC claim is a continuation of his first IATC claim. As this Court has already reviewed Howard's claim that his trial counsel was ineffective for failing to adequately investigate his psycho-social history and mental disorder in his first IATC claim, this Court will not repeat the full analysis here. The Court incorporates its above discussion into its analysis regarding Howard's second IATC claim.

### a. <u>Howard fails to show the state habeas court's findings were unreasonable regarding his mental competency claim</u>.

Howard's amended petition is silent regarding how the state habeas court is unreasonable pertaining to its findings of fact and conclusions of law regarding Howard's competency to stand trial. Howard also fails to discuss and establish how trial counsel was deficient for the purposes of *Strickland*, other than his complaint that trial counsel is deficient for allegedly failing to conduct an adequate mitigation investigation regarding Howard's mental illness. The Court has already addressed Howard's complaint regarding the adequacy of trial counsel's mitigation investigation above.

---

[19] This Court found that Howard's ineffective of assistance claim regarding the alleged failure to adequately investigate mitigation evidence was exhausted, *see supra*.

Howard merely points to the 2017 hearsay statements of his federal habeas expert witness—Dr. Woods—as reported to his federal habeas attorney, regarding Howard's prodromal mental illness to suggest incompetency during the guilt/innocence portion of his 2001 trial.[20] (Dkt. #76, pp. 81–82). Without more, however, such inadmissible hearsay evidence fails to negate whether Howard had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he ha[d] a rational as well as factual understanding of the proceedings against him." *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (citing *Dusky v. United States*, 362 U.S. 402 (1960)) (per curiam). The two are not coextensive: a defendant can be both mentally ill and competent to stand trial. *Mays*, 757 F.3d at 216; *see Mata v. Johnson*, 210 F.3d 324, 329 n.2 (5th Cir. 2000) (finding "presence or absence of mental illness or brain disorder is not dispositive" of competency); *see also Patterson v. Cockrell*, 69 F. App'x 658, 2003 WL 21355999 at *4–6 (5th Cir.) (not published), *cert. denied*, 540 U.S. 1008 (2003). Other than Dr. Wood's inadmissable hearsay statements regarding Howard's competency, Howard failed to present any other admissible evidence or legal argument that Howard was incompetent to stand trial. (*See* Dkt. #76, pp. 81–82).

The record in this case reveals that the issue of whether Howard was competent to stand trial was a major concern at trial, and the trial court went to great lengths to ensure that he was

---

[20] Howard's federal habeas counsel's reporting of her telephone conversation with Dr. Woods regarding his opinion pertaining to Howard's competency to stand trial in 2001 is nothing more than hearsay. *See* FED. R. EVID. 801(c). Dr. Woods' statements, through counsel, do not qualify for an exception under FED. R. EVID. 803, and thus, is not allowed to be considered by this Court. As to the claim that the Court did not sufficiently provide funds for Howard's expert witnesses, that claim has been addressed in Section VI.A.5. The Court still finds this argument to be specious and disingenuous.

competent before preceeding with the trial on the merits.  At Howard's second competency trial,[21] the State's psychiatric expert, Dr. Ned Groves testified that a person can be competent and still suffer from schizophrenia.[22]  (32 R.R. 26–28).  Dr. Groves also testified that a person can have ADHD and still be competent to stand trial.[23]  (32 R.R. 31).  He further testified that he found Howard competent to stand trial based on his examination of Howard.  (32 R.R. 33).

Dr. James Duncan, Howard's court-appointed psychological expert, testified that Howard was able to tell Dr. Duncan of the criminal charge against him and gave "a straightforward description of the events leading to his arrest."  (31 R.R. 117–20).  Under cross-examination by the prosecutor, Dr. Duncan testified:

Q.     And Jamaal Howard went into a lot of detail about the facts of the crimes that he was charged with, didn't he?

A.     He seemed to give me a straightforward description of the events leading to his arrest.

Q.     In fact, he said it was an incident in a store.  "I attempted to rob the store.  It was a Chevron car wash in Silsbee," right?

A.     Yes, sir.

Q.     "I intentionally shot a woman," right?

A.     Yes.

Q.     "It was in May, I think May 12th."  Is that what he said?

---

[21] Howard's first competency trial ended in a mistrial.  (30 R.R. 36–37).

[22] Dr. Groves provided a report detailing all the topics covered or attempted with Howard during his examination (1 C.R. 138–42), and testified for the State regarding these matters during both competency hearings (29 R.R. 120–46; 32 R.R. 20–63). Likewise, Dr. Gripon provided a report (2 C.R. 213–17), and testified for the State during the first trial on competency (29 R.R. 146–69), and in the rebuttal during both stages of trial. (23 R.R. 92–117; 26 R.R. 98–117).

[23] Howard was diagnosed with ADHD as a child.

A.     Yes.

Q.     He told you he had a gun?

A.     Yes, he did.

Q.     He said he decided to go into the store; "Did not know I was going to shoot someone," right?

A.     Yes.

Q.     He said when he went in the store, "she," meaning the clerk, "She got up.  She was sitting on the counter."  He told you that?

A.     Yes.

Q.     "I shot the gun at her." That's what he told you?

A.     Yes.

Q.     "I seen it hit her"?

A.     Yes.

Q.     "She fell on the floor"?

A.     Yes.

Q.     "I took money, cash; and I left," right?

A.     Yes.

Q.     "I ran to the back of the store, and I left," correct?

A.     Yes.

Q.     "I ran to my house," is what he told you?

A.     As I recall.

Q.    And you made notes, too, about it, didn't you?

A.    Yes, I did.

Q.    "I was afraid somebody was going to come to the store," right?

A.    Yes.

Q.    "The police came to my house soon afterwards," right?

A.    Yes.

Q.    "I was next door because no one lives there," is what he told you?

A.    That's what he told me.

Q.    "And they checked that house and found me," is what he told you?

A.    Yes.

Q.    He told you it was capital murder during an attempted robbery?

A.    Yes.

Q.    And, in fact, y'all talked a little bit about the possible punishment that Jamaal might get?

A.    I asked what he understood to be the possible consequences.

Q.    And what did he tell you?

A.    He told me that he — as I recall, he told me that he could get substantial jail time; he could get life in prison or something.

(31 R.R. 117–120).

Dr. Duncan also testified that schizophrenia could be one explanation for some of the symptoms Howard was exhibiting, (31 R.R. 121–22), and he concluded that Howard's

competency to stand trial was questionable and that he may need psychiatric treatment. (31 R.R. 123). Based on the evidence and credible testimony of the witnesses, the competency trial jurors made the factual determination and concluded that Howard was competent to stand trial. (32 R.R. 133–34).

The Supreme Court has concluded that competency to stand trial is a question of fact. *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam); *see also Thompson v. Keohane*, 516 U.S. 99, 113 (1995) (noting the "practical considerations that have prompted the Court" to consider competency a "factual issue," namely that the trial court has a "superior capacity to resolve credibility issues"); *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990) (per curiam) (considering the state court's conclusion regarding the defendant's competence to be a factual finding). In *Felde v. Blackburn*, the Fifth Circuit relied on *Fulford* in determining that a state court's finding of competence to stand trial is a finding of fact. *Felde v. Blackburn*, 795 F.2d 400, 402 (5th Cir. 1986) ("The state court's finding of mental competence to stand trial...is a finding of fact entitled to a presumption of correctness.") (citing *Fulford*, 462 U.S. at 116-17).

Section 2254(e) limits the Court's review of state-court fact findings, even if no claims were presented on direct appeal or state habeas. Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct" and the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). To the extent Howard's claim challenges factual determinations made by the state trial court, the Court applies § 2254(e)(1). Because competency is a question of fact,

the Court affords the state trial court the deference due under § 2254(e)(1).  *Austin v. Davis*, 876 F.3d 757, 779 (5th Cir. 2017); *see Appel v. Horn*, 250 F.3d 203, 210 (3rd Cir. 2001).

Under § 2254(e)(1), the state trial court's determination that Howard was competent to stand trial is presumed correct.  In his interview with Dr. Duncan, Howard clearly demonstrated an understanding of the charges against him and the possible consequences, as well as an ability to make strategic choices and to communicate clearly.  Howard bears the burden of rebutting that presumption of correctness by clear and convincing evidence.  Although Howard presents some evidence of mental illness that developed after his trial with his federal habeas petition,[24] he has not demonstrated by clear and convincing evidence that he was not competent to stand trial.

Howard contends that trial counsel was ineffective because he allegedly failed to adequately investigate Howard's psycho-social history and mental disorders thus preventing trial counsel from making a successful challenge to Howard's competency.  The fallacy in this argument is that competency to stand trial revolves around the criminal defendant's understanding of the charges and proceedings and his ability to communicate with his counsel–not with trial counsel's investigative abilities to search for every person who has knowledge of the defendant's past.  "There comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties."  *Bobby v. Van Hook*, 558 U.S. at 11.  Even if it were debatable whether trial counsel did as thorough a job as appropriate in adequately investigating Howard's psycho-

---

[24] TDCJ medical records demonstrate that Howard was diagnosed with schizophrenia in July 2002.  (Dkt. #76-11).

social history and mental disorders, trial counsel's investigation into more mitigating evidence has little bearing on Howard's understanding of the proceedings and consequences and his ability to communicate.

Moreover, Howard fails to establish that the state court decision—that Howard failed to prove deficient performance and prejudice (Supp. SHCR 26-27)—was based on an unreasonable determination of the facts in light of the evidence presented in the state proceedings or that its decision was an unreasonable application of *Strickland* under § 2254(d). Without this, Howard also has not shown that there is a reasonable probability that, but for trial counsel's failure to adequately conduct a mitigation investigation, the result of the proceeding would have been different and Howard would have been found incompetent to stand trial. *Strickland*, 466 U.S. at 694; *Felde v. Butler*, 871 F.2d 281, 282–83 (5th Cir. 1987). He cannot establish that reasonable jurists could debate this conclusion by the state court. Because Howard has not shown prejudice, there is no need to consider whether counsel was constitutionally deficient. Howard has failed to overcome § 2254(d). This request for relief is denied.

b. <u>Howard's insanity claim is unexhausted, procedurally defaulted and meritless</u>.

In his amended petition, Howard explains his "criminal responsibility for capital murder" issue as his trial counsel's alleged failure to adequately investigate Howard's psycho-social history and mental disorder; thus, preventing trial counsel "from presenting a potentially successful insanity defense." (Dkt. #76, p. 72). Above, this Court finds that this claim is

unexhausted. In addition to this claim being unexhausted, this claim is also procedurally barred and meritless.

1.    The procedural default doctrine.

The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition. *See* § 2254(b)(1)(A) (stating that habeas corpus relief may not be granted "unless it appears that...the applicant has exhausted the remedies available in the courts of the State"). The exhaustion requirement is satisfied if the substance of the federal habeas claim was presented to the highest state court in a procedurally proper manner. *Baldwin v. Reese*, 541 U.S. 27, 29–32 (2004); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002). In Texas, the highest state court for criminal matters is the Texas Court of Criminal Appeals. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). To properly exhaust a claim the petitioner must "present the state courts with the same claim he urges upon the federal courts." *Picard*, 404 U.S. at 276.

Howard did not raise this particular insanity claim before the Texas Court of Criminal Appeals; thus, this claim is unexhausted. *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001). If Howard, however, were to return to state court to satisfy the exhaustion requirement and if the state court found that his insanity claim was procedurally barred, the unexhausted claim would be considered procedurally barred from federal habeas review. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9–10 (1992) (holding an unexhausted claim is procedurally defaulted

for federal habeas purposes if the claim would now be procedurally barred by state court); *Coleman v. Thompson*, 501 U.S. at 735 n.1 (same).

Even though Howard did not request a stay and abeyance on his insanity claim, the Court should consider whether this issue should be stayed, as opposed to being dismissed for failure to exhaust. The Supreme Court has held that a district court has the discretion to stay a mixed petition to allow a petitioner to present his unexhausted claims to the state court in the first instance and then return to federal court for review of his perfected petition. *Rhines v. Weber*, 544 U.S. 269 (2005). The Supreme Court stressed that a stay should rarely ever be granted:

> For these reasons, stay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

*Id.* at 277. The Supreme Court further held that a stay and abeyance is appropriate only if the petitioner has not engaged in intentional delay. *Id.* at 278.

Even if a stay and abeyance were potentially available, Howard has not shown good cause for failing to exhaust his insanity claim, that his insanity claim was not plainly meritless or that he has not engaged in intentional delay. *See Miller v. Dretke*, 431 F.3d 241, 254 (5th Cir. 2005) (citing *Rhines*). A stay is not appropriate.

In this case, Howard is unable to return to state court to present any unexhausted claims, because doing so would be barred by Texas' abuse of the writ doctrine codified in Article 11.071, Section 5(a) of the Texas Code of Criminal Procedure.[25] *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998). The Fifth Circuit has consistently held that Texas' abuse of the writ doctrine is an independent and adequate state procedural bar foreclosing federal habeas review of unexhausted claims. *See Williams v. Thaler*, 602 F.3d 291, 305–06 (5th Cir. 2010) (holding a petitioner's claims were procedurally defaulted because if the petitioner returned to state court, the court would not consider the merits under Article 11.071, § 5(a)); *Rocha v. Thaler*, 626 F.3d 815, 832 (5th Cir. 2010); *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001). As a result, Howard's unexhausted insanity claim should be deemed procedurally defaulted in federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004).

Federal habeas relief on the basis of a procedurally defaulted claim is barred unless the petitioner can demonstrate cause for the default and actual prejudice arising from the default or demonstrate the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Barrientes v. Johnson*, 221 F.3d 741, 758 (5th Cir. 2000). Howard makes no attempt to show a "fundamental miscarriage of justice" will result from the Court's dismissal of this claim. (*See* Dkt. #76, p. 83).

---

[25] Article 11.071, Section 5(a) provides that a state court may not consider the merits of, or grant relief on, claims presented in a successive state habeas application unless the legal or factual issues were unavailable at the time the previous application was filed or, but for a violation of the Constitution, no rational juror could have found the applicant guilty or voted in favor of a death sentence.

Howard does not raise the specter of *Martinez* or *Trevino* to establish that the alleged ineffectiveness of his post-conviction counsel should be cause to excuse the default. Even if he had addressed *Martinez* and *Trevino* in his briefing, they would be inapplicable to this claim as he has failed to demonstrate that the claim is "substantial" *See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) (finding that *Martinez* requires a showing that the defaulted IATC claim is "substantial" and that state habeas counsel was constitutionally ineffective under *Strickland* for not raising it) (citing *Martinez*, 566 U.S. at 14)). Prior to *Martinez*, an attorney's negligence in a postconviction proceeding could not serve as "cause." *Coleman*, 501 U.S. at 755. *Martinez* and *Trevino* carved out a "narrow" exception to the *Coleman* rule for claims asserting ineffective assistance of trial counsel (IATC). *Trevino*, 569 U.S. at 422. Now, a petitioner may meet the cause element by showing: (1) "that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding" and (2) "that his [IATC claim] is substantial—i.e., has some merit." *Garza*, 738 F.3d at 676. Neither of these "cause" elements are satisfied regarding this claim.

With regard to this IATC claim, Howard fails to assert, let alone establish, that his habeas counsel was "ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d at 676. In the habeas context, allegations of ineffective assistance are reviewed under the familiar two-prong test established in *Strickland*. To establish deficient performance under *Strickland*, a petitioner must do more than identify issues or claims that habeas counsel did not raise and are now barred. *Strickland*, 466 U.S. at 689 ("Even the best criminal defense

attorneys would not defend a particular client in the same way."); *Smith v. Murray*, 477 U.S. 527, 535 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."); *see also Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) (finding "generalized allegations are insufficient in habeas cases" to meet the *Martinez* exception).

Indeed, a state habeas attorney "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal," because "counsel cannot be deficient for failing to press a frivolous point." *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (unpublished) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Furthermore, Howard has not shown that he was prejudiced by state habeas counsel's allegedly deficient performance—that is, "that there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application." *Barbee v. Davis*, 660 F. App'x 293, 314 (5th Cir. 2016) (unpublished); *Martinez v. Davis*, 653 F. App'x 308, 318 (5th Cir. 2016) (unpublished).

The record in this case demonstrates that state habeas counsel raised an IATC claim relating to insanity asserting that trial counsel was deficient for failing to timely file the notice of insanity defense. (Supp. SHCR 54). With the heavy deference given to state habeas counsel's strategic choices under *Strickland*, Howard has not shown a reasonable probability that the state habeas court would have granted relief had state habeas counsel advanced this unexhausted

claim, much less that the new claim had a better chance of success than the claim raised by state habeas counsel during Howard's state habeas proceedings. Accordingly, Howard has not shown that state habeas counsel's representation was either deficient or prejudicial enough to provide cause to overcome the procedural bar of this unexhausted claim.

Finally, regardless of whether Howard establishes a valid claim of ineffective state habeas counsel under *Martinez*, he still is not entitled to excuse the procedural bar because the defaulted claims are also plainly meritless. Again, to overcome a default under *Martinez*, a petitioner must also demonstrate that the underlying IATC claim "is a substantial one." *Martinez*, 566 U.S. at 14 (citing *Miller-El*, 537 U.S. at 322). "For a claim to be 'substantial,' a petitioner 'must demonstrate that the claim has some merit.'" *Reed*, 739 F.3d at 774 (quoting *Martinez*, 566 U.S. at 14). "Conversely, an 'insubstantial' ineffective assistance claim is one that 'does not have any merit' or that is 'wholly without factual support.'" *Reed*, 739 F.3d at 774 (quoting *Martinez*, 566 U.S. at 15–16).

As discussed in below, Howard fails to meet this criteria as well. Consequently, Howard fails to establish cause under *Martinez* that would excuse his unexhausted IATC claim regarding the insanity defense from being procedurally defaulted. Howard is thus barred from receiving federal habeas relief on this claim.

2.  Insanity defense is meritless.

Howard asserts that his trial attorney was ineffective because he failed to investigate Howard's psycho-social history thoroughly and failed to seek timely and relevant evaluations of

Howard's mental condition regarding his criminal responsibility for the death of the victim. (Dkt. #76, p. 81). His argument to support this thesis is that Dr. Woods needs the opportunity to examine Howard again, but for the Court denying further funding, to test the validity of the hypothesis of insanity. (Dkt. #76, p. 83).

The Court notes that it has reviewed Howard's claim that his trial counsel was ineffective for failing to adequately investigate his psycho-social history and mental disorder in his first IATC claim, and will rely on its previous analysis here. As to additional funding for Dr. Woods to conduct extraneous examinations, *see supra*, Section VI.A.5.

Howard is essentially complaining that his trial counsel was ineffective because he was not successful in persuading the jury to find that Howard was entitled to the defense of insanity. Howard's briefing fails to establish that his counsel's performance was deficient and that the alleged deficient performance prejudiced the defense as to Howard's insanity defense. In reviewing counsel's performance, courts must be "highly deferential," must eliminate the "distorting effect of hindsight," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 687. Howard has failed to put forth any evidence or argument that shows the likelihood of a different result is substantial, not just conceivable. *See Harrington*, 562 U.S. at 112.

Under Texas law, "[i]nsanity is an affirmative defense to prosecution when, at the time of the conduct charged, the actor, as a result of a severe mental disease or defect, did not know that his conduct was wrong." Tex. Pen. Code Ann. § 8.01(a) (emphasis added). "There is a general

presumption of sanity and the defendant bears the burden of proving, by a preponderance of the evidence, his insanity at the time of the conduct charged." *Martinez v. State*, 867 S.W. 2d 30, 33 (Tex. Crim. App. 1993).

The Director points out, and the Court finds persuasive, that in furtherance of the insanity defense, trial counsel retained Dr. Fason, who evaluated Howard prior to trial. Trial counsel presented testimony from Howard's mother, sister, older brother, cousin, and grandfather pertaining to Howard's mental state and unusual behavior the night before the murder. Trial counsel also presented Howard's former teachers and coaches to testify the Howard had mental health issues as a child to help show that Howard did not decide "to act like [he was] crazy" overnight. (23 R.R. 17). During trial, trial counsel called Dr. Duncan to testify regarding Howard's behavior during his March 2001 interview as possibly evidencing an emerging thought disorder or possible prodromal schizophrenia, and gave his opinion that Howard may be in need of psychiatric treatment. (*See*, generally, 21 R.R. 18–44).

On cross-examination, trial counsel elicited testimony from Earl Dabney, a local resident, that he saw Howard shortly after the crime and described him as having eyes that "looked wild," and that were "all glazed over and red like." (20 R.R. 37). Trial counsel also elicited testimony on cross-examination of Texas Ranger L. C. Wilson regarding Howard's unusual behavior at the time of his arrest, including his being found coiled up like a ball inside a closet in an abandoned house, grinning from ear to ear, and his laughing in an odd manner at officers who were pointing guns at him. (20 R.R. 133–35). On the cross-examination of Ranger Wilson, trial counsel

brought forth details regarding Howard being exceptionally calm and unaffected in talking about the murder during his statement to the police. (20 R.R. 134–35).

Howard's jury was instructed and charged on the defense of insanity. (23 R.R. 9–11; 3 C.R. 569–64). In his closing, trial counsel argued how the evidence showed that Howard was insane at the time of the murder and could not be held criminally responsible for the capital murder of the victim. (23 R.R. 14–26). The fact that the jury ultimately rejected the defense and convicted Howard of capital murder does not prove counsel was constitutionally ineffective. *Youngblood*, 696 F.2d at 410 ("The fact that trial counsel was unsuccessful in his efforts does not constitute, in light of the entire record, a basis for habeas relief.").

This record does not support Howard's claim that his trial counsel was deficient in presenting an insanity defense. Howard fails to discuss and establish how trial counsel was deficient for the purposes of *Strickland*, other than his complaint that trial counsel is deficient for allegedly failing to conduct an adequate mitigation investigation into Howard's prodromal mental illness. The Court has already addressed Howard's complaint regarding the adequacy of trial counsel's mitigation investigation above. Even if Howard could establish deficient performance, he cannot show prejudice. In reviewing such claims, it is important to remember that counsel's performance need not be optimal to be reasonable. *Richter*, 562 U.S. at 104; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam) (finding a defendant is entitled to "reasonable competence, not perfect advocacy").

Moreover, Howard's amended petition is silent as to how the state habeas court's findings of fact and conclusions of law are unreasonable regarding Howard's insanity defense. Howard has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Howard has not, however, rebutted the finding of fact that he was not insane with clear and convincing evidence. With respect to the conclusion of law that Howard was not insane, he at best has only shown that fairminded jurists could disagree about the correctness of the state court's decision; thus, the decision was not unreasonable. *Coleman*, 716 F.3d at 902. This claim lacks merit. All relief requested for this claim should be denied.

c.  Howard fails to show the state habeas court's findings were unreasonable regarding his IATC claim regarding the waiver of his *Miranda* rights.

Howard argues that if his trial counsel had performed effectively, i.e., conducted an adequate mitigation investigation regarding Howard's mental illness, there would be a reasonable probability that the defense could have successfully challenged his waiver of his *Miranda* rights and subsequent confession as not knowing and intelligent and prevented the use of the confession, which in turn, could have led to a different outcome of the trial. (Dkt. #76, pp. 83–85). Howard's thesis is tenuous at best, as Howard fails to connect a link between trial counsel's alleged failure to conduct an adequate mitigation investigation into Howard's mental health background and successfully challenging Howard's waiver of his *Miranda* rights and

subsequent confession. The Court is also skeptical of the claim that suppression of the confession could have led to a different outcome of the trial in light of the visual evidence found on the video tape of the murder at the convenience store. (SX-1).

As this Court has already reviewed Howard's claim that his trial counsel was ineffective for failing to adequately investigate his psycho-social history and mental disorder in his first IATC claim, this Court will not repeat the full analysis here. The Court incorporates its above discussion into its analysis regarding Howard's second IATC claim.

> d.    <u>Howard fails to show the state habeas court's findings were unreasonable regarding the waiver of his *Miranda* rights</u>.

Howard's amended petition is silent regarding how the state habeas court is unreasonable pertaining to its findings of fact and conclusions of law regarding Howard's waiver of his *Miranda* rights. Howard also fails to discuss and establish how trial counsel was deficient for the purposes of *Strickland*, other than his complaint that trial counsel is deficient for allegedly failing to conduct an adequate mitigation investigation regarding Howard's mental illness. The Court has already addressed Howard's complaint regarding the adequacy of trial counsel's mitigation investigation above.

Howard merely points to the 2017 hearsay statements of his federal habeas expert witness—Dr. Woods—as reported by his federal habeas counsel (now hearsay within hearsay), regarding how Howard's prodromal mental illness may have impacted his confession and may have rendered the confession unknowing and unintelligent. (Dkt. #76, pp. 83–85). The Court cannot accept Dr. Woods' hearsay statements as clear and convincing evidence on this claim.

*See* FED. R. EVID. 801(c). Dr. Woods' statements, through counsel, do not qualify for an exception under FED. R. EVID. 803; and thus, the statements are not allowed to be considered by this Court.

Even if the Court were to accept Dr. Woods' hearsay statements regarding Howard's knowing understanding of his waiver, Howard has failed to show or even allege that the actions of law enforcement during his arrest and questioning amounted to official coercion such that his confession was involuntary. *See,* e.g., *Butler v. Stephens*, 600 F. App'x 246, 247–48 (5th Cir. 2015); *United States v. Blake*, 481 F. App'x 961, 962 (5th Cir. 2012) (unpublished) ("While a defendant's mental condition 'may be a significant factor in the voluntariness calculus, this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional voluntariness.'") (quoting *Colorado v. Connelly*, 479 U.S. 157, 163–67 (1986)); *see also Carter v. Johnson*, 131 F.3d 452, 464 (5th Cir. 1997) ("[I]n the absence of any evidence of official coercion, [petitioner] has failed to establish that his confession was involuntary."). Consequently, in the absence of any evidence of official coercion, Howard has failed to establish that his confession was involuntary. *See United States v. Raymer*, 876 F.2d 383, 386 (5th Cir. 1989).

In his briefing, Howard fails to challenge the state habeas court's findings of fact or conclusions of law. Howard has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law as determined by the Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Howard has failed to show that the state habeas court's decision that trial counsel's performance was not deficient and did not result in prejudice was a reasonable application of *Strickland*'s standards. Howard has failed to overcome § 2254(d). Thus, reasonable jurists could not debate that the state court did not unreasonably apply *Strickland* in concluding that trial counsel was not ineffective for not raising a challenge to Howard's confession before the state trial court. Howard's claim is meritless.

Finally, in the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded state court decisions, which has been referred to as "doubly" deferential. *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.* at 102; *see also Morales*, 714 F.3d at 302. Howard has not satisfied his burden of overcoming the "doubly" deferential standard that must be accorded to counsel in conjunction with § 2254(d). He has not shown that he is entitled to relief based on ineffective assistance of counsel. The second ground for relief lacks merit.

**C.**     **Howard's third IATC Claim**: <u>Trial counsel's lack of, and failure to conduct the necessary research to develop a reasonable understanding of the difference between competency to stand trial and mental defenses to criminal responsibility deprived Howard of his right to effective assistance of counsel</u>.

Howard argues that his trial counsel provided ineffective assistance because he did not have a "reasonable understanding of the difference between competency to stand trial and mental defenses to criminal responsibility," and failed to conduct the "necessary research" to develop such an understanding. Howard does not address whether this claim is exhausted in his briefing. The Director asserts that Howard's third IATC claim is unexhausted and defaulted. The Court agrees.

Howard failed to raise this IATC claim in state court as required under § 2254(b)(2). If he tried to raise the claim now, the Texas Court of Criminal Appeals would dismiss it as a successive habeas application under Texas Code of Criminal Procedure Article 11.071, Section 5. *Williams*, 602 F.3d at 305–06. Accordingly, this claim is defaulted. *Rocha*, 626 F.3d at 832; *Beazley*, 242 F.3d at 305–06 (unexhausted claims are defaulted). As a result, Howard's unexhausted IATC claim is deemed procedurally defaulted in federal court. *O'Sullivan*, 526 U.S. 838 at 848; *Bagwell*, 372 F.3d at 755.

Federal habeas relief on the basis of a procedurally defaulted claim is barred unless the petitioner can demonstrate cause for the default and actual prejudice arising from the default or demonstrate the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Barrientes*, 221 F.3d at 758. Howard makes no attempt to show

cause and actual prejudice[26] or a "fundamental miscarriage of justice" that would result from the Court's dismissal of this claim. (*See* Dkt. #76, pp. 85–87).

Howard does not raise either *Martinez* or *Trevino* to establish that the alleged ineffectiveness of his post-conviction counsel to raise this claim should be cause to excuse the default. Even if he had addressed *Martinez* and *Trevino* in his briefing, they would be inapplicable to this claim as he has failed to demonstrate that the claim is "substantial." *See Garza*, 738 F.3d at 676 (finding that *Martinez* requires a showing that the defaulted IATC claim is "substantial" and that state habeas counsel was constitutionally ineffective under *Strickland* for not raising it) (citing *Martinez*, 566 U.S. at 14)). Prior to *Martinez*, an attorney's negligence in a post-conviction proceeding could not serve as "cause." *Coleman*, 501 U.S. at 755. *Martinez* and *Trevino* carved out a "narrow" exception to the *Coleman* rule for claims asserting ineffective assistance of trial counsel. *Trevino*, 569 U.S. at 422. Now, a petitioner may meet the cause element by showing: (1) "that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding" and (2) "that his [IATC claim] is substantial—i.e., has some merit." *Garza*, 738 F.3d at 676. Howard does not attempt to satisfy either of these "cause" elements regarding this claim.

Howard also fails to assert that his habeas counsel was "ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d at 676. In the habeas context, allegations of ineffective assistance are reviewed under the familiar two-prong test

---

[26] Howard does allege that trial counsel's alleged failure to understand the difference between competency and sanity results in an "immense" prejudice to Howard's defense. (Dkt. #76, p. 87). Prejudice in this context, however, is not the same as actual prejudice arising from the default.

established in *Strickland*.   To establish deficient performance under *Strickland*, a petitioner must do more than identify issues or claims that habeas counsel did not raise and are now barred. *Strickland* 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way."); *Smith v. Murray*, 477 U.S. at 535 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.").   Indeed, a state habeas attorney "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal," because "counsel cannot be deficient for failing to press a frivolous point."   *Vasquez*, 597 F. App'x at 780 (citing *Smith v. Robbins*, 528 U.S. at 288).   Furthermore, Howard has not shown that he was prejudiced by state habeas counsel's allegedly deficient performance—that is, "that there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application."   *Barbee*, 660 F. App'x at 314; *Martinez v. Davis*, 653 F. App'x at 318.

The Director argues and the Court agrees that Howard's third IATC claim is meritless. Howard asserts that "[t]hroughout the record," trial counsel used the terms "competent" and "insanity" or "insane" interchangeably and inaccurately.   (Dkt. #76, p. 86).   While Howard alleges that trial counsel used the terms inaccurately throughout the entire trial process, Howard only supplies one example from the opening statement.   Howard points to the following statement made during the opening statements of the guilt/innocence phase:

> [W]hen this case is over, we'll show to you that Jamaal Howard was incompetent. May the 11th, he began to lose his mind. He was incompetent when he walked into that room [at the] Chevron station and shot that girl. If you watch this trial and if [Howard] ever starts laughing or doing something odd as he sits at that table, you will see that he is incompetent as he sits in this courtroom today.

(20 R.R. 20).

While trial counsel's statement reflects the inaccurate use of the term "incompetent" during the opening statements, Howard fails to show that this inaccurate use affected trial counsel's performance for the remainder of the trial. As to competency, after Dr. Duncan testified that he had concerns regarding Howard's competency to stand trial and the court recessed the murder trial to conduct competency proceedings, trial counsel did present evidence regarding Howard's competency. (*See* 29 R.R.–32 R.R. ). Likewise, trial counsel presented testimony regarding Howard's insanity defense during the guilt/innocence and punishment phases of the trial, *see* Section VI.B.2.b.2, for trial counsel's affirmative steps in presenting an insanity defense.

While trial counsel may have misspoken during opening statements, this error does not demonstrate that trial counsel did not understand the difference between the competency defense and an insanity defense. Moreover, the Sixth Amendment's guarantee of effective assistance of counsel does not entitle the accused to error-free representation. *See United States v. Freeman*, 818 F.3d 175, 178 (5th Cir. 2016) (citing *Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997); *Williams*, 695 F.2d at 123 (same)). Counsel's effectiveness is judged in light of the entire record

and the totality of the circumstances.  *Beavers v. Balkcom*, 636 F.2d 114, 115 (5th Cir. 1981).

Howard's claim does not establish that trial counsel was substantially deficient and more importantly, Howard fails to demonstrate that he was prejudiced by the trial counsel's inadvertent statement.  Howard's third IATC claim is meritless.

**D.**   **Howard's Fourth Claim**: <u>The prosecutor's closing argument violated Howard's Eighth and Fourteenth Amendment rights to have the jury give effect to mitigating evidence even if the evidence had no causal relationship to the capital crime.</u>

Howard asserts that the prosecutor's statement during closing arguments violated his Eighth and Fourteenth Amendment right to have the jury give effect to mitigating evidence even if the mitigating evidence had no causal relationship to the crime.  (Dkt. #76, pp. 87–93).  More specifically, Howard is arguing that the prosecutor's statement did not allow the jury to give "full consideration and full effect" to the mitigating evidence, i.e., the possibility of schizophrenia, that Howard presented at the punishment phase of his trial.  Howard relies on *Tennard v. Dretke*, 542 U.S. 274 (2004) to support his contention.  Howard contends that he is entitled to a new sentencing hearing.

**1.**   **<u>Howard's fourth claim for relief is unexhausted and procedurally defaulted</u>**.

Howard does not address whether this claim is exhausted in his briefing.  The Director asserts that Howard's fourth claim for relief is unexhausted and defaulted.  The Court agrees.  Howard failed to raise this claim in state court as required under § 2254(b)(2).  If he tried to raise the claim now, the Texas Court of Criminal Appeals would dismiss it as a successive habeas application under Texas Code of Criminal Procedure Article 11.071, Section 5.  *Williams*, 602

F.3d at 305–06. Accordingly, this claim is defaulted. *Rocha*, 626 F.3d at 832; *Beazley*, 242 F.3d at 305–06 (unexhausted claims are defaulted). As a result, Howard's unexhausted claim is deemed procedurally defaulted in federal court. *O'Sullivan*, 526 U.S. at 848; *Bagwell*, 372 F.3d at 755.

Federal habeas relief on the basis of a procedurally defaulted claim is barred unless the petitioner can demonstrate cause for the default and actual prejudice arising from the default or demonstrate the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Barrientes*, 221 F.3d at 758. Howard makes no attempt to argue cause and actual prejudice exist or allege a "fundamental miscarriage of justice" that would result from the Court's dismissal of this claim. (*See* Dkt. #76, pp. 87–93).

Whether a petitioner's claims are procedurally defaulted or procedurally barred, the way he may overcome these barriers is the same. First, he can overcome the procedural default or bar by showing cause for it—and actual prejudice from its application. To show cause, a petitioner must prove that an external impediment (one that could not be attributed to him) existed to prevent him from raising and discussing the claims as grounds for relief in state court. *See United States v. Flores*, 981 F.2d 231 (5th Cir. 1993). To establish prejudice, a petitioner must show that, but for the alleged error, the outcome of the proceeding would have been different. *Pickney v. Cain*, 337 F.3d 542 (5th Cir. 2003). Even if a petitioner fails to establish cause for his default and prejudice from its application, he may still overcome a procedural default or bar by showing that application of the bar would result in a fundamental miscarriage of justice. To

show that such a miscarriage of justice would occur, a petitioner must prove that, "as a factual matter, that he did not commit the crime of conviction." *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (citing *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)). Further, he must support his allegations with new, reliable evidence—that was not presented at trial—and must show that it was "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Fairman*, 188 F.3d at 644 (citations omitted).

Howard never exhausted this claim by presenting it to the Texas Court of Criminal Appeals, and the deadline for doing so has expired. As such, his claims are procedurally defaulted. *Finley*, 243 F.3d at 220 ("If a petitioner fails to exhaust state remedies, but the court to which he would be required to return to meet the exhaustion requirement would now find the claim procedurally barred, then there has been a procedural default for purposes of federal habeas corpus relief."). Howard has shown neither cause for his default, prejudice from application of the default, nor that he is actually innocent of the crime. As such, he cannot overcome the default.

### 2. **Howard's fourth claim for relief is meritless.**

Howard's federal petition raises issues that relate to the jury's ability to evaluate and give effect to mitigating evidence during the punishment phase of his trial. The core of Howard's mitigating evidence claim finds root in *Penry v. Lynaugh*, 492 U.S. 302 (1989). Federal courts have incrementally developed extensive and detailed jurisprudence involving Texas' method of placing mitigating evidence before capital juries. Other decisions have elaborately traced the

"long and contentious line of cases" in which *Penry* law has evolved. *Pierce v. Thaler*, 604 F.3d 197, 204 (5th Cir. 2010); *see also McGowen v. Thaler*, 675 F.3d 482, 490–91 (5th Cir. 2012); *Blue v. Thaler*, 665 F.3d 647, 664 (5th Cir. 2011). The Supreme Court first questioned the absence of a specific mitigation instruction or interrogatory to the jury in 1989. As a result, the Texas Legislature in 1991 amended the statute regarding the sentencing scheme to ask the jury a new special issue: "whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." Tex. Code Crim. Pro. art. 37.0711, § 2(e)(1).

The law has coalesced into a constitutional expectation that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."[27] *Abdul–Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). "[W]hen the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,'" omitting a specific mitigation question amounts to constitutional error. *Abdul–Kabir*,

---

[27] In application, the Supreme Court's *Penry* jurisprudence involves a two-part inquiry. *See Mines v. Quarterman*, 267 F. App'x 356, 361 (5th Cir. 2008) (describing the process by which a court assesses a *Penry* claim); *Coble v. Quarterman*, 496 F.3d 430, 444 (5th Cir. 2007) (same). A reviewing court first asks whether the complained-of evidence meets a low relevance standard. *See Tennard v. Dretke*, 542 U.S. 274, 283 (2004). Second, a court must decide whether the defendant's evidence had "mitigating dimension beyond" the special issue questions actually posed to the jury. *Tennard*, 542 U.S. at 288; *see also Smith v. Texas*, 543 U.S. 37, 43–45 (2004) (reaching the same result in a case on *certiorari* review from the Texas Court of Criminal Appeals).

550 U.S. at 254 n.14. Howard does not contend that he was prevented from presenting his mitigating evidence during the punishment phase of his trial or that the jury instructions, the special interrogatories, or verdict form were defective in some manner and prevented the jury from giving his mitigating evidence full effect and consideration.

Instead, Howard argues that the prosecutor's singular statement in closing argument convinced the jury to disregard Howard's mitigating evidence pertaining to Dr. Fason's diagnosis of prodromal schizophrenia; thus, the jury was not able to give full effect and consideration to Howard's mitigating evidence in assessing his blameworthiness. (Dkt. #76, pp. 87–89). Howard complains that the prosecutor said:

> And in the punishment phase you're asked to – you're asked to find that he [Howard] has got schizophrenia as a mitigating circumstance. In the first place, so what? What if he does have schizophrenia? Does that reduce his moral blameworthiness?
>
> You know, *Dr. Fason didn't say that this [the crime] was any way related to someone having schizophrenia*. He didn't say that there was any medication that he could take that would make him a pleasant fellow, get rid of any antisocial disorder.[28]

(Dkt. #76, p. 89 (citing 27 R.R. 20–21)). Based on the above statement, Howard contends that "the prosecutor effectively narrowed the scope of Special Issue No. 2 by arguing to the jury that because [Howard] failed to show a nexus between his mental impairment (schizophrenia) and

---

[28] Dr. Gripon, the prosecutor's psychiatric expert witness, testified in the innocence/guilt phase and in the punishment phase that he diagnosed Howard as having antisocial personality disorder rather than having schizophrenia. (23 R.R. 113–18, 26 R.R. 112–14).

the crime ("Nexus Argument"), the jury should answer "no" to the second special issue."[29]  (Dkt. #76, p. 88).

a.  <u>Howard fails to establish prejudice regarding his "nexus" evidentiary burden argument</u>.

In his briefing, Howard states that "both Texas and Fifth Circuit precedent imposed a nexus showing between the crime and the mental impairment" at the time of Howard's 2001 trial (Dkt. #76, p. 89).  Howard presents *Rhoades v. State*, 934 S.W.2d 113, 126 (Tex. Crim App. 1996) ("[I]f evidence has no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to mitigation."), to support his position.

Based on *Rhoades* and its progeny, there is no requirement that there must be a showing "between the crime and the mental impairment" but rather there is a relevance requirement[30] for

---

[29] The jury instruction for Issue No. 2 provides in pertinent part:

> If the jury has answered Issue No. 1 [future dangerousness] in the affirmative, the jury will answer the following issue, Issue No. 2: Whether taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character, and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

> You are further instructed that the term "mitigating evidence" means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

(27 R.R. 9–10; 3 C.R. 574–575).

[30] The Court of Criminal Appeals relied on *Franklin v. Lynaugh*, 487 U.S. 164 (1988), in which a plurality of the Supreme Court remarked that it had "never suggested that sentencers be given—in the context of mitigation—'unbridled discretion in determining the fates of those charged with capital offenses.'"  *Id*. at 125.  "The *Franklin* plurality recognized a relevance requirement to evidence bearing on the jury's mitigation determination."  *Rhoades*, 934 S.W.2d at 126.  The Court of Criminal Appeals quoted Justice Sandra Day O'Connor's concurrence in *Franklin* when demarcating the limits of relevancy:

> [E]vidence about the defendant's background and character is relevant because of the belief, long held in society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse*. *Franklin*, *supra*, 487 U.S. at 184 (citing *California v. Brown*, 479 U.S. 538 (1987))] [emphasis added].

To Justice O'Connor, the evidence is relevant because it relates to the moral culpability of a defendant's act. By this logic, if evidence has no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to

the "evidence bearing on the jury's mitigation determination." *Rhoades*, 934 S.W2d at 126. As

discussed in *Rhoades v. Davis*, No. 4:14-3152, 2016 WL 8943327 (S.D. Tex. July 20, 2016),

Rhoades attempted to have admitted into evidence eleven pictures of himself as a child at trial.

The photographs showed common childhood scenes such as Rhoades posing with family,

fishing, and holding a trophy. The defense argued that the photographs were a response to the

State's punishment-phase evidence. *Rhoades*, 2016 WL 8943327, at *5. The State objected to

the photographs on the basis that the photographs were not relevant to the punishment hearing

and the trial court ruled that the photographs were not relevant to the issue before the jury, and

thus, not admissible. *Id.*

The *Rhoades* federal habeas court denied Rhoades' complaint that the trial court

improperly denied the admissibility of his photographs into evidence. *Rhoades*, 2016 WL

8943327, at *8.[31] On review, the Fifth Circuit affirmed the federal habeas court's finding that

the denial of the admissibility of the photographs into evidence was harmless error. *Rhoades v.

Davis*, 914 F.3d 357, 368–69 (5th Cir. 2019). In finding that he had failed to meet his burden for

habeas relief, the Fifth Circuit also held that Rhoades had failed to show how the exclusion of

the photographs had a substantial or injurious effect on the jury's deliberations. *Rhoades*, 914

F.3d at 369. The Fifth Circuit's holding in *Rhoades* does not advance Howard's argument.

Howard also cites *Davis v. Scott*, 51 F.3d 457, 460–61 (5th Cir. 1995), *abrogated by

Tennard v. Dretke*, 542 U.S. 274 (2004) ("In order to present relevant [mitigating] evidence that

---

mitigation. *Rhoades*, 2016 WL 8943327, at *6.

[31] The Fifth Circuit granted a certificate of appealability on this issue in *Rhoades v. Davis*, 852 F.3d 422, 428–29 (5th Cir. 2017).

one is less culpable for his crime, the evidence must show (1) a 'uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own,' and (2) that the criminal act was attributable to this severe permanent condition.").  Once again the focus of the opinion and the discussion in *Tennard* regarding *Davis v. Scott*, is whether the *evidence* was constitutionally relevant and beyond the effective reach of the jury.  *Tennard*, 572 U.S. at 283 (discussing *Davis v. Scott*) (emphasis added)..

Even though *Rhoades*, 934 S.W.2d at 126, and *Davis v. Scott* were in effect at the time of Howard's 2001 trial and both cases focused on the admissibility or relevance of evidence for mitigation purposes, Howard cannot show prejudice in his punishment phase as there is no application of then *Rhoades'* "nexus" evidence burden in his trial.  There is no complaint in Howard's briefing that any evidence, mitigating or not, was denied admittance and excluded from presentment to the jury.  (*See* Dkt. #76).  The Court notes that *Tennard* was not in existence at the time of Howard's criminal trial.

Moreover, Howard's trial court never instructed the jury that: (1) the defendant had to prove that his mitigating evidence was relevant to the defendant's moral culpability for the charged crime or (2) if the presented evidence had no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to the issue of mitigation; and thus, the jury could disregard the evidence.  (*See* 1 R.R.–27 R.R.).  There is nothing in Howard's seven-week trial that indicates to the jury that a "nexus" requirement existed in Texas case law and "if evidence ha[d] no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to

mitigation." (*See* 1 R.R.–27 R.R.). Moreover, neither the prosecutor nor defense counsel argued to the jury that the defendant failed to meet his "nexus" evidentiary burden or the defendant had met his "nexus" evidentiary burden; and thus, the jury could consider the evidence in deciding the issue of mitigation. (*See* 1 R.R.–27 R.R.). Howard has failed to show that the jury would draw a connection between the prosecutor's statement and a case law proposition regarding an evidentiary burden, which there is no evidence that anyone informed the jury that it even existed. The mere existence of a "nexus" evidentiary burden at time of Howard's 2001 trial is not sufficient to establish prejudice in conjunction with the particular facts of Howard's trial and the prosecutor's statement.

b.  Examination of *Tennard* and prosecutorial misconduct.

*Tennard* does not purport to establish standards for evaluating alleged prosecutorial misconduct. Rather, it addresses the Eighth Amendment requirement that the states give the jury a vehicle for considering and giving effect to constitutionally relevant mitigating *evidence*, which it defines as evidence the sentencer could reasonably find justifies a sentence less than death. *Id*. at 285. *Abdul–Kabir* and *Brewer*, however, indicate that courts should consider whether the prosecutor's comments to the jury may have "undermined" the jury's ability to give meaningful consideration and effect to all of the petitioner's mitigating evidence by suggesting that the jurors may not consider mitigating evidence for relevance outside the special issues. *Abdul–Kabir*, 550 U.S. at 261; *Brewer v. Quarterman*, 550 U.S. 281, 291 (2007).

In *Abdul-Kabir*, during the *voir dire*, the prosecutor advised the jurors that they had a duty to answer the special issues based on the facts, and the extent to which such facts objectively supported findings of deliberateness and future dangerousness, rather than their views about what might be an appropriate punishment for this particular defendant. For example, juror Beeson was asked:

> [I]f a person had a bad upbringing, but looking at those special issues, you felt that they [sic] met the standards regarding deliberateness and being a continuing threat to society, could you still vote 'yes,' even though you felt like maybe they'd [sic] had a rough time as a kid? If you felt that the facts brought to you by the prosecution warranted a 'yes' answer, could you put that out of your mind and just go by the facts?

> [T]hat would not keep you from answering 'yes,' just because a person had a poor upbringing, would it?

The prosecutor began his final closing argument with a reminder to the jury that during the *voir dire* they had "promised the State that, if it met its burden of proof," they would answer "yes" to both special issues. The trial judge refused to give any of several instructions requested by [Abdul-Kabir] that would have authorized a negative answer to either of the special issues on the basis of "any evidence which, in [the jury's] opinion, mitigate[d] against the imposition of the Death Penalty, including any aspect of the Defendant's character or record." *Abdul-Kabir*, 550 U.S. at 241–42 (internal citations omitted). Ultimately, the jurors answered both issues in the affirmative, and the defendant was sentenced to death. *Id.* The Supreme Court in its analysis focused on the trial court's failure to give an appropriate instruction directing the jury to fully consider the mitigating evidence, such that a negative answer to the special issues could be

given. The factual circumstance discussed in *Abdul-Kabir* is not the equivalent of what occurred in Howard's trial. Moreover, the *Abdul-Kabir* prosecutor's statements are not at all similar to the statements made by Howard's prosecutor.

In *Brewer*, the prosecutor stressed that the jurors lacked the power to exercise moral judgment in determining Brewer's sentence, admonishing them that "[y]ou don't have the power to say whether [Brewer] lives or dies. You answer the questions according to the evidence, mu[ch] like you did at the guilt or innocence [*sic*]. That's all." *Id*. at 114. Ultimately, the jury answered both special issues in the affirmative, and Brewer was sentenced to death. *Brewer*, 550 U.S. at 291 (internal citation omitted). By comparison, the prosecutor's statement in Howard's trial, however, is not similar at all to the argument presented by the *Brewer* prosecutor. More importantly, the 2001 jury instruction for Issue No. 2 used in Howard's trial directs the Howard jury to consider all the evidence, including the circumstances of the offense, the defendant's character, and background, and the personal moral culpability of the defendant.[32] *See*, *supra*, note 29. In the present case, the prosecutor's statement did not tell the jury that they had to disregard the mitigating evidence or that they were prohibited from answering "yes" to Special Issue No. 2 in order to effectuate a death sentence. The prosecutor's statement did not prevent the jury from giving full effect to Howard's mitigating evidence.

---

[32] Howard's "nexus" argument (Dkt. #76, p. 80) is not applicable in light of the language of the 2001 jury instruction for Issue No. #2, and the absence of any language in the charge, instructions, or verdict form, instructing the jury that they must find a nexus between the mitigating evidence and the crime before considering the mitigating evidence. Although Howard claims the prosecutor's statement raises a "nexus" issue, nothing about the statement prompts the jury that they must find a "nexus" between the mitigating evidence and the crime before they could consider it.

It is well established under Texas law "that proper jury argument must fall within one of the following categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement." *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990). Improper remarks by a prosecutor "are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair." *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008) (quoting *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002)), *cert. denied*, 556 U.S. 1239 (2009). "Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Id.* (quoting *Harris*, 313 F.3d at 245). "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

To prevail on this claim, Howard must show that in the context of the entire trial, there is a reasonable probability that the verdict might have differed absent the alleged misconduct. *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001). Howard's claim is based on the prosecutor's punishment phase closing argument that "Dr. Fason didn't say that this was any way related to someone having schizophrenia." The prosecutor's statement is not a suggestion to the jury to determine if the defense met its "nexus" evidentiary burden and reject Howard's mitigating evidence. Nor does the statement tell the jury that they cannot answer in the

affirmative to Special Issue No. 2. Howard's briefing reads too much into the prosecutor's statement. The prosecutor is permitted to summarize the evidence. If the prosecutor was wrong in his assessment of what the testimony or evidence was, defense counsel is permitted to object. Howard's trial counsel did object, stating: "That's totally improper. Dr. Fason did not say that." (27 R.R. 21).

Even if the statement was improper, the prosecution's argument did not constrict the jury's ability to consider mitigating evidence. The punishment phase charge instructed "[y]our answers must be based exclusively on the law and evidence submitted to you, and your responsibility is to make certain that justice is done in this case." (3 C.R. 375).[33] The jury was further instructed at the guilt/innocence phase that the opening statements and closing arguments of the attorneys "are not evidence" (20 R.R. 8), and "[t]he opening statement is not evidence but is merely an aid to you in generally understanding the nature of the case and the significance of evidence when it is introduced." (20 R.R. 6–7).

The prosecutor's singular statement was an isolated incident which could hardly undermine the fairness of the entire trial. Such a singular statement alone cannot so infect the trial with unfairness "as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *Bradford v. Whitley*, 953 F.2d 1008, 1013 (5th Cir. 1992) (prosecutor's closing argument, in which he allegedly accused defendant of lying, did not so infect trial with

---

[33] Additionally, at the start of guilt/innocence, the trial court instructed the jury: "You have just taken an oath that you will render a verdict *on the evidence* submitted to you under my rulings." (20 R.R. 5) (emphasis added). The trial court explained: "It is your duty to determine the facts and to determine them from the evidence and the reasonable inferences arising from such evidence and in doing so, you must not engage in guesswork or speculation. The evidence which you are to consider consists of the testimony of witnesses and exhibits admitted into evidence." (20 R.R. 7).

unfairness as to violate defendant's due process rights, where prosecutor's comments were neither persistent nor pronounced in context of closing argument as a whole).

Finally, Howard's trial is rendered fundamentally unfair[34] only if, in the context of the entire trial, the remarks by the prosecutor were "crucial, critical, highly significant" factors. *Ortega v. McCotter*, 808 F.2d 406, 411 (5th Cir. 1987). In other words, Howard has the burden of showing that the evidence against him was so insubstantial that, but for the remarks of the prosecution, no conviction would have occurred. *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988). At the sentencing phase, Howard must show that but for the prosecutor's remark, he would have received a sentence of less than death. A defect of constitutional proportions is not to be found except in the most egregious circumstances. *Ortega*, 808 F.2d at 410. In this case, the alleged misconduct complained of by Howard was an isolated statement. There is no reasonable probability that the verdict might have differed absent the misconduct. *Styron*, 262 F.3d at 449.

The Court finds that there was nothing in the prosecutor's remarks to reflect that he was asking the jury to forego its duty and automatically answer the special issues in such a way that Howard would receive the death penalty. Howard has not shown that he is entitled to relief on his prosecutorial misconduct claim.

---

[34]A trial is fundamentally unfair when the prosecutor engages in persistent or pronounced misconduct, or the evidence was so insubstantial that in all probability but for the remarks the jury would not have returned a guilty verdict. *See Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000); *Rushing v. Butler*, 868 F.2d 800, 806 (5th Cir. 1989).

In order to preempt the Director from raising the argument that Howard's fourth claim for relief was barred under *Teague v. Lane*, 489 U.S. 288 (1989), Howard asserted that his conviction was not final for the purposes of *Tennard*. (Dkt. #76, pp. 92–93). Under *Teague*, constitutional rules of criminal procedure announced before a criminal conviction becomes final apply retroactively to that conviction and sentence. Howard's direct appeal became final with the denying of his application for writ of certiorari on February 27, 2006, by the Supreme Court.

Howard states that *Tennard* created a new rule of criminal procedure by unequivocally rejecting the nexus requirement imposed by the lower state and federal courts; and thus, announced a new constitutional rule of criminal procedure. The Court agrees that *Tennard* did reject Texas' and the federal courts' "nexus" test as Texas' former capital sentencing scheme did not provide constitutionally adequate means of presenting mitigating evidence. 542 U.S. at 289. Howard, however, is not raising a "pure" nexus argument but rather is attempting to extend *Tennard* to prosecutorial misconduct claims. *Tennard* did not create a new constitutional rule of criminal procedure regarding prosecutorial misconduct claims. As such, Howard's fourth ground for relief is barred by *Teague.* Moreover, as discussed as above, Howard cannot show that the prosecutor's singular comment had "a substantial or injurious effect on the jury's deliberations." *See Rhoades*, 914 F.3d at 369. Howard's fourth claim for relief is without merit.

**D.** **Howard's Fifth Claim (IATC)**: <u>Assuming the Supreme Court did not announce a new rule in *Tennard v. Dretke*, 542 U.S. 274 (2004), Howard was denied his right to effective assistance of counsel because his attorney failed to object to the prosecutor's nexus argument</u>.

Howard argues that his trial counsel failed to provide effective assistance of counsel because he allegedly failed to raise a *Tennard* objection in response to the prosecutor's closing argument statement and preserve his Eighth Amendment right to have the jury consider his schizophrenia as mitigating in answering Special Issue No. 2. More specifically, Howard contends that his trial counsel failed to properly object to the prosecutor's statement that "Dr. Fason didn't say that this was any way related to someone having schizophrenia." (Dkt. #76, pp. 93–95). The Court notes that Howard's trial counsel did object to the prosecutor's statement, stating: "That's totally improper. Dr. Fason did not say that." (27 R.R. 21). Howard's IATC argument is deficient in many aspects.

First, Howard fails to address whether this claim is exhausted in his briefing. The Director asserts that Howard's fifth claim is unexhausted and defaulted. The Court agrees. Howard failed to raise this IATC claim in state court as required under § 2254(b)(2). If he tried to raise the claim now, the Texas Court of Criminal Appeals would dismiss it as a successive habeas application under Texas Code of Criminal Procedure Article 11.071, Section 5. *Williams*, 602 F.3d at 305–06. Accordingly, this claim is defaulted. *Rocha*, 626 F.3d at 832; *Beazley*, 242 F.3d at 305–06 (noting unexhausted claims are defaulted). As a result, Howard's unexhausted IATC claim is deemed procedurally defaulted in federal court. *O'Sullivan*, 526 U.S. at 848; *Bagwell*, 372 F.3d at 755.

Federal habeas relief on the basis of a procedurally defaulted claim is barred unless the petitioner can demonstrate cause for the default and actual prejudice arising from the default or demonstrate the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Barrientes*, 221 F.3d at 758. Howard makes no attempt to show cause and actual prejudice or a "fundamental miscarriage of justice" that would result from the Court's dismissal of this claim. (*See* Dkt. #76, pp. 93–95). Howard's fifth claim is procedurally defaulted.

Secondly, Howard does not even raise the specter of either *Martinez* or *Trevino* to establish that his post-conviction counsel was ineffective for failing to raise this claim, and thus, have cause to excuse the default. Even if he had addressed *Martinez* and *Trevino* in his briefing, they would be inapplicable to this claim as he has failed to demonstrate that the claim is "substantial." *See Garza*, 738 F.3d at 676 (*Martinez* requires a showing that the defaulted IATC claim is "substantial" and that state habeas counsel was constitutionally ineffective under *Strickland* for not raising it) (citing *Martinez*, 566 U.S. at 14)). Prior to *Martinez*, an attorney's negligence in a post-conviction proceeding could not serve as "cause." *Coleman*, 501 U.S. at 755. *Martinez* and *Trevino* carved out a "narrow" exception to the *Coleman* rule for claims asserting ineffective assistance of trial counsel. *Trevino*, 569 U.S. at 422. Now, a petitioner may meet the cause element by showing (1) "that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding" and (2) "that his [IATC claim] is

substantial—i.e., has some merit." *Garza*, 738 F.3d at 676. Howard does not attempt to satisfy either of these "cause" elements regarding this claim.

Third, Howard also fails to assert that his habeas counsel was "ineffective in failing to present those claims in his first state habeas proceeding" under *Strickland*. *Garza*, 738 F.3d at 676. In the habeas context, allegations of ineffective assistance are reviewed under the familiar two-prong test established in *Strickland*. To establish deficient performance under *Strickland*, a petitioner must do more than identify issues or claims that habeas counsel did not raise and are now barred. *Strickland* at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way."); *Smith v. Murray*, 477 U.S. at 535 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). Indeed, a state habeas attorney "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal" because "counsel cannot be deficient for failing to press a frivolous point." *Vasquez*, 597 F. App'x at 780 (citing *Smith v. Robbins*, 528 U.S. at 288).

Furthermore, Howard has not shown that he was prejudiced by state habeas counsel's allegedly deficient performance—that is, "that there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application." *Barbee*, 660 F. App'x at 314; *Martinez v. Davis*, 653 F. App'x at 318.

The Director argues and the Court agrees that Howard's fifth claim is meritless. *Tennard* does not purport to establish standards for counsel's representation under *Strickland*. Rather, it addresses the Eighth Amendment requirement that the states give the jury a vehicle for considering and giving effect to constitutionally relevant mitigating evidence, which it defines as evidence the sentencer could reasonably find justifies a sentence less than death. *Id*. at 285. As noted above, none of Howard's mitigating evidence was excluded and the jury received a special mitigation instruction from the court. *See*, *supra*, note 29.

Within the context of *Strickland*'s deficient performance and resultant prejudice requirements, *Strickland*, 466 U.S. at 694, Howard has the "difficult burden of showing a 'reasonable probability' that the jury would not have imposed the death sentence in the absence of errors by counsel." *Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) (citation omitted). Howard failed to show that the trial counsel ignored a meritorious objection. Howard's trial counsel did object to the prosecutor's statement. (27 R.R. 21). While the trial court did not expressly overrule the objection, the trial court did state that "the jury is going to remember the evidence as they have heard it." (27 R.R. 21–22).

Howard's trial counsel did not and *could not* raise an objection to the prosecutor's statement in 2001, based on *Tennard*, as *Tennard* was not decided until 2004. Arguing that trial counsel should have made an objection on the chance that the law might change sometime in the future to benefit his client cannot form the basis for habeas relief. The Fifth Circuit has "repeatedly held that 'there is no general duty on the part of defense counsel to anticipate

changes in the law.'" *Fields*, 565 F.3d at 294. Also, attorneys are not required to be clairvoyant. *Id*. at 294–95 ("Clairvoyance is not a required attribute of effective representation."). This Court refuses to hold trial counsel's performance as deficient for failing to raise an objection for a case law concept that did not exist at the time of Howard's trial.

Moreover, the Fifth Circuit "has made clear that counsel is not required to make futile motions or objections." *Koch*, 907 F.2d at 527 (citing *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) (per curiam)). Any objection based on *Tennard* would certainly have been futile in this instance since the remark was not erroneous under then-existing law. Trial counsel cannot perform deficiently by failing to raise a frivolous or meritless objection. *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998). Accordingly, if any objection by Howard's trial counsel would have been futile, then the failure to object would not fall below the standard in *Strickland* enunciated above.

Howard has not shown that his trial counsel's representation in this matter was deficient or that he was prejudiced by such deficient representation. He failed to satisfy his burden of proving ineffective assistance of counsel as required by *Strickland*. The fifth ground for relief lacks merit and should be denied.

## VII. CONCLUSION

The Court is of the opinion, and so finds, that Howard has not shown that he is entitled to federal habeas corpus relief and his petition should be denied.

# VIII. CERTIFICATE OF APPEALABILITY

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, under 28 U.S.C. § 2253(c)(1), he must first obtain a certificate of appealability ("COA") from a circuit justice or judge. *Id.* Although Howard has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (concluding a district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner need only show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The Supreme Court recently emphasized that the COA inquiry "is not coextensive with merits analysis" and "should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck*, 137 S. Ct. at 773 (quoting *Miller-El*, 537 U.S. at 336). Moreover, "[w]hen the district court denied relief on procedural grounds, the petitioner

seeking a COA must further show that 'jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rhoades*, 852 F.3d at 427 (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012)).

In this case, reasonable jurists could not debate the denial of Howard's § 2254 grounds for relief on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. Accordingly, the Court finds that Howard is not entitled to a certificate of appealability as to his grounds for relief. It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

**SIGNED this 20th day of September, 2019.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE